# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOHN SABAL,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:23-CV-01002-O** |
| | § | |
| **ANTI-DEFAMATION LEAGUE,** | § | |
| | § | |
| *Defendant.* | § | |

## DEFENDANT ANTI-DEFAMATION LEAGUE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

Dated: December 15, 2023

Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102
817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

Nathan Siegel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:    (202) 973-4499
nathansiegel@dwt.com

Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**

1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
Fax:     (212) 489-8340
jessefeitel@dwt.com

*Attorneys for Defendant Anti-Defamation League*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 1

      A.     Plaintiff John Sabal ................................................................................... 1

            1.     Sabal Actively Participates in Our Country's Political Controversies ....... 2

            2.     Sabal Organizes The Patriot Voice's Political Conferences ...................... 3

      B.     Defendant ADL and the Statements At Issue ......................................... 5

            1.     The ADL Backgrounder ................................................................... 6

            2.     ADL Glossary of Extremism Entry ................................................. 6

            3.     ADL's Testimony to the U.S. House Committee on Homeland Security .. 6

            4.     ADL's "Hate in the Lone Star State: Extremism & Antisemitism in Texas" Report ................................................................................................ 7

      C.     This Lawsuit ................................................................................... 8

LEGAL STANDARD ...................................................................................................... 8

ARGUMENT ................................................................................................................... 10

I.     THE COMPLAINT FAILS TO STATE A DEFAMATION CLAIM ........................... 10

      A.     The Challenged Statements Are Non-Actionable Opinions and/or Not Reasonably Capable of the Defamatory Implications Alleged ................................. 10

            1.     The Backgrounder ................................................................... 12

      a.     Sabal Has Been "Known to Peddle Antisemitic Beliefs" ................... 12

      b.     The Alleged Blood Libel Implication .................................................. 14

            2.     The Glossary of Extremism ................................................. 15

            3.     The Congressional Testimony ................................................. 17

            4.     The Lone Star Report ................................................................ 18

      B.     Sabal – A Limited-Purpose Public Figure – Fails To Plausibly Allege Actual Malice ................................................................................................ 19

4859-6560-0151v.3 0116649-000006

1.    Sabal is a Limited-Purpose Public Figure.................................................. 20

2.    The Complaint Does Not Plausibly Plead Actual Malice......................... 22

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR INJURIOUS FALSEHOOD . 24

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Energy Servs., Inc. v. Union Pac. Res. Co.*,
  2001 WL 953736 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) .........................25

*Bentley v. Bunton*,
  94 S.W.3d 561 (Tex. 2002).........................................................................................................11

*Brewer v. Capital Cities/ABC*,
  986 S.W.2d 636 (Tex. App.—Fort Worth 1998, no pet.).........................................................12

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976).......................................................................................................17

*Busch v. Viacom Int.*,
  477 F. Supp. 2d 764 (N.D. Tex. 2007) .......................................................................................9

*Carr v. Brasher*,
  776 S.W.2d 567 (Tex. 1989).......................................................................................................11

*Carter v. Burlington N. Santa Fe LLC*,
  2015 WL 11022766 (N.D. Tex. Oct. 9, 2015) (O'Connor, J.) .........................................10, 11

*Carto v. Buckley*,
  649 F. Supp. 502 (S.D.N.Y. 1986) .............................................................................................12

*Chevalier v. Animal Rehab. Ctr., Inc.*,
  839 F. Supp. 1224 (N.D. Tex. 1993) ..........................................................................................20

*Condit v. Clermont Cty. Review*,
  675 N.E.2d 475 (Ohio App. 1996)..............................................................................................12

*Corrosion Prevention Techs. LLC v. Hatle*,
  2020 WL 6202690 (S.D. Tex. Oct. 22, 2020)...........................................................................24

*Corsi v. Infowars, LLC*,
  No. A-20-CV-298-LY, 2021 WL 2115272 (W.D. Tex. May 25, 2021), *report and recommendation adopted,* 2021 WL 4955914 (W.D. Tex. June 25, 2021), *reconsideration denied,* 2021 WL 8442055 (W.D. Tex. Sept. 16, 2021).........................................................23

*Dallas Morning News, Inc. v. Tatum*,
  554 S.W.3d 614 (Tex. 2018)........................................................................................................11

*Delta Air Lines, Inc. v. Norris*,
  949 S.W.2d 422 (Tex. App.—Waco 1997, writ denied) ..........................................................24

*Dolcefino v. Turner*,
   987 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000) ...............................................................24

*Dorsey v. Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ...............................................................................9

*Double Diamond, Inc. v. Van Tyne*,
   109 S.W.3d 848 (Tex. App.—Dallas 2003, no pet.)...............................................11

*Duffy v. Leading Edge Prod., Inc.*,
   44 F.3d 308 (5th Cir. 1995) .................................................................................23

*Dunlap v. Fort Worth Indep. Sch. Dist.*,
   No. 4:21-CV-00790-O-BP, 2021 WL 6503710 (N.D. Tex. Dec. 15, 2021), *report and recommendation adopted*, 2022 WL 160242 (N.D. Tex. Jan. 18, 2022)...................8

*Edwards v. Schwartz*,
   378 F. Supp. 3d 468 (W.D. Va. 2019) ...............................................................14

*Ganske v. Mensch*,
   480 F. Supp. 3d 542 (S.D.N.Y. 2020)................................................................9

*Gonzalez v. Kay*,
   577 F.3d 600 (5th Cir. 2009) ...............................................................................8

*Hellmuth v. Efficiency Energy, L.L.C.*,
   2016 WL 642352 (S.D. Tex. Feb. 18, 2016) .......................................................25

*Immanuel v. Cable News Network, Inc.*,
   618 F. Supp. 3d 557 (S.D. Tex. 2022) ...................................................... *passim*

*Jorjani v. N.J. Inst. of Tech.*,
   No. 18-CV-11693, 2019 WL 1125594 (D.N.J. Mar. 12, 2019)............................12

*Lewis v. Abramson*,
   No. 22-CV-126-PB, 2023 WL 3322009 (D.N.H. May 9, 2023) ...........................17

*Lilith Fund for Reproductive Equity v. Dickson*,
   662 S.W.3d 355 (Tex. 2023)........................................................................11, 15

*LLC v. Barrie*,
   819 F.3d 170 (5th Cir. 2016) ...............................................................................8

*Miller v. Gizmodo Media Grp., LLC*,
   2019 WL 1790248 (S.D. Fla. Apr. 24, 2019) .......................................................9

*MKC Energy Invs., Inc. v. Sheldon*,
    182 S.W.3d 372 (Tex. App.—Beaumont 2005, no pet.) ......................................................25

*Mohamed v. Ctr. for Security Policy*,
    554 S.W.3d 767 (Tex. App. – Dallas 2018 pet. denied)........................................................21

