IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

JOHN SABAL,

        *Plaintiff,*

v.

ANTI-DEFAMATION LEAGUE,

        *Defendant.*

Case No. 4:23-cv-01002

**PLAINTIFF JOHN SABAL'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT ANTI-DEFAMATION LEAGUE'S
<u>MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................I

TABLE OF AUTHORITIES ......................................................... II

BACKGROUND ..................................................................... 1

STANDARD OF REVIEW ........................................................ 3

ARGUMENT ........................................................................ 4

I.    Mr. Sabal Sufficiently Pled a Claim for Defamation. ......................... 4

    a.   Defendants' statements about Mr. Sabal were provably false.... 4

    b.   Defendant's statements were *per se* defamatory. ........................ 9

    c.   Defendants acted with a sufficient degree of fault.................... 10

        1.   Mr. Sabal is not a limited-purpose public figure............. 10

        2.   Defendant acted negligently........................................... 14

        3.   Regardless, Defendant acted with actual malice. .......... 15

    d.   Mr. Sabal was damaged as a result of the Defendant's actions. 17

II.    Mr. Sabal Also Properly Pleaded a Claim for Injurious Falsehood. 17

CONCLUSION.......................................................................... 18

CERTIFICATE OF SERVICE ................................................... 20

# TABLE OF AUTHORITIES

## Cases

*American Addiction Centers, Inc. v. Nat'l Assoc. of Addiction Treatment Providers*,
   515 F. Supp. 3d 820 (M.D. Tenn. 2021) .................................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................. 4

*Bentley v. Bunton*,
   94 S.W.3d 561 (Tex. 2002) ............................................................ 4, 5, 7, 8, 9, 15

*Butowsky v. Folkenflik*,
   No. 4:18-cv-442, 2019 WL 3712026, *1 (N.D. Tex. Aug. 7, 2019) ................... 12, 13

*Campos v. Alamo Cmty. Coll. Dist.*,
   2005 WL 2402676, *1 (W.D. Tex. Sept. 23, 2005) ............................................... 15

*Cuba v. Pylant*,
   814 F.3d 701 (5th Cir. 2016) ................................................................................. 11

*Forbes v. Granada Biosciences, Inc.*,
   124 S.W.3d 167 (Tex. 2003) .................................................................................. 18

*Fox Entm't Grp. v. Abdel-Hafiz*,
   240 S.W.3d 524 (Tex. App. 2007) ........................................................................... 9

*French v. French*,
   385 S.W.3d 61 (Tex. App. 2012) ........................................................................... 14

*Hancock v. Variyam*,
   400 S.W.3d 59 (Tex. 2013) .................................................................................... 10

*Hawbecker v. Hall*,
   276 F. Supp. 3d 681 (W.D. Tex. 2017) ................................................................. 10

*Klentzman v. Brady*,
   312 S.W.3d 886 (Tex. App. 2009) .................................................................... 11, 13

*Leyendecker & Assocs., Inc. v. Wechter*,
   683 S.W.2d 369 (Tex. 1984) .................................................................................. 17

*Linenweber v. Southwest Airlines Co.*,
   No. 3:20-cv-00408, 2023 WL 6149106 (N.D. Tex. Sept. 19, 2023) ..................... 12

*Lozano v. Baylor Univ.*,
    408 F. Supp. 3d 861 (W.D. Tex. 2019) ...................................................................... 3

*Moreno v. EDCare Mgmt., Inc.*,
    243 F.R.D. 258 (W.D. Tex. 2007) .............................................................................. 3

*Morris v. Blanchette*,
    181 S.W.3d 422 (Tex. App. 2005) .............................................................................. 5

*Parker v. Spotify USA, Inc.*,
    569 F. Supp. 3d 519 (W.D. Tex. 2021) ...................................................................... 4

*Polk Cnty. Publ'g Co. v. Coleman*,
    668 S.W.3d 385 (Tex. App. 2021) ............................................................................ 14

