IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JOHN SABAL, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-01002-O |
| | § | |
| ANTI-DEFAMATION LEAGUE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss (the "Motion"), Brief in Support, and Appendix (ECF Nos. 20–22), filed December 15, 2024; Plaintiff's Response (ECF No. 26), filed January 19, 2024; and Defendant's Reply (ECF No. 27), filed February 2, 2024. After reviewing the briefing, relevant law, and applicable facts, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion. Accordingly, Defendant's Motion is **GRANTED** only in regard to the defamation claim arising out of Congressional testimony. However, Defendant's Motion is **DENIED** for all other claims of defamation and injurious falsehood.

## I.  BACKGROUND[1]

Plaintiff John Sabal started his own business, The Patriot Voice, to organize conservative political events. The purpose of these events is to showcase "pertinent and dynamic speakers,

---

[1] All undisputed facts pertaining to Defendant's motion are drawn from Plaintiff's Original Complaint, unless otherwise specified. *See* Pl.'s Compl., ECF No. 1. At the 12(b)(6) stage, these facts are taken as true and viewed in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). Plaintiff provides the website links to the four publications identified in his Complaint. Pl.'s Compl. ¶¶ 8 n.1, 10 n.2, 13 n.4, 17, ECF No. 1. Additionally, full copies of these publications are also provided in Defendant's the Appendix to its Motion. Def.'s App. to Mot. to Dismiss 098–114, 115, 116–141, 142–164, ECF No. 22-1. Because these publications are "documents incorporated into the [C]omplaint by reference," the Court may rely on Defendant's copy. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations and internal quotation marks omitted).

whose messages are timely and relevant." These events also "feature speakers of every color and creed, including those of the Jewish faith." Defendant Anti-Defamation League ("ADL") is a non-governmental organization founded in 1913. It is the world's oldest organization dedicated to combatting antisemitism.[2] Sabal contends that ADL defamed him. As a result, Sabal brings claims against ADL for defamation and injurious falsehood. Both claims are premised on the same alleged statements and implications found in three ADL publications and Congressional testimony.

### A. Backgrounder: QAnon

The first ADL publication at issue is entitled, "Backgrounder: QAnon" (the "Backgrounder"). The Backgrounder includes two references to Sabal. The first states that "several aspects of QAnon lore mirror longstanding antisemitic tropes, and multiple QAnon influencers, including . . . QAnon John (John Sabal) have been known to peddle antisemitic beliefs." The second states that "[i]n October 2021, several elected officials and candidates spoke at the Patriot Double Down conference hosted in Las Vegas, Nevada by antisemitic QAnon influencer John Sabal (QAnon John)." The words "spoke at the Patriot Double Down conference" link to an article published by the Arizona Mirror reporting on "some extremely antisemitic imagery," such as visuals of Hitler and the Star of David superimposed against a picture of the 9/11 attacks.

### B. Glossary of Extremism

The second publication is ADL's "Glossary of Extremism and Hate" ("Glossary"), which "provides an overview of many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies." The Glossary entry at issue here provides that "John Sabal, also known as 'QAnon John,' is a QAnon influencer who runs The Patriot Voice website, which he uses to advertise QAnon-related conferences. These

---

[2] Def.'s Br. in Support of Mot. to Dismiss 5–6, ECF No. 20.

conferences, the first of which was held in May 2021, have showcased the mainstreaming of QAnon and other conspiracy theories."

### C.  "Hate in the Lone Star State: Extremism & Antisemitism in Texas" Report

The third ADL publication at issue is the report entitled, "Hate in the Lone Star State: Extremism & Antisemitism in Texas" (the "Lone Star Report"), which "explore[d] a range of extremist groups and movements operating in Texas and highlights the key extremist and antisemitic trends and incidents in the state in 2021 and 2022." The Lone Star Report identifies Sabal in connection with a Dallas conference:

> Over the last few years, Texas has been at the heart of several notable QAnon events and incidents. The state has been home to multiple QAnon-themed conferences, highlighting the mainstreaming of QAnon and other conspiracies among conservative communities and the GOP. The most notable was "For God & Country: Patriot Roundup," which took place on Memorial Day weekend 2021. Organized by John Sabal, known online as "QAnon John" and "The Patriot Voice," the event featured then-Congressman Louie Gohmert (R-TX), then-Texas GOP chair Allen West, Lt. General Michael Flynn, attorney and conspiracy theorist Sidney Powell and various QAnon influencers. During the event, Michael Flynn seemingly endorsed a Myanmar-style coup in the U.S., although he has since backtracked on his remarks.