*Moore & Assocs. v. Metro. Life Ins. Co.*,
    604 S.W.2d 487 (Tex. App.—Dallas 1980, no writ) ......................................................17, 18

*Nat'l Rifle Ass'n of Am. v. Ackerman Mcqueen, Inc.*,
    2021 WL 3618113 (N.D. Tex. Aug. 16, 2021)......................................................................9

*Nat'l Rifle Ass'n of Am. V. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018)...................................................................................16

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) .............................................................................................17

*Parker v. Spotify USA, Inc.*,
    569 F. Supp. 3d 519 (W.D. Tex. 2021).................................................................................11

*Peter Scalamandre & Sons, v. Kaufman*,
    113 F.3d 556 (5th Cir. 1997) ................................................................................................23

*Rehak Creative Servs., Inc. v. Witt*,
    404 S.W.3d 716, 732 (Tex. App.-Houston [14th Dist.] 2013, pet. denied), *disapproved of on
    other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) .............................................9, 24

*Rosana v. Playboy Enters.*,
    580 F.2d 859 (5th Cir. 1978) ................................................................................................22

*Shanks v. AlliedSignal, Inc.*,
    169 F.3d 988 (5th Cir. 1999) ................................................................................................17

*Shaunfield v. Experian Info. Sols., Inc.*,
    991 F. Supp. 2d 786 (N.D. Tex. 2014) .................................................................................23

*Shell Oil Co. v. Writt*,
    464 S.W.3d 650 (Tex. 2015)................................................................................................17

*Simien v. Freeman*,
    2007 WL 9701229 (M.D. La. May 16, 2007).................................................................20, 22

*Teel v. Deloitte & Touche LLP*,
    2015 WL 9478187 (N.D. Tex. Dec. 29, 2015) ......................................................................11

*Trotter v. Jack Anderson Enters., Inc.*,
    818 F.2d 431 (5th Cir. 1987) .....................................................................................19, 20, 21

*Turner v. Wells,*
879 F.3d 1254 (11th Cir. 2018) ...................................................................10, 23

*U.S. ex rel. Lam v. Tenet Healthcare Corp.,*
481 F. Supp. 2d 673 (W.D. Tex. 2006).................................................................10

*United States ex rel. Osheroff v. Humana Inc.,*
776 F.3d 805 (11th Cir. 2015) ...............................................................................10

*Van Duzer v. U.S. Bank Nat. Ass'n,*
995 F. Supp. 2d 673 (S.D. Tex.), *aff'd,* 582 F. App'x 279 (5th Cir. 2014) ............................24

*Vecchio v. Jones,*
2013 WL 3467195 (Tex. App.—Houston [1st Dist.] July 9, 2013, no pet.) ..........................13

*Vice v. Kasprzak,*
318 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)........................................11

*Walker v. Beaumont Indep. Sch. Dist.,*
938 F.3d 724 (5th Cir. 2019) ........................................................................22, 23

*WFAA-TV, Inc. v. McLemore,*
978 S.W.2d 568 (Tex. 1998)........................................................................10, 22

**Statutes**

Article I, § 8 of the Texas Constitution.........................................................................11

**Rules**

Fed. R. Evid. 201(b)(2) .......................................................................................10

Local Rule 7.1(i)(3) ...............................................................................................2

Local Rules 7.1(i) and 7.2(e) ...................................................................................2

Fed. R. Civ. P. 12(b)(6)..........................................................................................9

## PRELIMINARY STATEMENT

Plaintiff John Sabal is an organizer of political events who openly participates in some of our country's most divisive political controversies.  Ostensibly to prove that he is not an antisemite or "extremist", he seeks to divest at least $25 million from this country's oldest organization fighting antisemitism, the Anti-Defamation League ("ADL"), for allegedly falsely claiming that he has publicly disseminated antisemitic and extremist political beliefs.

Sabal's claims suffer from several fundamental deficiencies that require their dismissal. His basic complaints are not about statements of fact, but rather about ADL's opinions about facts - that Sabal "has been known to peddle antisemitic beliefs" and is a political "extremist".  But whether a belief or image discussed at a conference is "antisemitic" or "extreme", or whether an organizer of conferences should be considered responsible for "peddling" information shared by speakers there, is the classic stuff of opinion, which defamation law expressly protects.  Moreover, Sabal's defamation claims are largely premised on alleged implications, and the Complaint fails to meet the demanding standard Texas law requires to state a claim for defamation by implication.

Additionally, Sabal's challenge to ADL's testimony before Congress is barred by the absolute privilege Texas law recognizes for statements made in legislative proceedings.  Finally, Sabal is a limited-purpose public figure by virtue of his active involvement in public political debates, and the Complaint fails to plausibly allege that ADL published these statements with actual malice.  Sabal's tagalong claim for injurious falsehood fails for the same reason as his defamation claim.  For all these reasons, the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.     Plaintiff John Sabal

The Complaint ("Compl.") alleges that Sabal "started his own business, The Patriot Voice, to organize conservative political events that showcase pertinent and dynamic speakers, whose

messages are timely and relevant." Compl. ¶ 5. Those events "feature speakers of every color and creed, including those of the Jewish faith." *Id.* ¶ 7. Mr. Sabal further alleges that he has achieved "success as an organizer of grassroots, conservative Christian festivals." *Id.* ¶ 14.

### 1.    Sabal Actively Participates in Our Country's Political Controversies

As the Complaint makes plain, Sabal has been a vocal participant in public debate about fundamental controversies over our nation's direction, including (but not limited to) the QAnon movement. For example, in 2020 *Business Insider* interviewed Sabal at a campaign rally for former President Trump. It reported that Sabal explained that "Q is everywhere" and that "There's people in your grocery store who follow QAnon. Your next-door neighbor could follow it and never even tell you." Appendix ("App'x")[1] at 003, Eliza Relman, et al., *How the GOP learned to love QAnon*, Business Insider (Oct. 16, 2020). According to the report, Sabal maintained that "When Trump talks at his rallies, he's talking to two different crowds," and that "He's talking to people who are, you know, just regular Trump supporters. And then he's talking to people who follow QAnon." *Id.* at 004.

In a video interview after the election, republished by *Dallas Observer*, Sabal was interviewed wearing a "WWG1WGA" cap, along with his wife Amy, as "leaders in the Patriot world." Sabal directed viewers to his various social media channels at the time – specifically "@QStorm1111 . . .@QAnonJohn17 . . .  @QAnon_John . . . @QAnonJohn". *A QAnon Power Couple Is Behind the For God & Country Patriot Roundup*, Dallas Observer (Apr. 6, 2021), Video at 9:05-10:10.[2] At the same time, Sabal explained that he was "trying to rebrand to the Patriot

---

[1] Pursuant to Local Rules 7.1(i) and 7.2(e), ADL has concurrently filed an Appendix containing all materials that ADL relies on in support of this motion, which includes the URL and full text of all online materials.