*Richey v. Brookshire Grocery Co.*,
    952 S.W.2d 515 (Tex. 1997) .................................................................................... 15

*Shaunfield v. Experian Information Solutions, Inc.*,
    991 F. Supp. 2d 786 (N.D. Tex. 2014) .................................................................... 16

*Trotter v. Jack Anderson Enterprises, Inc.*,
    818 F.2d 431 (5th Cir. 1987) ................................................................................... 11

*Turner v. KTRK Television, Inc.*,
    38 S.W.3d 103 (Tex. 2000) ................................................................................... 4, 5

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) .............................................................................. 16

*Warren v. Fed. Nat'l Mortgage Assoc.*,
    932 F.3d 378 (5th Cir. 2019) .................................................................................... 4

Put simply, John Sabal's name should never have appeared in Defendant ADL's inflammatory publications. Putting Mr. Sabal on a *de facto* terrorist watch-list, accusing him of espousing vile blood libels against the Jewish people, and repeatedly smearing him as a dangerous threat, was utterly gratuitous and vicious. It was based on nothing. Defendant's motion to dismiss highlights the complete lack of any connection between Mr. Sabal and antisemitic beliefs or statements, or with any violence or threats of violence. Instead, Defendant attempts to deflect from that central issue by claiming that this was merely "opinion" and attempts to muddy the water by associating Mr. Sabal with the nebulous and ill-defined QAnon "construct." And while the extrinsic material that ADL wishes for this Court to consider is improper, it is irrelevant because none of it shows that Mr. Sabal espouses blood libels or is in any way violent or dangerous, as falsely claimed and implied by Defendant.

## BACKGROUND

Mr. Sabal is a disabled veteran who started his own business, organizing and conducting conservative and patriotic events on behalf of all persons who love God and this country. Dkt. No. 1 at ¶ 5. This includes persons of all faiths. *Id.* at ¶ 7. Despite this, and without support, ADL included Mr. Sabal in a part of their website giving a background on "QANON," claiming Mr. Sabal is "known to peddle antisemitic beliefs." *Id.* at ¶ 8. The background continues, falsely implying that Mr. Sabal espouses a blood libel belief that Jews murder Christian children for ritualistic purposes. *Id.* As ADL was well aware, however, Mr. Sabal has never espoused any antisemitic beliefs. *Id.* at ¶ 9.

1

Defendant, however, did not stop its smear campaign against Mr. Sabal. Instead, ADL included Mr. Sabal in its "Glossary of Extremism" along with Islamic terrorists and white supremacists such as David Duke, Dylann Roof, and Patrick Cruscius. *Id.* at ¶ 10. Indeed, the mission of this Glossary is to "monitor, expose and disrupt extremist threats." *Id.* at ¶ 11. Even after Mr. Sabal made a retraction demand to Defendant, it later included Mr. Sabal in a report entitled, "Hate in the Lone Star State: Extremism and Antisemitism in Texas," in September 2023, with a hyperlink to Defendant's Glossary of Extremism entry for Mr. Sabal. *Id.* at ¶ 17. The Report goes into great detail about antisemitic incidents, extremist plots and murders, white supremacist propaganda, and hate crimes in Texas, and makes a gratuitous reference to Mr. Sabal, who had no connection to any of this. *Id.* at ¶¶ 17–20. In the context of such a report, including a gratuitous reference to Mr. Sabal organizing a so-called "QAnon-themed" conference (it was not QAnon-themed, and was not established as such; rather, the theme was "For God and Country"), and linking to the Glossary of Extremism, Defendant created the false implication that Mr. Sabal was a dangerous, and even criminal extremist.