### D.  Testimony to the U.S. House Committee on Homeland Security

The final ADL publication at issue involves the live testimony of Scott Richman, ADL's Regional Director for New York and New Jersey, before the U.S. House Committee on Homeland Security ("Richman Testimony") on October 3, 2022. Richman testified that "[i]n 2021, disparate groups of QAnon adherents, election fraud promoters and anti-vaccine activists organized events around the country to promote their causes.  This phenomenon underscores the extent to which the line separating the mainstream from the extreme has blurred, and how mainstream efforts to undermine our democratic institutions are bolstered by extremist and conspiratorial narratives and their supporters." Richman then provided multiple examples, including one mentioning Sabal as

3

the organizer of conferences in which one such "narrative" was "popular" among attendees: "That a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed when Donald Trump is reinstated as president (popular at The Patriot Voice: For God and Country conference, organized by QAnon influencer John Sabal, a/k/a 'QAnon John,' and at the We the People Patriots Day event and the OKC Freedom conference)."

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Rule "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy this standard, the defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that allows the court to reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Unlike a "probability requirement," the plausibility standard instead demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*. Where a complaint contains facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

When reviewing a Rule 12(b)(6) motion, courts must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier*, 509 F.3d at 675. However, a court is not bound to accept legal conclusions as true. *Iqbal*, 556 U.S. at 678–79. To avoid dismissal, pleadings must show specific, well-pleaded facts rather than conclusory allegations. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A court ruling on a motion to dismiss "may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott*, 635 F.3d at 763 (citations and internal quotation marks omitted). In defamation suits, courts may review at the Rule 12(b)(6) stage the challenged publications referenced in the complaint. *See, e.g.*, *Nat'l Rifle Ass'n of AM. v. Ackerman Mcqueen, Inc.*, 2021 WL 3618113, at *7 n.6 (N.D. Tex Aug. 16, 2021) (reviewing a letter with allegedly defamatory statements because it was central to the plaintiff's claims and part of the pleadings even where it was not attached to the complaint); *Busch v. Viacom Int.*, 477 F. Supp. 2d 764, 775 n.6 (N.D. Tex. 2007) (reviewing a DVD of a television program attached by the defendants in evaluating the motion to dismiss a defamation claim).

## III.   ANALYSIS

### A.  Count I: Defamation

The Complaint alleges that ADL published four false statements with defamatory impact: (1) "falsely claimed that Mr. Sabal espouses antisemitic beliefs; (2) "falsely implied that Mr. Sabal espoused the belief that Jews murder Christian children for ritualistic purposes;" (3) "falsely implied in Congressional testimony that Mr. Sabal promoted the belief that 'a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed

when Donald Trump is reinstated as President;" and (4) "falsely implied that Mr. Sabal is a dangerous, extremist threat, and even a criminal."[3] ADL characterizes these statements are "non-actionable opinions" that are "largely premised on alleged implications" that lacked defamatory meaning.[4] As a result, ADL argues that Sabal's "Complaint fails to meet the demanding standard Texas law requires to state a claim for defamation by implication."[5]

Under Texas law, the plaintiff must prove four elements to state a defamation cause of action: "'(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages, unless the statement constitutes defamation per se.'" *Warren v. Fed. Nat'l Mortgage Assoc.*, 932 F.3d 378, 383 (5th Cir. 2019) (quoting *Bedford v. Spassoff*, 520 S.W. 3d 901, 904 (Tex. 2017)); *accord WFAA-TV, Inc. v. McLemore*, 978 S.W. 2d 568, 571 (Tex. 1998) (reciting Texas defamation elements).

### 1. Threshold Elements: Publication of a False and Defamatory Statement[6]

Defamation claims, particularly those that arise from the context of harsh political debate, often present two threshold questions captured by the first two elements. First, in every defamation case, "[w]hether a publication is capable of the defamatory meaning alleged by the plaintiff is a question of law to be determined by the court." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.). Alleged defamatory meaning may also occur by implication. *Bentley v. Bunton*, 94 S.W.3d 561, 579, 581–82 (Tex. 2002). Texas law holds that

---

[3] Pl.'s Compl. ¶¶ 24–27, ECF No. 1.
[4] Def.'s Br. in Support of Mot. to Dismiss 1, 11–12, ECF No. 21.
[5] *Id.*
[6] The first two defamation elements—"published statement" and its "defamatory" impact—are addressed simultaneously despite the fact that they are distinct elements. This is consistent with how other courts have analyzed defamation. *E.g.*, *WFAA-TV, Inc.*, 978 S.W. 2d at 571; *Warren*, 932 F.3d at 383. Notably, the parties in this case also intertwine these elements.