[2] Pursuant to Local Rule 7.1(i)(3), ADL has concurrently submitted copies of this video, on a flash drive, to be delivered to the Court and to counsel for Plaintiff. All citations to this material include a time stamp to relevant portion of the video.

Voice" and "I kind of want to transition away from certain words."  *Id.* at 11:01-11:18.  Sabal advocated for multiple political beliefs and theories, such as "John McCain was put to death" (*id.* at 14:04-14:24); that "QAnon [was] 100% coming from the Trump White House" (*id.* at 17:45-18:04) and that Sabal is confident that "the plan is still moving forward" (*id.* at 20:30-20:44).

Multiple media outlets worldwide have similarly reported on Sabal's views, both as Sabal expresses them directly to the press and to his tens of thousands of social media followers.  To note just a few of many examples, news media have discussed his views about the Russian invasion of Ukraine (App'x at 039, Anders Anglesey, *QAnon Followers Celebrate Putin's 'Purge' of Ukraine*, Newsweek (Feb. 22, 2022) ("I don't see this 'invasion' of Ukraine as a 'bad' thing . . . I see it as a clearing out of a very corrupt center of operations for the Cabal.")), Elon Musk's acquisition of Twitter (App'x at 44, Alex Woodward, *QAnon, white nationalists and hate speech: Experts reveal how the floodgates opened on Elon Musk's Twitter*, Independent (Dec. 1, 2022)), the death of Queen Elizabeth (App'x at 050-051, Charles Wade-Palmer, *Crazy claims Queen 'died months ago' and was replaced by a hologram in public*, Daily Star (Sept. 17, 2022)), recalling California Governor Gavin Newsom (App'x at 054, Katie Dowd, *'Are we the sheep?': QAnon believers struggle to process Gavin Newsom recall election in California*, SF Gate (Sept. 14, 2021), and a public spat Sabal had with HBO television host Bill Maher about whether Sabal is antisemitic (App'x at 058-060, Jacob Vaughn, *QAnon John Gets Slammed on Real Time with Bill Maher*, Dallas Observer (Mar. 15, 2022)).

### 2.      Sabal Organizes The Patriot Voice's Political Conferences

As the Complaint alleges, Sabal has attracted even more public attention and comment through the political conferences he has organized under the banner of "The Patriot Voice."  Sabal organized two major political conventions in 2021 featuring politicians and political figures, former military officials, and religious leaders, which Sabal actively promoted.  For example,

before the first conference in 2021 he explained that "I want[] to make CPAC look like a puppy show" (*A QAnon Power Couple*, Video at 23:50-24:03), promoted the featuring of "powerhouse" speakers like retired General Michael Flynn and Sidney Powell (*id.* at 37:04-37:23), and noted that his conference would feature musicians with "Q-themed, Trump themed songs, which are really, really good" (52:10-52:52:31).  Sabal stated that "I'm going to put 'Where we go one, we go all'" in a display on the side of the hotel hosting the Conference (*id.* at 26:59-27:21), and Sabal also stated that "This is going to be the start of The Patriot Voice events. I have a vision and that's bringing patriots from all over the world together" (*id.* at 42:19-42:39).

The Patriot Voice conferences have indeed been the subject of widespread coverage and controversy.  That is the case both with respect to the first conference held in Dallas (App'x at 061, Kevin Krause, *Trump fans find fellowship at 3-day Dallas conference to talk God, country and patriotism*, Dallas Morning News (May 28, 2021); App'x at 066, David Gilbert, *QAnon's Wildest Moments From Their Massively Disturbing Conference*, VICE (May 31, 2021)), and a second conference in Las Vegas (App'x at 081, Anders Anglesey, *Full List of Republican Politicians Attending QAnon Convention in Las Vegas*, Newsweek (Oct. 22, 2021)).  News reports also discussed how a controversy erupted over whether facilities would host the conference after Sabal reportedly made the following post on Telegram:  "As a US Veteran, I have had ENOUGH, and I am officially calling for a TOTAL MILITARY MUTINY from the top ranks, and brass, all the way down to the E1s against this ROGUE ADMINISTRATION."  App'x at 091, David Gilbert, *QAnon's Biggest Conference Is in Complete Shambles Right Now*, VICE (Sept. 1, 2021).

During the Las Vegas conference, the Arizona Mirror reported that "some extremely antisemitic imagery" was presented.  App'x at 094, Jerod Macdonald-Evoy, *GOP legislators spoke at a QAnon convention chock full of conspiracies and hate*, Arizona Mirror (Oct. 28, 2021).

Specifically, the article pointed to several images, including a prominent image of Hitler and a slide with the words "Ritual Child Sacrifice:  Satanic City.":



App'x at 095.  The Arizona Mirror Article also reported that the company responsible for making the video played during the Conference created a video that "superimposed the Star of David among images of the 9/11 attacks" and a Twitter link, dated the same day, to the following image:



*See* App'x at 095; App'x at 097, Tweet by @AZ_RWW.

### B.    Defendant ADL and the Statements At Issue

Defendant ADL is a non-governmental organization.  Compl. ¶ 3.  Founded in 1913, it is

the world's oldest organization dedicated to combatting antisemitism.  The Complaint alleges that three ADL publications and Congressional testimony mentioning Sabal are defamatory.

### 1. The ADL Backgrounder

The first ADL publication at issue is entitled "Backgrounder:  QAnon."  *See* Compl. ¶ 8 n.1; App'x at 097 , "Backgrounder."  The Backgrounder includes two references to Sabal.  The first states that "several aspects of QAnon lore mirror longstanding antisemitic tropes, and multiple QAnon influences, including . . . QAnon John (John Sabal) have been known to peddle antisemitic beliefs."  App'x at 101.  The second states that "[i]n October 2021, several elected officials and candidates spoke at the Patriot Double Down conference hosted in Las Vegas, Nevada by antisemitic QAnon influencer John Sabal (QAnon John)."  App'x at 109.  The words "spoke at the Patriot Double Down conference" contain a link to the Arizona Mirror article discussed above, which included images of Hitler and the Star of David superimposed against a picture of the 9/11 attacks.  *Id.*

### 2. ADL Glossary of Extremism Entry

The second publication is ADL's "Glossary of Extremism and Hate," which "provides an overview of many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies."  *See* Compl. ¶ 10 n.2; App'x at 115, "Glossary Entry."  The Glossary Entry for Plaintiff provides that: "John Sabal, also known as 'QAnon John,' is a QAnon influencer who runs The Patriot Voice website, which he uses to advertise QAnon-related conferences. These conferences, the first of which was held in May 2021, have showcased the mainstreaming of QAnon and other conspiracy theories."  *Id.*

### 3. ADL's Testimony to the U.S. House Committee on Homeland Security

On October 3, 2022, Scott Richman, ADL's Regional Director for New York and New Jersey, provided testimony to the U.S. House of Representatives, House Committee on Homeland Security, during a hearing.  *See* Compl. ¶ 13 n.4; App'x at 116, "Richman Testimony."