Defendant fabricated these lies because of Mr. Sabal's conservative beliefs. It even appears that Defendant coordinated with PayPal to cancel its payment processing services with Mr. Sabal, which was Mr. Sabal's primary means of selling tickets for his conservative events. *Id.* at ¶ 15. In sum, Defendant defamed Mr. Sabal by stating as fact that: (1) through Defendant's website background on QAnon (the "QAnon Background"), Mr. Sabal peddles antisemitic beliefs and subscribes to the

2

beliefs that Jews murder Christian children for ritualistic purposes; (2) through its Glossary of Extremism (the "Glossary"), Mr. Sabal is an extremist threat in the same way as Islamic terror groups and mass shooters; (3) through its "Hate in the Lone Star State" report (the "Report"), Mr. Sabal is a domestic terrorist and commits hate crimes; and (4) through its Congressional testimony, Mr. Sabal is a domestic terrorist and subscribes to the belief that there is "a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed when Donald Trump is reinstated as president." Further, Defendant appears to have gone above and beyond these lies to harm Mr. Sabal's business by coordinating with PayPal to cancel its services with Mr. Sabal.

Defendant now seeks to avoid liability for its vicious lies and conduct. Accordingly, Mr. Sabal respectfully requests this Court deny Defendant's Motion to Dismiss in its entirety.

## STANDARD OF REVIEW

On a 12(b)(6) motion to dismiss, "the Court may not go outside the pleadings but must accept all well-pleaded facts as true, viewing them most favorably to the plaintiffs." *Moreno v. EDCare Mgmt., Inc.*, 243 F.R.D. 258, 260 (W.D. Tex. 2007). A complaint does not need to include detailed factual allegations; instead, it must provide enough facts that, when presumed true, rise to a right to relief beyond a mere speculative level. *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 878 (W.D. Tex. 2019) (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)). Accordingly, to survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint here exceeds this low bar.

## ARGUMENT

### I.   Mr. Sabal Sufficiently Pled a Claim for Defamation.

Defamation has four elements: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages, unless the statement constitutes defamation per se." *Warren v. Fed. Nat'l Mortgage Assoc.*, 932 F.3d 378, 383 (5th Cir. 2019). Mr. Sabal's Amended Complaint provides sufficient factual contentions to meet each element and alleges verifiably false statements of the Defendant.

#### a.   Defendants' statements about Mr. Sabal were provably false.

To be defamatory, statements must assert an objectively verifiable assertion of fact. *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 529 (W.D. Tex. 2021). As such, a statement is either fact or opinion based on its verifiability and the entire context of the statement. *Id.* Whether a statement is false and defamatory "depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). The same is true when determining whether a publication is actionable. *Id.* While determining whether statements are capable of being actionable is an initial question for the court, if the statements are "of ambiguous or doubtful import, the jury must determine its

meaning." *Turner*, 38 S.W.3d at 114. The determination turns on whether the statement can be objectively verified. *Morris v. Blanchette*, 181 S.W.3d 422, 424 (Tex. App. 2005). Looking at each statement in turn, each is provably false.

First, regarding the QAnon Background, whether a publication is defamatory or opinion, the court is instructed to look at the entirety of the publication, not merely individual statements. *Bentley*, 94 S.W.3d at 579. The Texas Supreme Court came to this holding when determining whether the term "corrupt" could be defamatory, answering in the affirmative because, given the publication's context, a reasonable viewer could view the use of the term "corrupt" as an assertion of fact. *Id.* at 585. Defendant improperly attempts to separate its lies about Mr. Sabal, arguing that they consist of two separate opinions. When considering the QAnon Background in its entirety, however, as required, it is apparent that Defendant was making a factual assertion about Mr. Sabal.

Indeed, Defendant stated in no uncertain terms that Mr. Sabal peddles antisemitic beliefs, and in the next sentence, clarifies that this means peddling the belief of blood libel. Mr. Sabal has never expressed or endorsed anything like this, which makes Defendant's accusations provably false. Defendant gave a specific example of a belief that Mr. Sabal supposedly "peddles," which is something that can be proven or not. No implication is required to make this connection; rather, it is an outright accusation, made without qualifications by the Defendant. At the very least, the defamatory import should be determined by a trier of fact.