"[f]or a court to subject a publisher to liability for defamation by implication, the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 633 (Tex. 2018). Specifically, in addition to the analysis that applies in every defamation case, a plaintiff must also "point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Id.* at 635 (citation omitted).

Second, the Texas Supreme Court has long held that, pursuant to both Article I, section 8 of the Texas Constitution and the First Amendment, "[a]ny limitation that defamation law places on free speech, however, may not muzzle a speaker from asserting an opinion in an ongoing debate." *Lilith Fund for Reproductive Equity v. Dickson*, 662 S.W.3d 355, 362 (Tex. 2023). Accordingly, "[t]o be actionable, a statement must be a factual assertion; expressions of opinion are not actionable." *Teel v. Deloitte & Touche LLP*, No. 3:15-cv-2593-G, 2015 WL 9478187, at *4 (N.D. Tex. Dec. 29, 2015); *see also Carter v. Burlington N. Santa Fe LLC*, No. 4:15-cv-366-O, 2015 WL 11022766, at *9 (N.D. Tex. Oct. 9, 2015) (explaining that an actionable "statement must assert an objectively verifiable fact rather than an opinion"). "Whether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law." *Lilith Fund*, 662 S.W.2d at 363. To evaluate this question, courts "focus[] the analysis on a statement's verifiability and the entire context in which it was made." *Bentley*, 94 S.W.3d at 581; *see also Vice v. Kasprzak*, 318 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion focuses on the statement's verifiability and the entire context in which it was made."). The disclosure of facts to support the statement at issue may show that it is a non-

actionable opinion. *Brewer v. Capital Cities/ABC*, 986 S.W.2d 636, 643 (Tex. App.—Fort Worth 1998, no pet.).

ADL argues that Sabal fails to provide sufficient facts satisfying the first two elements. According to ADL, Sabal's "basic complaints are not about statements of fact, but rather about ADL's opinions about facts."[7] Likewise, ADL contends that "whether a belief or image discussed at a conference is 'antisemitic' or 'extreme', or whether an organizer of conferences should be considered responsible for 'peddling' information shared by speakers there, is the classic stuff of opinion, which defamation law expressly protects."[8] Sabal rejects these characterizations and instead argues that ADL's publications contain verifiable statements capable of being proven false that also carry defamatory impact.[9] The Court addresses each ADL publication in turn.

### a. *Backgrounder*

The Complaint alleges that the Backgrounder is defamatory by falsely stating that Sabal has been "known to peddle antisemitic beliefs, including the "antisemitic trope of blood libel."[10] But according to ADL, "[w]hether a particular belief is antisemitic is inherently subjective and cannot be proven true or false," let alone whether it is "objectively verifiable [if] beliefs are 'peddled.'"[11] The Court disagrees.

From a review of the Backgrounder, the Complaint plausibly contends that a reasonable reader would view the statement "known to peddle antisemitic beliefs" as a factual assertion about Sabal. True, some courts have found calling a person "antisemitic" to be a non-actionable opinion. *See, e.g.*, *Vecchio v. Jones*, No. 01-12-00442-cv. 2013 WL 3467195, at *7 (Tex. App.—Houston

---

[7] Def.'s Br. in Support of Mot. to Dismiss 1, ECF No. 20.
[8] *Id.*
[9] Pl.'s Opp. to Def.'s Mot. to Dismiss 4–5, 9–10, ECF No. 26.
[10] Pl.'s Compl. ¶ 8., ECF No. 1.
[11] Def.'s Br. in Support of Mot. to Dismiss 12, ECF No. 20.

[1st Dist.] 2013, no. pet) (finding a statement non-verifiable "when the facts underlying an opinion are set out in the publication itself, thereby allowing the listener to evaluate the facts and either accept or reject the opinion"). However, Texas law makes clear that this determination depends on context, which may reveal that an opinion instead functions as a factual assertion. *Bentley*, 94 S.W.3d at 582, 585 (holding that calling someone "corrupt" was actionable defamation based on the challenged publication's context because a reasonable reader could view the statement as an assertion of fact). Taking as true the allegations that Sabal has never expressed or endorsed antisemitic views,[12] ADL's statements seem possible to verify: either Sabal has made such statements or he has not, making ADL's assertions capable of being proven false.