During his lengthy testimony, Richman testified that "[i]n 2021, disparate groups of QAnon adherents, election fraud promoters and anti-vaccine activists organized events around the country to promote their causes.  This phenomenon underscores the extent to which the line separating the mainstream from the extreme has blurred, and how mainstream efforts to undermine our democratic institutions are bolstered by extremist and conspiratorial narratives and their supporters."  App'x at 127.  Richman then provided a half-dozen examples, including one mentioning Sabal as the organizer of one conference, among several others, in which one such "narrative" was "popular" among attendees: "That a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed when Donald Trump is reinstated as president (popular at The Patriot Voice: For God and Country conference, organized by QAnon influencer John Sabal, a/k/a 'QAnon John,' and at the We the People Patriots Day event and the OKC Freedom conference)."  *Id.*

### 4.  ADL's "Hate in the Lone Star State: Extremism & Antisemitism in Texas" Report

The final ADL publication at issue is a report entitled "Hate in the Lone Star State: Extremism & Antisemitism in Texas," which "explore[d] a range of extremist groups and movements operating in Texas and highlights the key extremist and antisemitic trends and incidents in the state in 2021 and 2022."  *See* Compl. ¶ 17; App'x at 145, the "Lone Star Report." The Lone Star Report identifies Mr. Sabal once, in connection with the Dallas Conference:

> Over the last few years, Texas has been at the heart of several notable QAnon events and incidents. The state has been home to multiple QAnon-themed conferences, highlighting the mainstreaming of QAnon and other conspiracies among conservative communities and the GOP. The most notable was "For God

& Country: Patriot Roundup," which took place on Memorial Day weekend 2021. Organized by John Sabal, known online as "QAnon John" and "The Patriot Voice," the event featured then-Congressman Louie Gohmert (R-TX), then-Texas GOP chair Allen West, Lt. General Michael Flynn, attorney and conspiracy theorist Sidney Powell and various QAnon influencers. During the event, Michael Flynn seemingly endorsed a Myanmar-style coup in the U.S., although he has since backtracked on his remarks.

App'x at 153.

### C.    This Lawsuit

The Complaint asserts two claims against ADL: defamation and injurious falsehood.  *See* Compl. ¶¶ 23-34, 35-40.  Both are premised on the same alleged statements and implications.  *Id.* ¶ 37.  The allegations pertinent to each allegedly defamatory statement are addressed below in the context of addressing each of the four ADL publications at issue.

## LEGAL STANDARD

"When considering a Rule 12(b)(6) motion, courts must 'take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff ... and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'"  *Dunlap v. Fort Worth Indep. Sch. Dist.*, 2021 WL 6503710, at *2 (N.D. Tex. Dec. 15, 2021), *report and recommendation adopted*, 2022 WL 160242 (N.D. Tex. Jan. 18, 2022) (quoting *Yumilicious Franchise, LLC v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  If the plaintiff's allegations "do not permit the Court to infer more than the mere possibility of misconduct," then the plaintiff fails to meet its burden and the complaint should be dismissed.  *Id.*  And, "[g]enerally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments," but courts are "permitted, however, to rely on documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations and quotation marks omitted).

Here, four ADL publications and a U.S. House document form the basis of Sabal's Complaint.  When evaluating a Rule 12(b)(6) motion, courts appropriately review the allegedly defamatory publications the complaint references when the defendant provides them with a motion to dismiss.  *See Nat'l Rifle Ass'n of Am. v. Ackerman Mcqueen, Inc.*, 2021 WL 3618113, at *7 n.6 (N.D. Tex. Aug. 16, 2021) (letter containing allegedly defamatory statements was central to plaintiff's claims and part of the pleadings even where it was not attached to the complaint); *Busch v. Viacom Int.*, 477 F. Supp. 2d 764, 775 n.6 (N.D. Tex. 2007) (considering DVD of a television program attached by the defendants in evaluating motion to dismiss defamation claim). Furthermore, where the defendant's publication includes hyperlinks to other source materials, those materials are likewise appropriately considered in evaluating a motion to dismiss, particularly for purposes of assessing sources that are disclosed to support an opinion or privilege. *See, e.g.*, *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("the linked documents are part of the context that must be taken into consideration when assessing what the website actually conveyed about Rehak"), *disapproved of on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 555 (S.D.N.Y. 2020) (challenged statement claiming that the plaintiff "clearly personally spread Russian bots on [his] own site" was not actionable because the "Defendant both referenced and hyperlinked to the data on which her opinion . . .  was grounded").  *Miller v. Gizmodo Media Grp., LLC*, 2019 WL 1790248, at *2 n.1 (S.D. Fla. Apr. 24, 2019) (considering a document "link[ed] to" in challenged article in evaluating motion to dismiss defamation claim).

9

Finally, when evaluating a defamation plaintiff's status as a public figure, courts may consider news reporting and other publicly-available materials, "from sources whose accuracy cannot reasonably be questioned," not for the truth of the statements therein – but merely for the fact of their publication.  Fed. R. Evid. 201(b)(2).  *See U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles").[3]

## ARGUMENT

## I.   THE COMPLAINT FAILS TO STATE A DEFAMATION CLAIM

Under Texas law,  "[t]o maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was . . . a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).  A "statement" means "a non-privileged statement of fact (as opposed to opinion)."  *Carter v. Burlington N. Santa Fe LLC*, 2015 WL 11022766, at *9 (N.D. Tex. Oct. 9, 2015) (O'Connor, J.) (citation omitted).

### A.   The Challenged Statements Are Non-Actionable Opinions and/or Not Reasonably Capable of the Defamatory Implications Alleged

Defamation claims, particularly those that arise from the context of harsh political debate, often present two threshold questions of law.  First, in every defamation case, "[w]hether a publication is capable of the defamatory meaning alleged by the plaintiff is a question of law to be

---

[3] *See also, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1272 n.5 (11th Cir. 2018) (in evaluating motion to dismiss defamation claim, "[i]n determining [the plaintiff's] public figure status, we take judicial notice of the existence of videos produced or articles written about [the plaintiff] that were filed by the Defendants. We do not, however, consider them for the truth of the matters they assert"); *cf. United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) (courts may "take judicial notice of . . .  newspaper articles . . . for the limited purpose of determining which statements the documents contain").

determined by the court." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.). *See also Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 529 (W.D. Tex. 2021). Moreover, many of the alleged defamatory meanings here assert claims for defamation by implication. Texas law holds that "[f]or a court to subject a publisher to liability for defamation by implication, the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 633 (Tex. 2018). Specifically, in addition to the analysis that applies in every defamation case, a plaintiff must also "point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Id.* at 635 (citation omitted).