Defendant deflects and muddies the water here, claiming that its statements about blood libel cannot be attributed to Mr. Sabal, and is somehow an "opinion" about QAnon. Dkt. No. 21 at 14–15. This argument, however, defies logic. Blood libel is mentioned twice in the QAnon Background. First, it is mentioned in Defendant's section entitled, "Key Points," which simply summarizes the QAnon Background and states that some QAnon followers believe in blood libel. Second, it is mentioned when Defendant clarifies that the "QAnon followers" who believe this include Mr. Sabal. The paragraph reads:

> It is important to note that several aspects of QAnon lore mirror longstanding antisemitic tropes, and multiple QAnon influencers, such as GhostEzra (Robert Smart), IET (Craig Longley), Negative48 (Michael Protzman) and QAnon John (John Sabal), have been known to peddle antisemitic beliefs. The belief that a global "cabal" is involved in rituals of child sacrifice has roots in the antisemitic trope of blood libel, the false theory that Jews murder Christian children for ritualistic purposes.

A reasonable reader could conclude that Defendant mentioned four persons who specifically espouse the antisemitic belief of blood libel. The blood libel accusation was not merely being used as one of many possible examples; rather, Defendant very clearly stated this is a belief that Mr. Sabal "peddles."

Defendant's final argument likewise fails. Defendant argues that because it also mentions persons such as Hillary Clinton, John Podesta, and Barack Obama, and they obviously don't believe in blood libel, then the blood libel accusation cannot be attributed to Mr. Sabal either. Dkt. No. 21 at 14. Defendant, however, only mentioned these people to assert that QAnon has conspiracy theories *about* them, not that these individuals espouse any of the conspiracy theories. This is patently obvious

6

to any reasonable viewer, who can easily separate mentions of these three persons from Defendant's specific accusations about Mr. Sabal.

Second, as for the Glossary, Defendant misconstrues Mr. Sabal's Complaint. Defendant argues this is not defamatory because it includes many persons and a description about one person does not apply to others, and because calling someone an extremist is not defamatory. Dkt. No. 21 at 16–17. The Glossary, however, includes a disclaimer that reads: "This database provides an overview of many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies." Further, the Glossary is part of Defendant's "Center on Extremism," which describes its mission as being to "monitor, expose and disrupt extremist threats." Dkt. No. 1 at ¶ 11.

The Glossary of Extremism indicates, to a reasonable reader, that all persons on this list are similarly dangerous and abhorrent. Thus, the defamatory implication that Mr. Sabal pled is that Defendant wrongly likened him to "murderous Islamic terrorists—such as Nidal Hasan, Khalid Sheikh Mohammad, and ISIS—notable white supremacists—such as David Duke—and racist mass-murderers—such as Dylann Roof (the Charlestown church shooter), Brenton Tarrant (the Christchurch shooter), and Patrick Cruscius (the El Paso Walmart shooter)." *Id.* at ¶ 10. Accordingly, it was defamatory to liken Mr. Sabal to obviously dangerous Islamic terror groups and mass shooters. Further, in the full context of the Glossary, it was certainly defamatory to call Mr. Sabal an extremist because it placed him on a *de facto* terrorism watchlist. *See Bentley*, 94 S.W.3d at 581–82 (holding that, while the

term "corrupt" is normally used as opinion, it can be used as a statement of fact in certain contexts).

Third, regarding the Report, Defendant's sole argument appears to be that most of the article cannot be attributable to Mr. Sabal. Dkt. No. 21 at 19. As discussed, however, the statements about Mr. Sabal are by implication and must be read in context with the Report as a whole. *Bentley*, 94 S.W.3d at 579. Like the Glossary of Extremism, the Report discusses hate crimes and terrorist activities. By including Mr. Sabal, it implies to a reasonable reader that Mr. Sabal is likewise responsible for such activity. The utter lack of any information about Mr. Sabal in the Report, other than the fact that he organized a conference that Defendant falsely calls "QAnon-themed," makes his inclusion in a report about "Hate," "Extremism," and "Violence" all the more gratuitous. Similar to the Glossary, implying that Mr. Sabal is an extremist in this context is defamatory. *See id.* at 581–82.