To accept Defendant's argument that a reasonable viewer would not attribute the blood libel conspiracy to Sabal would require the Court to ignore illustrative context in the Backgrounder.[13] Contextual clues plausibly suggest to a reasonable reader that Sabal factually believes and endorses this antisemitic belief. For instance, the Backgrounder's description of the blood libel conspiracy immediately follows the explicit mention of four "QAnon influencers" by name.[14] One of those names is Sabal.[15] ADL identifies these influencers as those who are "known to peddle antisemitic beliefs."[16] The textual proximity of the blood libel theory appears to function as an example of one such antisemitic belief. A reasonable reader could conclude that ADL mentioned Sabal and the other three names to provide examples of people who espouse the specific antisemitic belief of blood libel.

---

[12] Pl.'s Compl. ¶ 9, 13, 19, ECF No. 1.
[13] Def.'s Br. in Support of Mot. to Dismiss 14–15, ECF No. 21.
[14] Pl.'s Opp. to Def.'s Mot. to Dismiss 6, ECF No. 26.
[15] *Id.*
[16] *Id.*

In an effort to argue that naming a specific person does not factually convey that the person promotes the blood libel conspiracy, ADL highlights other individual references to Hillary Clinton, John Podesta, and Barack Obama.[17] But once again, contextual clues are instructive. Unlike the apparent attribution of blood libel to Sabal, the reference to Clinton, Podesta, and Obama seems to function as an example of a QAnon conspiracy theories *about* them—not that these individuals espouse antisemitic conspiracy theories. Not only is it entirely plausible that a reasonable reader would differentiate these references based on the publication's full context, but such a reader would also understand this context as revealing when the Backgrounder attempts to convey factual assertions about who is peddling theories versus being the target of them.

The Complaint also plausibly shows that ADL's statements in the Backgrounder carry defamatory impact. In Texas, a statement is defamatory if it is "obviously hurtful to a plaintiff's reputation." *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). This includes statements that injure a person in their "office, profession, or occupation." *Id.* at 64. A further example includes accusing someone of a crime. *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1162 (5th Cir. 2006). ADL's accusation that Sabal espouses abhorrent beliefs is plausibly harmful to his reputation and occupation—just like calling someone "corrupt" in certain contexts carries the same potential harm, *Bentley*, 94 S.W.3d at 582—because such allegations do not carry "innocent" meaning. *Tatum*, 554 S.W.3d at 626. Sabal alleges as much in his Complaint by stating that ADL's false statements "tended to injure Mr. Sabal in his trade, businesses, or profession by accusing [him] of having racial and ethnic intolerance."[18]

Viewing the entire context—and not merely the individual statements—the Backgrounder implies "materially true facts from which a defamatory inference can reasonably be drawn." *Id.* at

---

[17] Def.'s Br. in Support of Mot. to Dismiss 14, ECF No. 21.
[18] Pl.'s Compl. ¶ 30, ECF No. 1.

635 (citation omitted). Such context makes a sufficiently "'rigorous showing'" of defamatory meaning at this stage. *Id.* at 633 (citation omitted). Therefore, assuming the veracity of the Complaint's allegations, the Court determines that Sabal sufficiently pleads that the Backgrounder's published statements are provably false and carry defamatory impact.

### b. *Glossary of Extremism*

Sabal's Complaint next alleges that ADL's inclusion of his name as an entry in the Glossary of Extremism is provably false and defamatory because it implies Sabal "is a dangerous, extremist threat and even a criminal."[19] Published by ADL's Center on Extremism, the entry links to a mission statement advising readers that ADL "track[s] extremist trends, ideologies and groups across the ideological spectrum" and its "staff of investigators, analysts, researchers and technical experts strategically monitor, expose and disrupt extremist threats."[20] ADL argues that the Glossary entry is not defamatory because it includes entries for many persons beyond Sabal.[21] As such, a description about one person does not necessarily apply to others.[22] But the Glossary has one overarching theme shared by all entries: extremism. The Glossary even states that "many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies."[23] Although ADL contends that calling someone an extremist is not defamatory,[24] the type of extremism featured in the Glossary is of a highly criminal and depraved nature. Combined with the mission statement, the Glossary's context appears convey factual assertions about persons with Glossary entries rather than mere opinion.

---

[19] Pl.'s Compl. ¶¶ 11, 27, ECF No. 1.
[20] *Id.* ¶ 11 n.3.
[21] *Id.* ¶ 11.
[22] Def.'s Br. in Support of Mot. to Dismiss 6, ECF No. 21.
[23] Pl.'s Opp. to Def.'s Mot. to Dismiss 7, ECF No. 26.
[24] *Id.* at 16–17.