Second, the Texas Supreme Court has long held that pursuant to both Article I, section 8 of the Texas Constitution and the First Amendment, "[a]ny limitation that defamation law places on free speech, however, may not muzzle a speaker from asserting an opinion in an ongoing debate . . ." *Lilith Fund for Reproductive Equity v. Dickson*, 662 S.W.3d 355, 362 (Tex. 2023). *See also Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989). Accordingly, "[t]o be actionable, a statement must be a factual assertion; expressions of opinion are not actionable." *Teel v. Deloitte & Touche LLP*, 2015 WL 9478187, at *4 (N.D. Tex. Dec. 29, 2015). Specifically, "a statement must assert an objectively verifiable fact rather than an opinion." *Carter*, 2015 WL 11022766, at *9.

"Whether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law." *Lilith Fund*, 662 S.W.2d at 363. When evaluating this question, courts must "focus[] the analysis on a statement's verifiability and the entire context in which it was made." *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002); *see also Vice v. Kasprzak*, 318 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion

focuses on the statement's verifiability and the entire context in which it was made."). When facts are disclosed to support the statement at issue, that too shows that it is a non-actionable opinion. *Brewer v. Capital Cities/ABC*, 986 S.W.2d 636, 643 (Tex. App.—Fort Worth 1998, no pet.).

Applying these criteria to each ADL publication at issue, none of the statements or alleged implications challenged by Sabal are actionable.

### 1.    The Backgrounder

The Complaint alleges that the Backgrounder is defamatory in two respects, each addressed below. Both fail as a matter of law.

### a.    Sabal Has Been "Known to Peddle Antisemitic Beliefs"

First, Sabal's Complaint alleges that the statement that he (and others) "have been known to peddle antisemitic beliefs'" is defamatory. Compl. ¶ 8; App'x at 101-02. This statement is classic, nonactionable opinion. Whether a particular belief is antisemitic is inherently subjective and cannot be proven true or false. Nor is it objectively verifiable whether beliefs are "peddled." Courts routinely dismiss defamation claims based on similar, or sometimes identical, language. *See, e.g., Condit v. Clermont Cty. Review*, 675 N.E.2d 475, 478 (Ohio App. 1996) ("Numerous courts have concluded that allegations of fascism, anti-Semitism, or other accusations of ethnic bigotry are not actionable as defamation.") (collecting cases); *see also Carto v. Buckley*, 649 F. Supp. 502, 508 (S.D.N.Y. 1986) (statement describing the defendant's "racial and religious bigotry" not actionable as "imprecise concepts which cannot be proven true or false as statements of fact," because "[t]here is no one opinion of what constitutes 'racial and religious bigotry,' or for that matter what constitutes 'bigotry' generally"). ADL's description of Sabal is analogous to the challenged statements in *Jorjani v. N.J. Inst. of Tech.*, where the defendant published statements allegedly "stat[ing] or impl[ying] Plaintiff 'peddled pseudo-science and racism'" and "peddled 'racial theories equivalent to those underlying slavery, Jim Crow laws and the Holocaust.'" 2019

WL 1125594, at *6 (D.N.J. Mar. 12, 2019).  The court there granted the defendant's motion to dismiss, holding that "[t]hese statements and implications are unverifiable opinion, and thus cannot result in defamation liability" because "[a]s the current dispute demonstrates, what constitutes racism, pseudo-science, and discredited ideas is subject to intense debate and incapable of objective verification."  *Id.*

The "peddled" statement is also a nonactionable opinion because it is supported by facts disclosed by the Backgrounder.  Sabal is one of four individuals the Backgrounder states "have been known to peddle antisemitic beliefs."  App'x at 101-02.  Subsequently, the Backgrounder discusses almost all those individuals separately and in more detail, and links to specific examples. App'x at 104-05.

In Sabal's case, the Backgrounder notes that he hosted the Las Vegas Conference and links to the Arizona Mirror article that is filled with screenshots of what that article characterizes as "extremely antisemitic imagery" shown to presenters at the conference.  App'x at 094.  Whether those images are antisemitic or reflect antisemitic beliefs, or whether the organizer of a conference in which they appeared should be considered responsible for "peddling" those beliefs, are inherently matters of opinion that are not objectively verifiable.  *Vecchio v. Jones*, 2013 WL 3467195, at *7 (Tex. App.—Houston [1st Dist.] July 9, 2013, no pet.) (that a statement in non-verifiable "is particularly so when the facts underlying an opinion are set out in the publication itself, thereby allowing the listener to evaluate the facts and either accept or reject the opinion.").

Finally, the allegations of Sabal's Complaint itself reinforce the conclusion that all the statements Sabal challenges are nonactionable opinions.  The Complaint alleges that ADL "has devolved into a rabidly partisan pressure group, abusing its platform and reputation as an 'anti-hate' group to bully and deplatform those that do not share its Leftist ideology. It has now turned

its partisan ire on John Sabal . . ." Compl. ¶ 1.  While ADL certainly disagrees, it does not question

Sabal's right to express his derogatory opinions about ADL.  But the very allegation that the

statements stem from ADL's "partisan ire" further shows they are nonactionable opinion.

*Edwards v. Schwartz*, 378 F. Supp. 3d 468, 510 (W.D. Va. 2019) (statements by "opposing

partisans in a heated and emotional public health debate" favor a finding they are nonactionable

opinion).  Indeed, the debate over what should, and should not be, considered "antisemitism" might

be one of the most heated public controversies of the moment.  For all these reasons, this statement

is nonactionable opinion.

### b.        The Alleged Blood Libel Implication

The Complaint also alleges that the Backgrounder falsely implies that Sabal "espouses"

the "antisemitic trope of blood libel."  Compl. ¶ 8.  This is an allegation of defamation by

implication, and it fails for two reasons.

First, the Backgrounder does not reasonably imply that Sabal, nor any of the other persons

mentioned in the same paragraph, "espouses the belief" that "Jews murder Christian children for

ritualistic purposes."  *Id.*.  Rather, the Backgrounder explains in multiple places that one belief that

many QAnon adherents hold in common is that there is "a cabal of Satan-worshipping pedophiles

who control the world and run a global child sex trafficking ring, murdering children in ritual

Satanic sacrifices in order to harvest a supposedly life-extending chemical from their blood known

as adrenachrome."  App'x at 099.  The Backgrounder never asserts that QAnon's theory is that the

"cabal" is Jewish, nor that its child victims are specifically Christian.  Indeed, the roughly half-

dozen references in the Backgrounder to the specifics of that theory never mention Judaism or

Christianity at all.  To the contrary, the Backgrounder specifically identifies key alleged members

of the "cabal" who are not Jewish, like Hilary Clinton, John Podesta, and Barack Obama.  App'x

at 100-01.  This reason alone is sufficient to require dismissal.