Fourth and lastly, as for the Congressional Testimony, Defendant first argues this is not actionable because the testimony was privileged. Dkt. No. 21 at 17–18. As the link in Mr. Sabal's Complaint illustrates, however, the testimony was not limited to the halls of congress but was published as a report, with the ADL logo for posting on the internet. Dkt. No. 1 at ¶ 13 n.4. Mr. Sabal brought this lawsuit because of this report, which was not privileged. *See American Addiction Centers, Inc. v. Nat'l Assoc. of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 833 (M.D. Tenn. 2021) (holding that absolute immunity does not apply to republished Congressional testimony).

8

Defendant also argues that its statement was not actionable. Dkt. No. 21 at 18. Defendant, however, began discussing that certain events were promoting certain narratives and then included as a (false) example that Mr. Sabal's events promote the idea "[t]hat a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed when Donald Trump is reinstated as president." Defendant made this accusation in no uncertain terms. Mr. Sabal has never promoted this belief, either for himself or at his events, and therefore is provably false.

While Defendant argues that the defamatory meaning requires an implication and, thus, is held to a higher standard, much of Defendant's statements are direct accusations. For those that do require an implication, it is an implication that a reasonable reader would find. Further, to the extent Defendant argues its speech was an opinion, "an 'opinion' that reasonably implies false and defamatory facts *may* be actionable." *Fox Entm't Grp. v. Abdel-Hafiz,* 240 S.W.3d 524, 560 n.38 (Tex. App. 2007) (emphasis in original). Like in *Bentley*, where the Supreme Court of Texas held that, while the term "corrupt" can be seen as opinion, it can also be used as a statement of fact in context, the same logic applies here. *Bentley*, 94 S.W.3d at 581–82. Accordingly, Defendant's statements are actionable and verifiably false.

### b. Defendant's statements were *per se* defamatory.

Notably, Defendant did not argue at any point in its motion that the statements would not be defamatory *per se*. In Texas, a statement is defamatory *per se* if it is "obviously hurtful to a plaintiff's reputation." *Hancock v. Variyam*, 400

9

S.W.3d 59, 63 (Tex. 2013). This includes statements that injure a person in their "office, profession, or occupation." *Id.* at 64. A further example includes accusing someone of a crime. *Roehrs*, 470 F.3d at 1162; *Hawbecker v. Hall*, 276 F. Supp. 3d 681, 686 (W.D. Tex. 2017). *Per se* defamatory statements are so obviously harmful that general damages are presumed, which "furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective." *Hancock*, 400 S.W.3d at 64.

Defendant accused Mr. Sabal of committing hate crimes, being a domestic terrorist, and espousing abhorrent beliefs. This is, on its face, defamation *per se*. Accusing someone of committing hate crimes and acts of domestic terrorism is obviously harmful to their reputation, just as calling someone "corrupt" in certain contexts can be defamatory *per se*. *Bentley*, 94 S.W.3d at 582. No "extrinsic evidence" or "explanatory evidence" is required to find that these statements are defamatory. *See Tatum*, 554 S.W.3d at 625. These allegations do not have an innocent meaning, nor do they rely on other facts and circumstances. *See id.* at 626. Thus, Mr. Sabal has met his burden in showing that Defendant's lies were defamatory *per se*.

### c. Defendants acted with a sufficient degree of fault.

#### 1. *Mr. Sabal is not a limited-purpose public figure.*

Mr. Sabal is neither a public figure nor a limited-purpose public figure and, therefore, need not prove actual malice by Defendant. Under Texas law, to prove defamation, a plaintiff must show that "[t]he defendant (1) published a statement; (2) that was defamatory concerning the defendant; (3) while acting with actual malice (if

the plaintiff was a public official or figure) or with negligence (if the plaintiff was a private individual) regarding the truth of the statement." *Cuba v. Pylant*, 814 F.3d 701, 713-14 (5th Cir. 2016) (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998)).