To a reasonable reader, the Glossary may objectively indicate that all persons on this list are similarly dangerous and abhorrent. In his Complaint, Sabal pleads that Defendant wrongly likened him to "murderous Islamic terrorists—such as Nidal Hasan, Khalid Sheikh Mohammad, and ISIS—notable white supremacists—such as David Duke—and racist mass-murderers—such as Dylann Roof (the Charlestown church shooter), Brenton Tarrant (the Christchurch shooter), and Patrick Cruscius (the El Paso Walmart shooter)."[25] In the full context of the Glossary, it was plausibly defamatory to call Sabal an extremist by including him alongside obviously dangerous terrorists and mass murderers. *Cf. Bentley*, 94 S.W.3d at 581–82 (holding that, while the term "corrupt" is normally used as opinion, it can be used as a statement of fact in certain contexts). Further revealing the plausibility of this defamatory implication is the absence of additional information about Sabal in the Glossary to counter the likelihood that a reasonable reader would understand this publication as a factual assertion about Sabal. *Brewer*, 986 S.W.2d at 643.

Moreover, listing Sabal in the Glossary is plausibly "hurtful to [his] reputation." *Hancock*, 400 S.W.3d at 63. Such inclusion could certainly injure a person in their "office, profession, or occupation." *Id.* at 64. And the potential for this injury increases given the highly criminal nature of the entire list. *Roehrs*, 470 F.3d at 1162. Indeed, Sabal pleads that ADL's false statements "tended to injure Mr. Sabal in his trade, businesses, or profession by accusing [him] of having racial and ethnic intolerance" and "implying that he is a dangerous, extremist threat, and even a criminal.[26] Such imputation does not carry any "innocent" meaning. *Tatum*, 554 S.W.3d at 626.

Therefore, it is plausible that the inclusion of Sabal as an entry in the Glossary factually implies that he is a particular type of dangerous extremist who engages in, or is otherwise responsible for, similar criminal activity. As a result, the Court determines that Sabal pleads

---

[25] Pl.'s Compl. ¶ 10, ECF No. 1.
[26] *Id.* ¶ 30.

sufficient facts at this stage to show that the Glossary entry is a provably false statement and, in context, carries defamatory impact.

### c. *Lone Star Report*

Similar to the Glossary and the Backgrounder, the third allegedly defamatory statement is found in the Lone Star Report's reference to Sabal's 2021 "QAnon-themed" event when discussing antisemitic incidents, hate crimes, and terrorist activities in Texas.[27] ADL's sole argument is that most of the statements in this publication are not attributable to Sabal.[28] But a contextual review of the entire Lone Star Report tells a different story. By including Sabal alongside antisemites and extremists in a report highlighting "[h]ate [c]rime [s]tatistics" and "[e]xtremist [p]lots and [m]urders,"[29] a reasonable reader could objectively understand the publication's context as making a factual assertion that Sabal's events are associated with such criminal activity. Further evincing this potential factual imputation is the Lone Star Report's hyperlink to Sabal's Glossary entry.[30] As with the publications discussed above, inclusion of Sabal by name in a report about criminal extremism and antisemitism is "obviously hurtful to [his] reputation" in Texas and carries the potential to injure his "office, profession, or occupation." *Hancock*, 400 S.W.3d at 63, 64.

Therefore, the Court determines that Sabal pleads sufficient facts at this stage to show plausible defamation based on the Lone Star Report because it factually implies Sabal is a particular type of extremist who engages in, or is otherwise responsible for, dangerous criminal activity. And such an implication is far from innocent. Therefore, the Court determines that Sabal pleads sufficient facts at this stage to show plausible defamation based on the Lone Star Report.

---

[27] *Id.* ¶ 17; Def.'s App. to Mot. to Dismiss 153, ECF No. 22-1.
[28] Def.'s Br. in Support of Mot. to Dismiss 19, ECF No. 21.
[29] Def.'s App. to Mot. to Dismiss 146, ECF No. 22-1.
[30] *Id.* at 153.

### d. *Congressional Testimony*

Sabal alleges that Richman's Congressional testimony falsely implied that Sabal "promoted the belief that 'a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood, will be executed when Donald Trump is reinstated as president."[31] As a result, Sabal contends that Richman "implied that Mr. Sabal was a dangerous, extremist threat" given the title of the testimony: "Countering Violent Extremism, Terrorism and Antisemitic Threats."[32] In response, ADL argues that Sabal's challenge to testimony presented to Congress is not actionable because it is "barred by the absolute privilege Texas law recognizes for statements made in legislative proceedings."[33] The Court agrees with ADL.