Second, the Background does not affirmatively endorse Sabal's alleged implication. Rather, the Backgrounder expresses the opinion that the current QAnon "cabal" belief and several others that are not about Jews, have "roots in", or "play into", other ancient antisemitic tropes that incorporate some of the same elements, such as ritualistic child murder.   App'x at 099, 102. Whether a contemporary belief does or does not have "roots in", or carries "undertones" of, some other ancient, preexisting belief, or whether espousing the contemporary belief "plays into" any prejudices associated with the ancient belief, are inherently matters of opinion that are impossible to verify.

The Backgrounder discloses facts about both the current QAnon "cabal" belief (and several others), and the ancient blood libel one (and several others).   Specifically, it links to another ADL publication that explains the ancient blood libel trope.  App'x at 102.  That publication says nothing about QAnon, Donald Trump, Satanic pedophiles or sex-trafficking rings.  So any reader can judge for themselves whether the cabal theory does or does not have any roots in any ancient tropes. App'x at 165, Anti-Defamation League, *Blood Libel: A False, Incendiary Claim Against Jews* (Sept. 1, 2016).   Thus, even if the Backgrounder could somehow convey some defamatory implication, any such implication would be a matter of opinion.  *See Lilith Fund*, 662 S.W.3d at 364-69 (affirming dismissal of defamation claim where one alleged theory was not reasonably capable of the alleged implication, and the other alleged implication was non-actionable opinion).

## 2.    The Glossary of Extremism

The Complaint does not allege there is anything defamatory about the text of the entry on Sabal in ADL's Glossary of Extremism.  Rather, it pleads another attenuated theory of defamation by implication that is two steps removed from the words of the actual Sabal entry.  The Complaint alleges that the Glossary of Extremism is published by ADL's Center on Extremism, and it then links to the general webpage of that Center, which describes its mission:  "We track extremist

trends, ideologies and groups across the ideological spectrum. Our staff of investigators, analysts, researchers and technical experts strategically monitor, expose and disrupt extremist threats." Compl. ¶ 11 n.3.  The Complaint then alleges that by including his name in the Glossary of Extremism, ADL implied that Sabal "is a dangerous, extremist threat and even a criminal . . .". *Id.* ¶ 27; *see also* ¶ 11.  This theory fails for either of two reasons.

First, it fails because the Glossary entry on Sabal implies nothing about him being a criminal or a criminal threat.  Nor does the description of the Glossary itself say anything about criminal culpability or threats: "This database provides an overview of many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies."  There are over a thousand entries in the Glossary, which detail the specifics of the individuals identified, which include individuals accused of criminal conduct, along with politicians, lawyers, and media figures.  The mere inclusion of a person's name in the Glossary does not reasonably imply that they are a criminal or a criminal threat, and there is no affirmative evidence that ADL endorses any inference that Sabal is a criminal.  And any suggestion that every detail about each person or group that has a glossary entry is somehow imputable to all the others would be an absurd construction of the Glossary.  *See* Compl. ¶ 10.  That works both ways.  For example, Sabal's entry discussing QAnon does not reasonably imply that every other person or group in the Glossary has something to do with QAnon.

Moreover, including Sabal in a document about political extremism is not actionable for the additional reason that whether he is an "extremist" or an "extremist threat" is inherently subjective and unverifiable.  *See, e.g.*, *Nat'l Rifle Ass'n of Am. V. Cuomo*, 350 F. Supp. 3d 94, 133 (N.D.N.Y. 2018) (statement describing the National Rifle Association as "an extremist organization" was not capable of being proven true or false and was "clearly an expression of

[the defendant's] opinion"); *Lewis v. Abramson*, 2023 WL 3322009, at *11 (D.N.H. May 9,

2023) (dismissing defamation claim over statements accusing the plaintiffs of being "radical,"

"militant," "dangerous," or "extremists" because "the challenged assertions here are the sort of

'vague, judgement-based terms that admit of numerous interpretations and are not objectively

provable as false'") (citation omitted).[4]

### 3.     The Congressional Testimony

The Complaint alleges that Richman's Congressional testimony falsely implied that Sabal

"promoted the belief that 'a global cabal of pedophiles (including Democrats) who are kidnapping

children for their blood, will be executed when Donald Trump is reinstated as president." Compl.

¶ 27.  It also alleges that Richman "implied that Mr. Sabal was a dangerous, extremist threat"

because the title of his testimony was "Countering Violent Extremism, Terrorism and Antisemitic

Threats [in New Jersey]" (the Complaint omits the "in New Jersey" portion of the title).  *Id.*  ¶ 26.

The Richman Testimony is not actionable for several reasons.  First, Congressional

testimony is subject to an absolute privilege from defamation liability.  *See, e.g.*, *Moore & Assocs.

v. Metro. Life Ins. Co.*, 604 S.W.2d 487, 489 (Tex. App.—Dallas 1980, no writ) (the "[a]bsolute

privilege is limited to communications uttered in executive, legislative, judicial and quasi-judicial

proceedings"); *see also Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999) ("Texas

law regards its privilege for communications made in the context of judicial, quasi-judicial, or

legislative proceedings as a complete immunity from suit, not a mere defense to liability"); *Shell

---

[4] *See also Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976) (the use of the terms "fascist,"
"fellow traveler" and "radical right" "cannot be regarded as having been proved to be statements
of fact, among other reasons, because of the tremendous imprecision of the meaning and usage
of these terms in the realm of political debate," as these "are concepts whose content is so
debatable, loose and varying, that they are insusceptible to proof of truth or falsity."); *Ollman v.
Evans*, 750 F.2d 970, 987 (D.C. Cir. 1984) (statement describing the plaintiff as an "an
outspoken proponent of political Marxism" was "obviously unverifiable" and not actionable).

*Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015) ("statement made during legislative and judicial proceedings" are absolutely privileged). This "rule is based upon the public-policy principle that every citizen should have the unqualified right to appeal to the agencies of his government for redress without the fear of being called to answer in damages for libel[,]" and "the agencies of government, in order to properly perform their functions, should be authorized to call upon any citizen for full disclosure of information without subjecting the citizen to a claim for libel." *Moore & Assocs.*, 604 S.W.2d at 489. Since Sabal admits that Richman's testimony was presented to the U.S. House of Representatives, Compl. ¶ 13, any defamation claim allegedly arising from it must be dismissed.