"[D]efining a public figure has been likened to trying to nail a jellyfish to the wall." *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433 (5th Cir. 1987). Most Fifth Circuit jurisprudence on public figures dates from the 1970s and 1980s, decades before the advent of social media, and courts have increasingly recognized the limitations of the limited-public figure doctrine.

The Fifth Circuit applies a three-part test to determine whether someone is a limited-purpose public figure: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Trotter*, 818 F.2d at 433–34. "It is not enough that a plaintiff is involved or associated with a matter of public or general interest, no matter how significant or sensational. 'A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention' or is newsworthy." *Klentzman v. Brady*, 312 S.W.3d 886, 904 (Tex. App. 2009) (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167 (1979)) (internal citations omitted).

11

Here, per Defendant's own characterizations of its statements, each relates to QAnon. Dkt. No. 21 at 6–8. Defendant's only argument for its contention that Mr. Sabal is a limited-purpose public figure is simply because he organizes conservative events and has spoken to promote them. *Id.* at 20–22. While the subject of QAnon may be a public controversy—depending upon how you define it and in what context—Mr. Sabal and his events are not QAnon. Rather, the events that Mr. Sabal organizes are events for all persons who love both God and this Country. Dkt. No. 1 at ¶ 5. Certainly, Mr. Sabal welcomes all patriotic Americans to his festivals, even if they hold beliefs different from his own, but the fact that people who identify with QAnon, or various aspects of QAnon may have attended his festivals does not make Mr. Sabal a public figure in an ill-defined public controversy.

Defendant tries to avoid this inconvenient fact by pointing to several media articles that mentioned Mr. Sabal's events. First, while this Court may take judicial notice of the existence of the articles, it cannot accept as true the content of those articles. *See Linenweber v. Southwest Airlines Co.*, No. 3:20-cv-00408, 2023 WL 6149106, at *4 (N.D. Tex. Sept. 19, 2023). Beyond this, merely because some media has covered Mr. Sabal's events, this is inconsequential.

As one district court concluded, a plaintiff was not a limited-purpose public figure, where the plaintiff had only limited communications related to the investigation of a murdered political party staffer. *Butowsky v. Folkenflik*, No. 4:18-cv-442, 2019 WL 3712026, at *18 (N.D. Tex. Aug. 7, 2019). The court explained that even though the plaintiff had appeared on national media outlets, that was

12

"inapposite to the limited-purpose public figure analysis," and the plaintiff had no more than a "tangential role" in the investigative controversy. *Id.*

Comparing the facts of this case with those in *Butowsky*, where the district court determined that the plaintiff's national media appearance and "tangential role" in controversy were not enough to establish limited-purpose public figure status, Mr. Sabal's own "tangential" involvements are even more inapposite. Defendant claims that Mr. Sabal's role in QAnon was more than tangential, simply because others had discussed him in the media, but importantly, not because Mr. Sabal ever sought that attention. *See* Dkt. No. 21 at 21–22. If this Court were to adopt that line of argument, Mr. Sabal would become a limited-public figure based on someone else's repetition of the defamatory claims that undergird this lawsuit. Mr. Sabal no more becomes a limited-public figure by others' false portrayal of him than he does by Defendant's. *See Klentzman*, 312 S.W.3d at 904. Similarly, Defendant's baseless and false assertion in its "Hate in the Lone Star State" report that Mr. Sabal's festival in Texas was a QAnon conference does not make it so, and it does not make Mr. Sabal a public figure.

Mr. Sabal did not attempt to influence any public controversy over QAnon, violent extremism, or antisemitism. *Id.* (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 168 (1979). Mr. Sabal's only goal has been to bring people together through patriotism and God. Dkt. No. 1 at ¶ 5. Thus, Mr. Sabal cannot be a limited-purpose public figure with regard to Defendant's defamatory statements.