Congressional testimony is subject to an absolute privilege from defamation liability. *See, e.g.*, *Moore & Assocs. v. Metro. Life Ins. Co.*, 604 S.W.2d 487, 489 (Tex. App.—Dallas 1980, no writ) ("Absolute privilege is limited to communications uttered in executive, legislative, judicial and quasi-judicial proceedings."); *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999) ("Texas law regards its privilege for communications made in the context of judicial, quasi-judicial, or legislative proceedings as a complete immunity from suit, not a mere defense to liability"); *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015) (finding that "statements made during legislative and judicial proceedings" are absolutely privileged). This "rule is based upon the public-policy principle that every citizen should have the unqualified right to appeal to the agencies of his government for redress without the fear of being called to answer in damages for libel." *Moore & Assocs.*, 604 S.W.2d at 489. And "the agencies of government, in order to properly perform their functions, should be authorized to call upon any citizen for full disclosure of

---

[31] Pl.'s Compl. ¶ 27, ECF No. 1.
[32] *Id.* ¶ 26.
[33] Def.'s Br. in Support of Mot. to Dismiss 1, ECF No. 21.

information without subjecting the citizen to a claim for libel." *Id.* Courts have recognized an exception to this absolute privilege from defamation liability when the challenged testimony is republished by an actor other than Congress. *See, e.g.*, *Am. Addiction Ctrs., Inc. v. Nat'l Assoc. of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 833 (M.D. Tenn. 2021) (finding no absolute immunity for Congressional testimony republished during annual meeting and to media outlets).

Since Sabal admits that Richman's Testimony was presented to the U.S. House of Representatives,[34] any defamation claim allegedly arising from such testimony must be dismissed unless the allegations in the Complaint plausibly demonstrate the applicability of the privilege exception. Sabal's allegations fall short here. The Complaint identifies only one source of republication: a link to the document maintained on an official Congressional website.[35] While Sabal correctly notes that no privilege does attaches when testimony is "not limited to the hall of [C]ongress," he does not allege any republication by ADL.[36] To hold that the posting of testimony on Congress's official website qualifies as a republication that triggers the absolute privilege exception would wholly undermine the entire purpose of such privilege. *See Moore & Assocs.*, 604 S.W.2d at 489 (recognizing the "public-policy principle that every citizen should have the unqualified right to appeal to the agencies of his government for redress without the fear of being called to answer in damages for libel"). Even if Sabal is correct that Richman's Testimony included defamatory statements, the testimony is not actionable due to lack of a qualifying republication. Therefore, Defendant's Motion to Dismiss is **GRANTED** in this regard.

*       *       *       *       *

---

[34] Pl.'s Compl. ¶ 13, ECF No. 1.
[35] *Id.* ¶ 13 n.4 (linking to publication of the testimony by Congress).
[36] Pl.'s Opp. to Def.'s Mot. to Dismiss 8, ECF No. 26.

Looking at each non-Congressional statement, individually and in context, it is plausible that each is provably false. That is not to preliminarily determine that each statement is, in fact, false. Instead, the Court merely recognizes that evidence could be produced to prove the falsity of the challenged statements, which leads to the conclusion at this stage that they are factual assertions rather than opinion. Similarly, these statements plausibly carry defamatory significance due to the lack of innocent meaning that is hurtful to Sabal's business and reputation. Therefore, the Court concludes at this stage that Sabal plausibly alleges defamation based on statements contained in three of the four ADL publications. As explained above, Sabal does not plead facts showing that the Richman Testimony before Congress is not subject to absolute privilege.

### 2.   Limited-Purpose Public Figure

To survive early dismissal, a plaintiff asserting a defamation claim must also plausibly establish the "requisite degree of fault regarding the truth of the [defamatory] statement." *Warren v. Fed. Nat'l Mortgage Assoc.*, 932 F.3d 378, 383 (5th Cir. 2019). The requisite degree of fault depends on the defamation plaintiff's status. *See WFAA-TV, Inc.*, 978 S.W. 2d at 571 (explaining that a defamation defendant must "act[] with either actual malice, if the plaintiff was . . . a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement"). Questions concerning the defamation plaintiff's status "is a matter of law for the court to decide." *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987).