Second, the single sentence that mentions Sabal within the 25 pages of testimony are not actionable for other reasons as well. That sentence says that the "global cabal of pedophiles" narrative that it describes was "popular" at one of the conferences Sabal organized, as well as a couple of other conferences he did not organize. App'x at 127. Whether or not a belief was "popular" is itself not objectively verifiable, and as previously discussed whether or not the organizer of a conference can be said to have "promoted" or "peddl[ed]" (Compl. ¶ 13) particular views expressed by conference participants is likewise a matter of opinion. As for allegedly being portrayed as a "dangerous, extremist threat", what the testimony specifically states is that the narratives it describes "go well beyond the mainstream into extreme territory", and that generally "conspiracy theories . . . have an unusual power to motivate people to action." App'x at 127. Whether that is so is not specific to Sabal and is plainly a matter of opinion. Moreover, even if those words within the context of Richman's testimony could be construed to imply that Sabal is a "dangerous, extremist threat", that too would be a matter of opinion for all the reasons discussed.

### 4.     The Lone Star Report

The single reference in the Lone Star Report to Sabal states that he organized a "QAnon-

themed" conference, with a link on Sabal's name to the entry about him in the Glossary of Extremism, which says much the same thing.  App'x at 153.  The Complaint alleges that the mere inclusion of his name in this Report implies that Sabal is a "dangerous, antisemitic, extremist threat" because all the other numerous persons or issues discussed in the Report, such as "antisemitic incidents" and "white supremacist propaganda" in Texas are all imputable to him personally.  Compl. ¶¶ 17-19.  According to the Complaint, "Simply put, there is no reason for Mr. Sabal's gratuitous inclusion in this Report or for ADL to include him and republicize his inclusion in its Glossary of Extremism."  *Id.* ¶ 19.

That claim fails for much the same reasons as all the other allegedly defamatory statements. To the extent Sabal alleges that every statement within the Report is imputable to him personally, the Report cannot reasonably be construed to imply that.  Indeed, in describing different examples of "extremist activity", the Introduction specifically distinguishes between a group it identifies as a "white supremacist" group, others who "continue to target the LGBTQ+ community", and "QAnon supporters."  App'x at 145.  And it would be patently absurd to suggest the Report implies that Sabal is a Nation of Islam member or believes in Pan-Africanism, or that those groups sympathize with QAnon, merely because all are discussed in the Report.  *Id.* at 156.

In essence, whether by organizing the Dallas Conference Sabal was engaged in "extremist activity"; including his name in the Lone Star Report was "gratuitous"; and the groups or views discussed in the Report could pose a "threat" to democracy or anything else, are all matters of opinion.  For all these reasons, the Defamation claim should be dismissed.

**B.    Sabal – A Limited-Purpose Public Figure – Fails To Plausibly Allege Actual Malice**

The actual malice standard applies to defamation claims filed by "[l]imited-purpose public figures."  *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987).

While the Complaint may be dismissed without reaching this element of defamation, it provides yet another alternative ground for dismissal.

### 1.      Sabal is a Limited-Purpose Public Figure

"Whether an individual is a public figure is a matter of law for the court to decide." *Id.* Generally, limited public figures are persons who have "thrust[] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," or "voluntarily inject [themselves] or [are] drawn into a particular public controversy." *Id.* (citations omitted).  This Circuit applies a three-part test to determine limited public figure status: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of Its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Id.* at 433-34. Courts have often resolved whether a plaintiff is a limited-purpose public figure on a motion to dismiss.  *See, e.g.*, *Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 566 (S.D. Tex. 2022) (determining the plaintiff was limited-purpose public figure when evaluating motion to dismiss defamation claim); *Chevalier v. Animal Rehab. Ctr., Inc.*, 839 F. Supp. 1224, 1234 (N.D. Tex. 1993) (same); *Simien v. Freeman*, 2007 WL 9701229, at *6 (M.D. La. May 16, 2007) (same).

The Complaint itself makes clear that Sabal meets each of the three requirements.

First, Sabal alleges that he "organizes conservative events [or "political festivals"] that showcase pertinent and dynamic speakers whose messages are timely and relevant."  Compl. ¶¶ 5, 7.  The ADL publications at issue discuss Sabal in the context of "elected officials and political candidates across the United States" appearing at these conferences, views expressed by prominent persons such as General Flynn and Sidney Powell, the broader role of those conferences in contemporary politics, and antisemitic imagery appearing at such conferences.  App'x at 109, 153.

20

The ADL publications also link directly to media reports about issues discussed at those conferences, such as  Arizona's audit of the 2020 election and the origins of the COVID-19 pandemic.  App'x at 094-095.  And the Complaint itself incorporates by reference a similar *Newsweek* report about PayPal canceling its association with Sabal, which notes that Sabal had 69,000 Telegram followers, discusses topics to be covered at the Las Vegas conference, and contains multiple links to other media reports about the same issues.  Compl. ¶ 15 n.5; App'x at 167, Anders Anglesey, *PayPal Blocks QAnon Group Patriot Voice Ahead of Las Vegas Convention*, Newsweek (Oct. 6, 2021).

Applying the three-part *Trotter* test, the controversies at issue here are all public, as people are "discussing" them.  The political and social issues they touch on are the kind that "people other than the immediate participants in the controversy are likely to feel the impact of [their] resolution." *Mohamed v. Ctr. for Security Policy*, 554 S.W.3d 767, 774 (Tex. App. – Dallas 2018 pet. denied).  Indeed, the described  point of Sabal's political activities is to showcase "timely and relevant" topics and high-profile speakers.  *See also, e.g.*, *Immanuel*, 618 F. Supp. 3d at 566 (doctor who "weighed in on controversial issues of public concern—how to medically treat COVID" was a limited-purpose public figure).

Second, the Complaint establishes on its face that Sabal's involvement in these controversies was more than trivial or tangential.  He acknowledges that through his organization, The Patriot Voice, he created events where these topics were discussed and widely reported on. *See* Compl. ¶ 15 n.5 (citing a news article reporting that after PayPal cancelled its services "Sabal shared a grab of the cancelation message with his 69,000 Telegram followers on Tuesday"); App'x at 167.  And even if that were not so, this Court can take judicial notice of numerous news articles (*see supra* 9-10) that demonstrate, regardless of the truth of their underlying content, that Sabal

21

and the conferences he organizes have been widely covered in the media.  It does not matter whether one thinks those reports are fair or unfair to Sabal, or good or bad journalism.  Their relevance is that they help demonstrate that Sabal and his political activities are widely covered. "[W]hen determining whether a plaintiff is a 'limited public figure,' it is appropriate for the court to consider past media reports of the plaintiff vis a vis the relevant controversy."  *Simien*, 2007 WL 9701229 at *6 (citing *Rosana v. Playboy Enters.*, 580 F.2d 859, 861 (5th Cir. 1978)).

And third, each of the statements challenged in the Complaint are germane to Sabal's involvement, because they all relate to the above controversies.  *See, e.g.*, *WFAA-TV*, 978 S.W.2d at 573 (third element satisfied where the "defamatory comments are indeed germane to [the plaintiff's] participation in the controversy").  In sum, because Sabal "chose to participate in activities that were bound to invite attention and comment, [he] is a limited purpose public figure" subject to the actual malice requirement.  *Immanuel*, 618 F. Supp. 3d at 566.