13

### 2. *Defendant acted negligently.*

As a private individual, the requisite degree of fault in this case is negligence. This requires a showing that the defendant knew or *should have known* that their statements were false. *French v. French*, 385 S.W.3d 61, 73 (Tex. App. 2012). "Negligent conduct is determined by asking 'whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'" *Polk Cnty. Publ'g Co. v. Coleman*, 668 S.W.3d 385, 398 (Tex. App. 2021) (quoting *Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App. 2003, pet. denied)).

Here, at the very least, Defendant acted negligently when it claimed that Mr. Sabal believes in antisemitic tropes such as blood libel, is an extremist on par with Islamic terror groups and mass shooters, and is a domestic terrorist who commits hate crimes. Notably, at no point in Defendant's motion does it argue that it was not negligent. Instead, Defendant solely focuses on actual malice, which is inapplicable to the facts of this case. This is likely because Defendant is aware it cannot survive a negligence standard. Any person who follows Mr. Sabal or his events knows that he espouses none of these beliefs and is in no way a threat. As the Complaint illustrates, Defendant had no basis for its lies. Dkt. No. 1 at ¶¶ 19, 20. Thus, Defendant should have known that its statements about Mr. Sabal were false. Accordingly, Mr. Sabal has sufficiently pled Defendant's negligence.

### 3.   *Regardless, Defendant acted with actual malice.*

Even if the Court finds that Mr. Sabal was a limited-purpose public figure, Defendant's motion still fails because Mr. Sabal plausibly pleaded that Defendant acted with actual malice. "[A] statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Campos v. Alamo Cmty. Coll. Dist.*, 2005 WL 2402676, at *2 (W.D. Tex. Sept. 23, 2005) (quoting *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997)).

Oftentimes, the only way to prove actual malice is through circumstantial evidence. *Bentley*, 94 S.W.3d at 596. While "lack of care or an injurious motive in making a statement is not alone proof of actual malice," they "are factors to be considered." *Id.*

Mr. Sabal properly showed in his Complaint that Defendant knew its claims about him were false or, at the very least, acted recklessly in making the subject statements. Dkt. No. 1 at ¶ 32. Notably, Mr. Sabal sent Defendant a letter on April 1, 2023, informing Defendant of its falsehoods. *Id.* at ¶ 16. In direct evidence of actual malice, rather than retract its lies, Defendant doubled down on them, publishing the Report in September 2023. *Id.* at ¶ 17.

Defendant's conduct is likewise circumstantial evidence of actual malice. Indeed, Defendant published the lies because of Mr. Sabal's political beliefs. *Id.* at ¶ 14. Defendant even went out of its way to coerce PayPal to cancel its services with Mr. Sabal. *Id.* at ¶ 15. Indeed, Defendant was aware that Mr. Sabal never espoused

any beliefs that would make him "dangerous, an extremist, a racist, an antisemite, a domestic terrorist, or any kind of threat," yet Defendant accused Mr. Sabal of such conduct, nonetheless. *Id.* at ¶¶ 19–20. Importantly, given Defendant's close relationship with law enforcement agencies, Defendant knew that Mr. Sabal was not considered a threat. *Id.* at ¶ 22. Thus, Mr. Sabal has more than satisfied the pleading requirements for actual malice.

Defendant cites two cases for the premise that Mr. Sabal failed to plead actual malice. Neither, however, is persuasive. First, in *Shaunfield v. Experian Information Solutions, Inc.*, this Court found that the plaintiff did not plead actual malice because the plaintiff only pled that the defendant's "actions constituted incompetence, negligence, and malfeasance." 991 F. Supp. 2d 786, 807 (N.D. Tex. 2014) (internal citations omitted). Second, in *Turner v. Wells*, the Eleventh Circuit held that the complaint did not plead malice because the plaintiff only made broad assertions that the defendant deliberately avoided the truth, without factual support. 879 F.3d 1254, 1273 (11th Cir. 2018). Both of these cases are unlike the current one where, as discussed, Mr. Sabal has set forth several factual bases for Defendant's actual malice.