More recently, courts have recognized a third category—limited-purpose public figures—in which a private individual can become a public figure in particular situations. *Id.* "Generally, limited public figures are persons who have "thrust[] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," or "voluntarily inject [themselves] or [are] drawn into a particular public controversy." *Id.* (citations omitted). A

three-part test determines whether a person is a limited public figure: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Id.* at 433–34. "It is not enough that a plaintiff is involved or associated with a matter of public or general interest, no matter how significant or sensational. 'A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention' or is newsworthy." *Klentzman v. Brady*, 312 S.W.3d 886, 904 (Tex. App. 2009) (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167 (1979)) (internal citations omitted).

Some courts assess whether a plaintiff is a limited-purpose public figure at the motion to dismiss stage. *See, e.g.*, *Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 566 (S.D. Tex. 2022) (concluding that the plaintiff was a limited-purpose public figure at the motion to dismiss stage); *Chevalier v. Animal Rehab. Ctr., Inc.*, 839 F. Supp. 1224, 1234 (N.D. Tex. 1993) (same); *Simien v. Freeman*, 2007 WL 9701229, at *6 (M.D. La. May 16, 2007) (same). But "defining a public figure has been likened to trying to nail a jellyfish to the wall." *Trotter*, 818 F.2d at 433. Most Fifth Circuit jurisprudence on public figures dates from the 1970s and 1980s, decades before the advent of social media, and courts have increasingly recognized the limitations of the limited-public figure doctrine.

ADL argues that Sabal is a limited-purpose public figure "by virtue of his active involvement in public political debates."[37] If correct, Sabal must show that ADL acted with actual malice to successfully establish defamation. ADL argues the Complaint does show actual malice.[38]

---

[37] Def.'s Br. in Support of Mot. to Dismiss 1, ECF No. 21.
[38] *Id.* (arguing that Sabal "fails to plausibly allege that ADL published these statements with actual malice").

But if Sabal is a private individual, a negligence standard applies. Under this lower standard, there appears to be no dispute that Sabal sufficiently pleads negligence.[39]

The requisite degree of fault that flows from Sabal's status is a question of law for the Court to ultimately decide. In candor, this is a close call. And the chaotic state of case law on limited-purpose public figures only further complicates this question. *See, e.g.*, *Berisha v. Lawson*, 141 S. Ct. 2424, 2429 (2021) (mem.) (Gorsuch, J., dissenting from denial of certiorari) (lamenting that "the very categories and test this Court invested and instructed lower courts to use in this area—'pervasively famous,' 'limited purpose public figure'—seem increasingly malleable and even archaic when almost anyone can attract some degree of public notoriety in some media segment"). As a result, the Court determines that it is appropriate to instead evaluate whether Sabal is a limited-purpose public figure at a later stage in these proceedings with the benefit of additional briefing and development of the factual record. Indeed, there are times when "[i]ssues pertaining to [a plaintiff's] defamation claims are better resolved at the summary judgment stage." *Jackson v. Wright*, No. 21-cv-00033, 2022 WL 179277, at *18 (E.D. Tex. Jan. 18, 2022) (denying motion to dismiss because resolution of the defamation claim was better suited for summary judgment).

Because the Complaint plausibly states facts establishing all other defamation elements at this stage, the Court **DEFERS** making any determination regarding whether Sabal is a limited-purpose public figure pursuant to Federal Rule 12(i). *See* FED. R. CIV. P. 12(i) (explaining that "any defense listed in Rule 12(b)(1)–(7) . . . must be heard and decided before trial *unless the court orders a deferral until trial*" (emphasis added)). Accordingly, the Court will evaluate the question of whether Sabal is a limited-purpose public figure at a later stage in these proceedings.

*     *     *     *     *

---

[39] *See generallly id.* (lacking any argument that ADL's allegedly defamatory statements are not negligent); Def.'s Reply in Support of Mot. to Dismiss, ECF No. 27 (same).

Therefore, assuming the veracity of Plaintiff's allegations, the Court determines that the Complaint plausibly give rise to an entitlement to relief based on three of the four challenged publications containing defamatory statements. Some of these statements are direct accusations while others occur via implication from the context of the entire publication. What these statements have in common is an objectively verifiable communication to readers of the factual assertion that Sabal is an antisemite and an extremist. While these terms may in other contexts constitute non-actionable opinion, the record at this stage reveals sufficient facts that a reasonable reader would understand ADL's statements in a way that is harmful to Sabal's reputation. Therefore, the Court finds that Plaintiff pleads sufficient facts at this stage to survive early dismissal. Accordingly, the Court **DENIES** Defendant's Motion to Dismiss with regard to Plaintiff's defamation claims based on all publications except for those arising directly from Congressional testimony.