## 2.     The Complaint Does Not Plausibly Plead Actual Malice

As a limited public figure, to plausibly "plead defamation, [Sabal] must allege clear and specific evidence of actual malice."  *Id.* (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744 (5th Cir. 2019)).  Actual malice "means that the statement was made with knowledge of its falsity or with reckless disregard for its truth.  *Beaumont Ind. School Dist.*, 938 F.3d at 744.  It requires the plaintiff to show that the defendant "published the false statements about [him] knowing the statements were false or with reckless disregard of whether they were false".  Importantly, actual malice is a subjective standard.  *Rosanova*, 580 F.2d at 862.  Thus, "[t]o establish reckless disregard, the publisher must have "entertained serious doubts as to the truth of his publication."  *Beaumont Ind. School Dist.*, 938 F.3d at 744 (quotation and citation omitted). "This is a higher standard than common law malice; only clear and convincing proof will support recovery. . . . Negligence, lack of investigation, or failure to act as a reasonably prudent person are

22

insufficient to show actual malice." *Duffy v. Leading Edge Prod., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) (citation omitted).  "Proving actual malice is a heavy burden[,]" and "[p]roof that a defendant spoke out of dislike, or with ill will towards another, also does not automatically meet the test of actual malice, even if his statements are shown to be false." *Peter Scalamandre & Sons, v. Kaufman,* 113 F.3d 556, 560-61 (5th Cir. 1997).  Courts regularly dismiss defamation claims for failure to plausibly plead actual malice.  *See, e.g.*, *Beaumont Ind. School Dist.*, 938 F.3d at 749; *Immanuel*, 618 F. Supp. 3d at 566-67; *Corsi v. Infowars, LLC*, 2021 WL 2115272, at *6 (W.D. Tex. May 25, 2021), *report and recommendation adopted,* 2021 WL 4955914 (W.D. Tex. June 25, 2021), *reconsideration denied,* 2021 WL 8442055 (W.D. Tex. Sept. 16, 2021).

Sabal fails to allege any facts that could demonstrate actual malice – i.e., that ADL believed Sabal is not responsible for disseminating antisemitic and extremist beliefs, but went ahead and published that anyway.  Instead, Sabal largely parrots the legal standard, claiming that "Defendant published its defamatory statements knowing that they were false or with reckless disregard for the truth".  Compl. ¶ 28.  These conclusory allegations fall short, because the Complaint "still fails to allege or assert any facts raising a reasonable inference that [ADL] knew such information was false, or that it entertained serious doubts about its truth or falsity."  *Shaunfield v. Experian Info. Sols., Inc.*, 991 F. Supp. 2d 786, 807 (N.D. Tex. 2014); *see also Turner*, 879 F.3d at 1273 (the "complaint alleges malice, but most of his allegations are set forth in a conclusory manner. . . . Those portions of the complaint do not allege sufficient relevant facts to support a claim of actual malice.").

Aside from these conclusory allegations, Sabal appears to allege that ADL exhibited "malice" in the sense of ill will by allegedly convincing PayPal to cancel its payment processing services with him.  Compl. ¶ 15.  As previously noted, that does not assert actual malice.  Finally,

23

Sabal appears to claim that ADL acted with actual malice because it does not share Sabal's political views. *See* Compl. ¶ 1. But this claim also cannot overcome a motion to dismiss, because "[p]olitical bias does not equate to evidence of actual malice in statements made about a limited purpose public figure." *Immanuel*, 618 F. Supp. 3d at 566-67; *see also Dolcefino v. Turner*, 987 S.W.2d 100, 119 (Tex. App.—Houston [14th Dist.] 1998) ("strong political bias against [the defendant] . . . amounts to no evidence of actual malice, let alone clear and convincing evidence. Political motivation does not equate with knowing or reckless falsity"), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000). For this reason as well, the defamation claims should therefore be dismissed.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR INJURIOUS FALSEHOOD

In order to prevail on a claim for injurious falsehood, "a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Corrosion Prevention Techs. LLC v. Hatle*, 2020 WL 6202690, at *5 (S.D. Tex. Oct. 22, 2020) (citation omitted). "An action for injurious falsehood or business disparagement is similar in many respects to an action for defamation" and "[m]ore stringent requirements have always been imposed on the plaintiff seeking to recover for injurious falsehood . . . " *Van Duzer v. U.S. Bank Nat. Ass'n*, 995 F. Supp. 2d 673, 694 (S.D. Tex.), *aff'd*, 582 F. App'x 279 (5th Cir. 2014).

A claim for injurious falsehood fails if the plaintiff cannot establish, at a minimum, that the underlying statement is defamatory. *See, e.g.*, *Rehak*, 404 S.W.3d at 728 ("The words at issue must be defamatory to be actionable as business disparagement."); *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, writ denied) ("Non-defamatory statements will not support a claim for business disparagement"). A plaintiff may not re-purpose a failed defamation claim as a different tort, and courts routinely dismiss as duplicative injurious falsehood claims

24

challenging the same conduct at issue in a defamation claim.  *See, e.g.*, *Am. Energy Servs., Inc. v. Union Pac. Res. Co.*, 2001 WL 953736, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) ("Because we have heretofore held that statements directly attributable to UPRC were not defamatory . . . we find no merit to AES's claim of business disparagement."); *Hellmuth v. Efficiency Energy, L.L.C.*, 2016 WL 642352, at *4 (S.D. Tex. Feb. 18, 2016) ("The court finds that Defendants' business disparagement and defamation counterclaims fail as a matter of law because the statements at issue in those counterclaims cannot be objectively verified").[5]  Aside from the statements he challenges in his defamation claim, Sabal fails to plead any independent basis for his injurious falsehood claim.  *See* Compl. ¶ 37 (challenging the "Defendant's false statements, including accusing Mr. Sabal of being antisemitic").  It must therefore be dismissed for the same reasons as his defamation claim.

## CONCLUSION

For all of the foregoing reasons, ADL respectfully requests that this Court grant its motion and dismiss the Complaint with prejudice.

Dated: December 15, 2023

/s/ Robert P. Latham
Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102

---

[5] *Cf. MKC Energy Invs., Inc. v. Sheldon*, 182 S.W.3d 372, 378 (Tex. App.—Beaumont 2005, no pet.) ("As we have found the statements were not defamatory as a matter of law, the trial court properly could have granted summary judgment on MKC's business disparagement cause of action.").

817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

Nathan Siegel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:    (202) 973-4499
nathansiegel@dwt.com

Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
Fax:    (212) 489-8340
jessefeitel@dwt.com

*Attorneys for Defendant Anti-Defamation League*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document has been served on all counsel of record, via the Court's CM/ECF system, in accordance with the Federal Rules of Civil Procedure, on this 15th day of December, 2023.

/s/ Robert P. Latham
Robert P. Latham