For the reasons discussed, Mr. Sabal is not a limited-purpose public figure by virtue of his *non-existent* participation in QAnon. Yet even if he was, Defendant, maliciously and recklessly, accused Mr. Sabal of being a dangerous extremist and peddler of a grotesque, antisemitic, blood libel.

### d.   Mr. Sabal was damaged as a result of the Defendant's actions.

Because Defendant's lies constituted defamation per se, Mr. Sabal is entitled to damages, and this element has been satisfied. Even if these lies were not defamatory per se, Mr. Sabal's well-pleaded Complaint demonstrates that he was injured. Mr. Sabal properly alleged that because of Defendant's actions, he lost business opportunities, was harassed, and suffered from mental anguish. Dkt. No. 1 at ¶ 31. These facts are all presumed to be true in this motion. Importantly, Defendants do not counter that these injuries occurred in their motion. Further, the comments were defamatory *per se*, something Defendant does not contest, so damages are presumed. *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984). Thus, Mr. Sabal has satisfied the final element of defamation, and Defendants are not entitled to dismissal.

## II.   Mr. Sabal Also Properly Pleaded a Claim for Injurious Falsehood.

Defendant makes two arguments for its contention that Mr. Sabal failed to state a claim for injurious falsehood, both of which fail. First, Defendant argues that because Mr. Sabal failed to state a claim for defamation, his claim for injurious falsehood fails. Dkt. No. 21 at 24–25. As discussed above, however, Mr. Sabal sufficiently pled each element of his defamation claim.

Second, Defendant argues that Mr. Sabal's injurious falsehood claim fails because he did not plead "any independent basis." *Id.* at 25. Again, this is incorrect. Because of Defendant's lies, Mr. Sabal was "forced cancel several planned events." Dkt. No. 1 at ¶ 39. This was independent of his harm from Defendant's defamation.

17

Indeed, Defendant coordinated with PayPal to cancel its services with Mr. Sabal, preventing him from being able to sell tickets to his events. *Id.* at 15.

Mr. Sabal sufficiently pled each of the four elements of his injurious falsehood claim, which are: (1) Defendant published false and disparaging information about him, (2) with malice, (3) without privilege, and (4) that resulted in special damages. *Forbes v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). Here, Mr. Sabal pled, in no uncertain terms, that Defendant's statements were false, but Defendant made them anyway with the intent to harm Mr. Sabal's organizational work, which forced him to cancel several events. Dkt. No. 1 at ¶¶ 37–39. Thus, Mr. Sabal sufficiently pled each element of his injurious falsehood claim, and Defendant has presented no argument to the contrary.

## CONCLUSION

There was simply no excuse for Defendant to drag Mr. Sabal's name through the mud, associating him with terrorists and mass murderers, and attributing vile beliefs to him that he has never expressed or endorsed in any way. Defendant's statements and implications are devastating to Mr. Sabal and his reputation.

Viewing the facts in the Complaint as true and in the light most favorable to Mr. Sabal, as the Court is required to do, and given the unambiguous statements and implications made about Mr. Sabal without any basis, Defendant's motion must be denied. In the alternative, if this Court were to believe that any aspect of Mr. Sabal's claims are lacking, Mr. Sabal would request leave to amend his Complaint to more fully articulate his claims.

18

Dated: January 19, 2024

Respectfully submitted,

*/s/ Jason C. Greaves*
Jason C. Greaves, TBN 24124953
Jared J. Roberts (*pro hac vice*)
Binnall Law Group
717 King Street
Suite 200
Alexandria, VA 22314
(703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jared@binnall.com

Paul M. Davis
Paul M. Davis & Associates PC
9355 John W Elliott Dr
Suite 25454
Frisco, TX 75033
(945) 348-7884
paul@fireduptxlawyer.com

*Attorneys for John Sabal*

19

## CERTIFICATE OF SERVICE

I certify that on January 19, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


*/s/ Jason C. Greaves*
Jason C. Greaves

*Attorney for John Sabal*