### B. Count II: Injurious Falsehood

To prevail on a claim for injurious falsehood, a plaintiff must establish that the defendant (1) published false and disparaging information about him, (2) with malice, (3) without privilege, and (4) that resulted in special damages. *Forbes v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003); *Corrosion Prevention Techs. LLC v. Hattle*, 2020 WL 6202690, at *5 (S.D. Tex. 2020). "An action for injurious falsehood or business disparagement is similar in many respects to an action for defamation" and "[m]ore stringent requirements have always been imposed on the plaintiff seeking to recover for injurious falsehood." *Van Duzer v. U.S. Bank Nat. Ass'n*, 995 F. Supp. 2d 673, 694 (S.D. Tex.), *aff'd*, 582 F. App'x 279 (5th Cir. 2014). ADL only challenges Sabal's injurious falsehood claim on the first and fourth elements.

At a minimum, a claim for injurious falsehood fails if the plaintiff cannot establish that the underlying statement is defamatory. *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W. 3d 716, 728

(Tex. App. 2013) ("The words at issue must be defamatory to be actionable as business disparagement."); *Delta Air Lines, Inc. v. Norris*, 949 S.W. 2d 422, 427 Tex. App.—Waco 1997, writ denied) ("Non-defamatory statements will not support a claim for business disparagement."). A plaintiff may not re-purpose a failed defamation claim as a different tort, and courts routinely dismiss as duplicative injurious falsehood claims challenging the same conduct at issue in a defamation claim. *See, e.g.*, *Am. Energy Servs., Inc. v. Union Pac. Res. Co.*, 2001 WL 953736, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) ("Because we have heretofore held that statements directly attributable to UPRC were not defamatory . . . we find no merit to AES's claim of business disparagement."); *Hellmuth v. Efficiency Energy, L.L.C.*, 2016 WL 642352, at *4 (S.D. Tex. Feb. 18, 2016) ("The court finds that Defendants' business disparagement and defamation counterclaims fail as a matter of law because the statements at issue in those counterclaims cannot be objectively verified.").

ADL's primary argument is that Sabal fails on the first element. According to ADL, Sabal's "tagalong claim for injurious falsehood fails for the same reason as his defamation claim."[40] However, the Court already determined that three of the four alleged sources of defamation—the Backgrounder, the Glossary, and the Lone Star Report—survive dismissal at this stage. For the same reasons, the Court likewise finds that Sabal's allegations regarding the defamatory impact of these sources plausibly show that ADL published false and disparaging information about him.

ADL also argues that the injurious falsehood claim fails because Sabal does not plead any independent basis to satisfy the fourth element.[41] But this contention is belied by allegations in the

---

[40] Def.'s Br. in Support of Mot. to Dismiss 1, ECF No. 21.
[41] *Id.* at 17; *see also* Def.'s Reply in Support of Mot. to Dismiss 10, ECF No. 27 (arguing that Sabal's injurious falsehood claim is not independent from his defamation claim "since both claims are based on the same allegedly false statements").

Complaint. For instance, Sabal pleads that he was "forced to cancel several planned events."[42] Likewise, Sabal contends that ADL coordinated with PayPal to cancel services with Sabal, which prevented the selling of tickets for events.[43] Separate from the reputational harm caused by any defamation, these allegations are sufficient to survive early dismissal at this stage.

Accordingly, the Court finds that the Complaint contains sufficient allegations to state a plausible injurious falsehood claim. Sabal pleads that ADL made false statements about him, with the intent to harm his organizational work, and succeeded when he was forced to cancel several events.[44] Taking those allegations as true at this stage, the Court **DENIES** Defendant's Motion to Dismiss with regard to injurious falsehood.

## IV.    CONCLUSION

Accepting as true all well-pleaded facts in Plaintiff's Complaint, the Court concludes that Plaintiff's claims plausibly suggest an entitlement to relief. For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion to Dismiss. Defendant's Motion is **GRANTED** only as it relates to defamation claim arising out of Congressional testimony. However, Defendant's Motion is **DENIED** for all other claims of defamation and injurious falsehood.

SO ORDERED on this **30th day** of **April, 2024**.

_Reed O'Connor_
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[42] Pl.'s Compl. ¶ 39, ECF No. 1.
[43] *Id.*
[44] *Id.* ¶¶ 37–39.

21