**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOHN SABAL,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:23-CV-01002-O** |
| | § | |
| **ANTI-DEFAMATION LEAGUE,** | § | |
| | § | |
| *Defendant.* | § | |

<u>**DEFENDANT ANTI-DEFAMATION LEAGUE'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102
817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

Nathan Siegel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:    (202) 973-4499
nathansiegel@dwt.com

Katherine M. Bolger (admitted *pro hac vice*)
Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:   (212) 489-8230
Fax:     (212) 489-8340
katebolger@dwt.com
jessefeitel@dwt.com

*Attorneys for Defendant Anti-Defamation
League*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

    I.    John Sabal Peddles Antisemitism ............................................................... 2

          1.    The Ancient Blood Libel Canard ................................................... 2

          2.    Sabal Promotes *The Protocols of the Elders of Zion* .................................. 5

          3.    The "Khazarian Mafia":  Western (Ashkenazi) Jews Are Fake Jews Who Kill Gentile Children and Secretly Rule the World ................................... 7

          4.    Sabal Promotes Other Theories of World Domination by Satanic Jews .... 9

          5.    Sabal Peddles More Antisemitism and His Very Defense is Antisemitic  12

II.    Sabal is One of Qanon's Most Prominent Influencers Who Commands a Large National and Media Audience .......................................................................... 15

    A.    Sabal, QAnon and the Patriot Movement ............................................ 15

    B.    Sabal Sought to Be, and Became, a QAnon and "Patriot Movement" National Influencer ............................................................................... 18

          1.    By 2020 Sabal Was One of QAnon's Most Prominent Supporters .......... 18

          2.    Sabal's Political Conferences Gained a Mass Audience and Generated Regular National Media Coverage of His Political Views ...................... 19

III.    ADL and the Center on Extremism ..................................................................... 23

STANDARD OF REVIEW .................................................................................................. 31

ARGUMENT ....................................................................................................................... 32

I.    The Challenged Statements Are Not Actionable Because They Are Substantially True, Or Non-Actionable Opinion, and/or Not Actionable On Other Grounds ............................ 32

    A.    The QAnon Backgrounder:  Antisemitism and the Blood Libel Canard ............. 33

    B.    The Glossary of Extremism ................................................................ 35

    C.    The Texas Report .............................................................................. 39

II.    Sabal Cannot Prove that ADL Acted With Fault ............................................... 41

      1.      Sabal is a Limited-Purpose Public Figure..................................................... 42

      2.      The Actual Malice Standard Also Applies Because Sabal Seeks Only Presumed Damages ...................................................................................... 45

  B.      The Record Contains No Clear and Convincing Evidence of Actual Malice....... 46

CONCLUSION............................................................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Energy Servs., Inc. v. Union Pac. Res. Co.*,
    2001 WL 953736 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) .........................49

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................................46

*Ayers v. Peterson*,
    130 F. App'x 666 (5th Cir. 2005) ..............................................................................................5

*Blankenship v. NBCUniversal, LLC*,
    60 F.4th 744 (4th Cir.), *cert. denied*, 144 S. Ct. 5 (2023)......................................................47

*Burns v. Wilson*,
    346 U.S. 137 (1953) (Minton, J., concurring) ........................................................................37

*Casso v. Brand*,
    776 S.W.2d 551 (Tex. 1989)....................................................................................................32

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................................31

*Corrosion Prevention Techs. LLC v. Hatle*,
    2020 WL 6202690 (S.D. Tex. Oct. 22, 2020)..........................................................................50

*Dallas Morning News, Inc. v. Tatum*,
    554 S.W.3d 614 (Tex. 2018).....................................................................................................36

*Depalma v. Kerns*,
    2023 WL 6164312 (M.D. Ga. Sept. 21, 2023) ........................................................................44

*Dolcefino v. Turner*,
    987 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1998),
    *aff'd sub nom. Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103 (Tex. 2000)......................32, 47, 48

*Duffy v. Leading Edge Prod., Inc.*,
    44 F.3d 308 (5th Cir. 1995) ...............................................................................................46, 47

*Ex parte Milligan*,
    71 U.S. 2 (1866)........................................................................................................................38

*Flynn v. Cable News Network, Inc.*,
    2024 WL 1765566 (S.D.N.Y. Apr. 24, 2024).....................................................................15, 35

*Foster v. Laredo Newspapers, Inc.*,
    541 S.W.2d 809 (Tex. 1976)..................................................................49

*Hamad v. Ctr. For Jewish Cmty. Stud.*,
    265 F. App'x 414 (5th Cir. 2008) .........................................................38

*Hellmuth v. Efficiency Energy, L.L.C.*,
    2016 WL 642352 (S.D. Tex. Feb. 18, 2016) .........................................50

*Holly v. Cannady*,
    669 S.W.2d 381 (Tex. App.—Dallas 1984, no pet.)..............................49

*Howard v. State Farm Lloyds*,
    2005 WL 2600442 (S.D. Tex. Oct. 13, 2005).......................................38

*Immanuel v. Cable News Network, Inc.*,
    618 F. Supp. 3d 557 (S.D. Tex. 2022) ............................................43, 45

*In re Philadelphia Newspapers, LLC*,
    690 F.3d 161 (3d Cir. 2012).................................................................39

*Langiano v. City of Fort Worth, Tex.*,
    2022 WL 6813630 (N.D. Tex. Sept. 10, 2022).....................................38

*LaRavia v. Cerise*,
    462 F. App'x 459 (5th Cir. 2012) .........................................................49

*McCollum v. Baldwin*,
    2023 WL 5392684 (S.D.N.Y. Aug. 22, 2023) .....................................44

*McIlvain v. Jacobs*,
    794 S.W.2d 14 (Tex. 1990)..................................................................33

*Mohamed v. Ctr. for Security Policy*,
    554 S.W.3d 767 (Tex. App.—Dallas 2018 pet. denied) .......................43

*Nationwide Bi-Wkly. Admin., Inc. v. Belo Corp.*,
    512 F.3d 137 (5th Cir. 2007) ...............................................................38

*Newton v. National Broad. Co.*,
    930 F.2d 662 (9th Cir. 1990) ...............................................................47

*Oliver v. Scott*,
    276 F.3d 736 (5th Cir. 2002) ...............................................................32

*Patrick v. Daily Beast Co., LLC*,
    674 F. Supp. 3d 159 (E.D. Pa. 2023) ...................................................16

*Peter Scalamandre & Sons, v. Kaufman*,
  113 F.3d 556 (5th Cir. 1997) ................................................................46, 47

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986)..................................................................................32

*Privler v. CSX Transport. Inc.*,
  2021 WL 3603334 (N.D.N.Y. Aug. 13, 2021) ..........................................3

*Robinson v. Radio One, Inc.*,
  2010 WL 11698068 (N.D. Tex. June 9, 2010) (O'Connor, J.)..................32

*Rosanova v. Playboy Enters., Inc.*,
  580 F.2d 859 (5th Cir. 1978) ...................................................................46

*Scudday v. King*,
  2022 WL 2230730 (Tex. App.—San Antonio June 22, 2022, pet. denied)...........................49

*Snead v. Redland Aggregates Ltd.*,
  998 F.2d 1325 (5th Cir. 1993) ..................................................................45

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..................................................................................32

*Trotter v. Jack Anderson Enters., Inc.*,
  818 F.2d 431 (5th Cir. 1987) ..............................................................42, 43

*Waldbaum v. Fairchild Publ'ns*,
  627 F.2d 1287 (D.C. Cir. 1980)................................................................42

*Walker v. Beaumont Indep. Sch. Dist.*,
  938 F.3d 724 (5th Cir. 2019) ...................................................................46

*Waring v. William Morrow & Co.*,
  821 F. Supp. 1188 (S.D. Tex. 1993) ...................................................34, 36

*WFAA-TV, Inc. v. McLemore*,
  978 S.W.2d 568 (Tex. 1998)...............................................................43, 45

*Williams v. Roc Nation, LLC*,
  2020 WL 6158242 (E.D. Pa. Oct. 21, 2020)........................................34, 48

**Statutes**

18 U.S.C. § 2383..........................................................................................37

Tex. Civ. Prac. & Rem. Code § 16.002(a) ...................................................38

Fed. R. Civ. P. 56........................................................................................1

Defendant Anti-Defamation League ("ADL") files this Brief in support of its Motion for Summary Judgment ("Motion") in accordance with Fed. R. Civ. P. 56 and Local Rule 56.5.

## PRELIMINARY STATEMENT

In its order on ADL's motion to dismiss ("April 30 Order"), this Court held the Complaint ("Compl.") plausibly pled claims with respect to three ADL publications. The Complaint, however, is no longer relevant and the record leaves no room for dispute that Sabal repeatedly peddled heinous antisemitic content. This includes a fake video claiming that Jews kill gentile children in synagogues to use their blood for Passover rituals – the *exact* blood libel trope the Complaint falsely alleges Sabal never "espoused." Compl. ¶ 8. Moreover, Sabal now *admits* that multiple examples of material he has disseminated "could be seen as antisemitic."

If not an opinion, that Sabal "peddled antisemitism" is indisputably true and would alone support his inclusion in any publication about extremism and hate. Even so, summary judgment is warranted for several additional reasons. With respect to the Glossary of Extremism, moving beyond the pleadings to consider the full record of the 300 individuals it includes demonstrates that ADL did not intend to imply that everyone is akin to terrorists and murderers. Sabal's claim regarding the Glossary is also time-barred because his entry was published in January 2022.

Likewise, the full context of the Texas Report demonstrates that ADL did not intend to imply Sabal was guilty of heinous criminal conduct. Finally, even if either publication could be construed to imply that Sabal has advocated criminal or violent conduct, that implication would be substantially true and/or protected opinion. For example, Sabal urged the military to engage in "open rebellion" to remove President Biden, urged soldiers to desert, and called for military tribunals for hundreds of thousands of Americans.

Summary judgment is also warranted because Sabal cannot meet his burden to

demonstrate that the challenged statements were published with actual malice. That standard applies for either of two reasons. First, the record clarifies that Sabal is a limited-purpose public figure. Second, Sabal is only seeking presumed reputational and punitive damages. And there is no evidence of actual malice; instead, the record is replete with evidence that ADL conducted extensive factual research about Sabal and had no serious doubt about anything it published about him. Finally, even if a negligence standard applies, summary judgment is warranted.

## STATEMENT OF FACTS

### I.      John Sabal Peddles Antisemitism

Sabal is the sole owner of a company called The Patriot Voice ("TPV"), which has a channel on the social media site Telegram. Deposition of John Sabal ("Sabal") in ADL's concurrently-filed Appendix ("App.") at App. 0012:11-18; 0015:16-24; 0016:24-27:4. Through TPV, Sabal organized two political conferences in 2021, in Dallas and Las Vegas.

The content on TPV's Telegram channel comes from three sources.  First, Sabal posts comments he personally writes. Second, Sabal posts content from other Telegram accounts by forwarding those posts to TPV's channel. *Id.* at App. 0019:22-20:7. Sabal forwards a post when it "resonates with my values or my stance on things" and he checks their accuracy. *Id.* at App. 0019:22-0021:12. Third, about a year ago Sabal gave several people administrative access to also post on the channel, whom he trusts will post appropriate content.  *Id.* at App. 0017:9-0018:17.

The amount of antisemitic content that Sabal has disseminated is far too large to include in this Motion. This Memorandum focuses on several significant examples.

### 1.      The Ancient Blood Libel Canard

Sabal acknowledges that "the antisemitic trope of blood libel, the false theory that Jews murder children for ritualistic purposes" is an "antisemitic belief." Compl. ¶¶ 8-9; Sabal at App.

0035:20- 0036:3. ADL has written extensively on the topic. *See, e.g.*, App. 1556.[1]

In January 2022, Sabal forwarded a post with a link to a video purporting to describe how Jews are killing non-Jewish children in synagogue basements to use their blood for Passover rituals. According to the video, to "make some shekels" Jews also sell the children's flesh to make sausage and hamburgers for places like McDonald's:



App. 1304. The video is narrated by someone purporting to be "Zionist Rabbi Abe Finkelstein."

App. 0312 at 0:30. The "rabbi" in the video says:

> ...the children of our enemy, which is the white race.  And we bring  them to the
> basements in the synagogues where we drain the blood and watch them die there.
> It's very similar to how we do the the, the, do the sacrifices that we do with the kosher
> butchering.  And so we do that and then we mix it with the Passover bread and so
> we eat the blood of our enemies.  And the bodies, eh, we're not cannibals.  So

---

[1] *See also Privler v. CSX Transport. Inc.*, 2021 WL 3603334, at *12 (N.D.N.Y. Aug. 13, 2021) ("'blood libel' [is] an antisemitic canard originating in the Middle Ages in which Jews have been falsely accused of kidnapping and murdering children for ritual purposes during Passover.").

what we do is we take those, 'cause we can make some shekels, and we give 'em to the slaughterhouses and those are pounds and pounds and pounds of meat that we grind up in the sausage and the hamburger. And that's why we made those the most popular things, sausage for breakfast and hamburger for lunch. And so all the goyim out here are really eating their children and even when we say this outright and tell you people, you don't believe it, so!

The purported "rabbi" whose picture is shown in the video, in the left screenshot below, is not in fact "Rabbi Abe Finkelstein."

 

Rather, it is a picture of Kenneth Feinberg, a distinguished attorney who served as the Special Master for claims by 9-11 victims. App. at 0561:8-0562:17. Both the picture of Feinberg in the video and the audio appear to have been taken from a longer purported radio interview with "Rabbi Finkelstein", which used the same picture of Feinberg on the right above. App. 1597; App. at 0563:15-0564:13. The radio interview was purportedly conducted by James Wickstrom, a notorious antisemite whom ADL has written about. App. 1565. Feinberg was "outrage[d]" to learn his picture appeared in such antisemitic material. App. at 0563:3-5.

Sabal claims the video is likely true, and that posting it helped "expose wickedness". Sabal at App. 0124:16-0125:19; 0126:16-19. He maintains the onus is on *Jews* to "call this out" to put a stop to it. *Id.* at App. 0128:3-24; App. 0126:25-0127:17. Nonetheless, Sabal concedes "I could see how somebody would see it as antisemitic". *Id.* at App. 0129:14-0130:8.

Yet on February 26, 2024, *after* this lawsuit was filed, one of Sabal's administrators

posted memes about a prominent Jew killing children for their blood, along with other antisemitic imagery. App. 0315. The post celebrated the death of Lord Jacob Rothschild, a member of the Rothschild family. It included pictures of Lord Rothschild, juxtaposed between a meme of the Simpsons character Mr. Burns with an exaggerated, hook-shaped nose:

 

The post links to an animated video over the caption "ADRENOCHROME", in which the Burns character says "all I really needed was the blood of a young boy." App. 1305. The post he post includes messages purportedly written by Lord Rothschild, such as "We own nearly every central bank in the world" and "We financed both sides of every war since Napoleon." Sabal admits the post "could be seen as antisemitic". Sabal at App. 0037:14-20; App. at 0131:5-0134:6.

## 2.    Sabal Promotes *The Protocols of the Elders of Zion*

The *Protocols of the Elders of Zion* is a 120-year old document purporting to be a secret plan by Jewish leaders to rule over the non-Jewish world. It has its own entry in ADL's Glossary of Extremism, which describes it as "probably the most influential antisemitic text ever written." App. 0569.  *See also Ayers v. Peterson*, 130 F. App'x 666, 671-72 (5th Cir. 2005) (describing the "*Protocols of the Elders of Zion*" as "propagandistic and anti-Semitic").

On June 12, 2021, Sabal personally forwarded a post with a link to a documentary

entitled *The Sequel to the Fall of the Cabal*, which also has its own entry in ADL's Glossary of Extremism. App. 0567. The episode to which Sabal linked focuses on the *Protocols*, quoting it to state that "[w]e [Jews] shall so wear down the goyim that they will offer us international power that will enable us to form a super government". App. 0281 at 5:36; Sabal at App. 0098:4-13.[2]



Sabal admits that by forwarding this video he was "indirectly" encouraging people to read the *Protocols*. *Id.* at App. 0096:18-0098:3. Sabal maintains the *Protocols* may reflect an actual plan, and again suggested *Jews* should "call it out [the plan] as false". But he admits the film "could be taken in an anti-Semitic context". *Id.* at App. 0099:19-0100:6; App. 0102:6-11.

In October 2023, after this lawsuit was filed, one of Sabal's administrators forwarded yet another post linking to more episodes of the same *Fall of the Cabal* series. One episode is "The Protocols of the Elders of Zion." App. 0279; App. 1295; App. 0288; Sabal at App. 0103:1-15.

That documentary begins:

The Protocols of Zion, dismissed as a hoax, but we can assure you after months of in-depth research that they are not . . . In 24 protocols, the Elders of Zion described their vision of the world, its population and their ultimate goal, absolute world dominance and a one world government and New World Order in which their king, the king of kings, will be crowned on the throne of Zion to rule the world forevermore.

App. 0288 at 0:14-0:54. Sabal would not post this today. Sabal at App. 0104:14-0105:12.

---

[2] "Goyim" is a Hebrew word for people who are not Jewish. Sabal at App. 0035:13-19; App. 0099:13-18.

3.     The "Khazarian Mafia":  Western (Ashkenazi) Jews Are Fake Jews
       Who Kill Gentile Children and Secretly Rule the World

Sabal and TPV repeatedly promoted an antisemitic trope often called the "Khazarian Mafia", which uses ethno-racial theories to demonize vast portions of American and European Jewry. It has its own entry in the Glossary of Extremism (App. 0568) and ADL has published about it. App. 1655.  Some of the material also includes more accusations of blood libel.

A detailed exposition of the trope appears within a documentary (another *Fall of the Cabal* episode) that one of Sabal's administrators linked to on TPV's channel. App. 0279. The episode claims that Ashkenazi Jews are not real Jews because they supposedly did not descend from the inhabitants of ancient Israel.[3] Rather, they are exclusively descendants of "Khazarians" who converted to Judaism in the eight century and then supposedly emigrated from Khazaria (an area near modern Ukraine) to Europe.

It should be noted that as ADL itself has published, whether the genetic ancestry of some Ashkenazi Jews might include some traces from the Caucus region where Khazaria once existed is a matter of academic debate. App. 1655. But the material Sabal forwarded posits a geno-racial, antisemitic canard.  According to the documentary, the Khazars were descended from ancient Sumerians who maintained the satanic, child sacrificing rituals of their ancestors.  The film claims that once in Europe, the Khazars secretly assumed the identity of "Ashkenazi" Jews to mask their real "Luciferian" practices, which included drinking the blood of children.  After settling in Europe, Ashkenazi Jews supposedly "formed an absolute master plan [to control the world]". App. 0290 at 4:00-10:59; Sabal at App. 0105:13-0106:9. The episode uses images of ordinary Jews to illustrate who practices these "Luciferian beliefs". App. 0290 at 7:02; 7:05; 9:48. The film claims the leading Khazar family is the Rothschilds, who eventually "gained

---

[3] "Ashkenazi" Jews refers to Jews who originate from central and Eastern Europe, including the large majority of Jews in the United States and Europe today. https://www.britannica.com/topic/Ashkenazi.

financial power over all of Europe." App. 0290at 11:00-12:19; Sabal at App. 0110:22-0111:13.

Sabal largely stands by the film. While he does not explicitly endorse all of it, he says "the elements of the film are very precise" and would be "a whole lot to make up". He endorses the film's claims about the Rothschilds and the most he will say is he does not believe that "*all*" Ashkenazi Jews are Khazars. Sabal at App 0106:12-0109:1; *id.* at App. 0111:16-0112:1. Again, he thinks the film should be "very bothersome" to *Jews* because it may be accurate. *Id.* at App. 0107:2-6. Nonetheless, Sabal acknowledged "if you are targeting regular Ashkenazi people as being evil . . . that would be antisemitic." *Id.* at App. 0109:8-0110:5; *id.* at App. 0111:16-0113:4.

Long before the link to this documentary was posted, Sabal repeatedly promoted material that repeated the same claims about fake, "Khazarian" Jews. In June 2021 he forwarded the following, which also claims fake Jewish "Khazars" are responsible for establishing the State of Israel, thus questioning Israel's legitimacy:



 App. 1078. In October 2021, a video Sabal commissioned and showed at his Las Vegas conference included a screenshot promoting the same trope:



App. 0295 at 3:29. Sabal personally approved the video, but now claims he did not see that image and would have ordered it removed. Sabal at App. 0033:25-0034:12; App. at 0114:12-0115:6; App. at 0116:6-13.

In January 2022 Sabal forwarded a chart that traces "Judaism: Synagogue of Satan" as converted Khazars, who in turn were responsible for "Kabbalah"[4] and the "Rothschild Dynasty." App. 0317. The post contained yet another blood libel, claiming this "Khazarian Mafia" were "wicked people worshipping Satan involved with human sacrifice and cannibalism".



### 4.    Sabal Promotes Other Theories of World Domination by Satanic Jews

In addition to the "Khazarian Mafia", Sabal has also promoted other conspiracy theories

---

[4] Kabbalah refers to a mystical strain of Jewish tradition. *See* https://www.britannica.com/biography/Jonathan-Eybeschutz.

of Jews dominating the world.  Some examples include:

<u>"Sabbatean Frankism"</u>.  Sabal forwarded a post that identifies a supposed "satanic sect of Judaism" as the "cabal" that controls the world, with the hashtag "#SynagogueOfSatan.":



App. 0316.  Sabal stands by the post, claiming it is not antisemitic because he can identify the Jews who are the "bad apples", not "all Jews." Sabal at App. 0134:17-0138:22. But after seeing other similar content from the same "Libertas" channel that Sabal agreed could be antisemitic (see *infra*), Sabal testified he would not forward this today.  *Id.* at App. 0142:21-0143:7.

<u>The Rothschilds.</u>  Sabal's theories of world domination all include the Rothschild family, which has an entry in the Glossary. App. 0570. A search of TPV's channel for "Rothschild" yields 71 posts, most of which refer to the family. App. 1429. A few examples are:

\*        On multiple occasions, Sabal has posted material claiming the Rothschilds are Khazars (or "sabbatean frankists") who lead the Ashkenazic Jewish conspiracy, engage in child sacrifice rituals, control nearly all the world's central banks and are responsible for funding both sides of all wars. *See, e,g*., App. 0281 at 9:12; Sabal at App. 0101:3-14; App. 1078; App. 0317.

\*        In July 2022, Sabal forwarded a post linking to a document entitled "Rothschild Family History," which includes "all major events that has [sic] involved the family from 1743 .

. . ". App. 0324; Sabal at App. 0160:4:-0161:8. The document claims that all Ashkenazi Jews, including the Rothschilds, are really descendants of Khazars, and are part of the "Synagogue of Satan." App. 0329-0330. It claims the Rothschilds "control[s] somewhere in the area of 550 trillion" dollars, "which is roughly half the money in the world's circulation." App. 0328. The document claims that Nazism, the Holocaust, and antisemitism were actually engineered by the Rothschilds and other "Ashkenazi" Zionist leaders like Theodor Herzl. App. 0383, App. 0399, App. 0406-0409, App. 0442, App. 0446-0448, App. 0451-0452, App. 0466. The document blames alleged plotting by the Rothschilds and Zionists for causing numerous world events.[5]

There are far too many other examples to list here. *See, e.g.*, App. 0322, App. 1662; App. 0508 (TPV posts highlighting a Q Drop purporting to provide a list of "ROTHSCHILD OWNED & CONTROLLED BANKS", stating the Rothschilds "own China, too", and alleging the co-owner of Comet Ping-Pong, a child-sacrificing Satanist, is actually a Rothschild).

Sabal stands by the accuracy of all the above conspiracy theories – while producing no evidence. Sabal at App. 0101:10-14; App. at 0152:15-17; App. at 0153:3-0154:8; App. at 0155:1-0156:10.[6] The only point he is not sure about is whether the Zionist movement supported the Holocaust, which he acknowledges "could come across as antisemitic." *Id.* at App. 0156:23-0157:1; 0158:23-0159:2; 0161:11-0162:25.

Neo-Nazi Film.  In October 2021, Sabal forwarded posts promoting *Europa, The Last Battle*, an antisemitic film produced by European neo-Nazis.  App. 0319-0320.  After some on social media criticized Sabal for posting a neo-Nazi film, Sabal removed it, claiming that he had

---

[5] Just a few examples include the entry of America into World War I (App. 0421, App. 0423); the 1929 stock market crash (App. 0438), the election of Franklin Roosevelt, who is alleged to be an Ashkenazi Jew (App. 0445); and the assassination of President Kennedy (App. 0470-0472).

[6] In fact, today no member of the Rothschild family is even listed on *Forbes*' list of the world's billionaires. https://www.forbes.com/real-time-billionaires/#73b8d7f13d78.

not watched the video. Sabal at App. 0143:17-0144:15. Regardless, even today Sabal supports some of the film's antisemitic substance. At his deposition he viewed an excerpt about how the Rothschilds supposedly amassed half the world's wealth, established the Federal Reserve and control all major world events. App. 0320 at 9:41-16:15; Sabal at App. 0145:1-0148:25. He acknowledged the substance of the film excerpt was similar to what he has posted and that he agrees with much of it. *Id.* at App. 0149:4-0151:19 ("this [the film] isn't the first place we've seen this information either . . . there has to be some basis for it, right, you know?").

     **5.**     **Sabal Peddles More Antisemitism and His Very Defense is Antisemitic**

Other content Sabal has peddled includes:

•      Multiple posts suggesting that Israel and prominent Jews were behind the 9-11 attacks. They suggest Prime Minister Netanyahu predicted the attacks and that five "Dancing Israelis" were celebrating them. App. 0514-0515, App. 0517-0518. The posts also suggest a think tank led by two neoconservative Jews (William Kristol and Robert Kagan) also predicted the catastrophe. App. 0514, App. 0516. The "Dancing Israelis" trope has its own entry in ADL's Glossary (App. 1382), and ADL has written about the 9-11 conspiracies Sabal promotes. *See, e.g.*, App. 1326. In addition, the main video at the Las Vegas conference included two images of a plane flying into the Twin Towers with Jewish symbols on the bottom right of the images:

 

Sabal testified that to "insinuate that there's a connection between 9/11 and Israel" "could be seen as antisemitic" and claims he did not notice the images. Sabal at App. 0114:12-0115:6;

App. at 0116:6-13.  Yet he stood by the possibility that Israel was involved in 9-11.  *Id.* at App. 0169:16-0170:9; *id.* at App. 0171:18-0172:3. Sabal also forwarded posts claiming the Mossad, has "conducted a massive amount of influence in US politics and media for years and hold controlling positions and influence within parties on both sides", App. 0519-0521, which he still thinks may be accurate. Sabal at App. 0172:5- 0173:9.

* In October 2022 Kanye West, who is also in the Glossary (App. 0904), posted antisemitic statements including "I'm a bit sleepy tonight but when I wake up I am going death con 3 ON JEWISH PEOPLE." App. 1421. Two weeks later, Sabal forwarded a post featuring a video of West saying, "[y]ou listen to people that's getting their checks cut by Jewish media. George Soros, come meet with me directly." App. 0511-0512; Sabal at App. 0165:22-0167:11. Sabal acknowledges this video was antisemitic. *Id.* at App. 0167:21-0168:5.

* Many of the Telegram channels from which Sabal has forwarded the materials at issue here are themselves replete with antisemitic content.  By promoting those channels to his followers, Sabal has effectively promoted those other antisemites as well.  For example, Libertass's channel (App. 0316) contains content denouncing "Jewish power" while highlighting a potpourri of the same conspiracy theories Sabal promotes, like "khazaria", "Kabbalah", "blood libel", "Rothschild", "13abbatean frankism", "dancing Israelis", and "they're not even real jews".  App. 0318; Sabal at App. 0022:19-0023:15; App. at 0024:7-18. *See also* App. 0507 (post on "anon-fa-mous" channel stating "Synagogue of Satan" refers to "Jews who were the non-believers of Christ, who represent modern day Judaism."); App. 0509-0510 (post on Whiplash 47 channel linking to a film titled "Jewish Ritual Murder", stating that Jews have "been sacrificing children forever."). Sabal acknowledges that all this content on channels he used as sources is antisemitic – or in the case of Whiplast 47's blood libel post, "I could see how this post could be

construed as antisemitic". Sabal at App. 0139:11-0141:10; 0160:1-0161:8; 0163:18-0164:5.

- That Sabal promotes the same canards as other antisemites is illustrated by Louis Farrakhan, who is also in the Glossary and the Texas Report. App. 0770, App. 1588. Sabal says Farrakhan is probably antisemitic. Sabal at App. 0173:13-24. Yet at his deposition Sabal viewed a four-minute clip from a Farrakhan speech called "The Conspiracy of the International Bankers." App. 0521. Farrakhan articulated the same messages Sabal does about the Rothschilds; that some Jews are righteous but others are 'members of the synagogue of Satan"; and that he [Farrakhan] is not an antisemite because he does not condemn every Jew, just the bad, satanic ones. *Id.*; Sabal at App. 0174:9-0176:3. Sabal agrees with most of Farrakhan's remarks there. *Id.* at App. 0176:5-0178:15.

More broadly, as the above statements from Farrakhan illustrate, today many people who peddle antisemitic ideas claim they are not personally antisemitic because the Jews they target are imposters, not real Jews. This "Fake Jews" trope even has its own entry in the Glossary of Extremism. App. 0566. Sabal is a classic example. When someone on Twitter criticized one of his posts as antisemitic, Sabal's defense was he does not "hate Jews", he "just know[s] the difference between INFILTRATORS and the real thing." App. 0316.  And the same 'fake Jews' trope is at the heart of the "Kazharian Mafia" conspiracy theory Sabal promotes.

Sabal also tries to rebut accusations of antisemitism by pointing to the church he attends (New Beginnings Church), which is pro-Israel and emphasizes the Hebrew roots of the Bible. Compl. ¶ 1; Sabal at App. 0013:8-0014:19. Pastor Sean Golliday, who evangelizes at the church and who also preached at Sabal's conferences, reviewed several of the Sabal/TPV posts at issue here. Pastor Golliday testified that he considers them all to be antisemitic and inconsistent with the values of new Beginnings Church. App. 0538:9-0543:1; 0544:9-0549:21.

## II.    SABAL IS ONE OF QANON'S MOST PROMINENT INFLUENCERS WHO COMMANDS A LARGE NATIONAL AND MEDIA AUDIENCE

### A.    Sabal, Qanon and the Patriot Movement

Sabal has long occupied a prominent and outspoken role in Qanon, and what he now calls more broadly the "Patriot movement". "Qanon" refers to people who call themselves "Anons" who interpret posts on the 8chan website called "Q Drops." Sabal at App. 0040:6-24; App. at 0049:15-0050:5. Many Anons (including Sabal) believe Q "is a military intelligence dissemination program that . . . was run out of the Trump White House". *Id.* at App. 0038:15-0039:9. Sabal began following Q Drops in 2018 and shared his interpretations of them on multiple social media platforms. *Id.* at App. 0041:9-0042:15. Through 2022, Sabal posted as "Qanon John." *Id.* at App. 0069:11-0070:3.

Up until 2021, Sabal called the movement he considered himself to be a part of "Qanon", including on national television (*see infra*). He stopped regularly using that term because that is what Q told Anons to do, because the mainstream media was using it derisively. Instead, Sabal substituted "Q" for "Qanon", or other terms like "17" (Q being the 17th letter of the alphabet) to refer to the same thing. Sabal at App. 0048:18-0050:20; 0070:8-0072:11. He also uses the slogan "Where We Go One We Go All", or "WWG1WGA", a unifying slogan that Anons who follow Q often use with each other. *Id.* at App. 0073:8-23. Qanon is undoubtedly a "fluid" and somewhat "amorphous" set of beliefs, and not all Anons think the same. App. at 1799:6-1800:4. *Flynn v. Cable News Network, Inc.*, 2024 WL 1765566 at *1 (S.D.N.Y. Apr. 24, 2024). Nonetheless, Sabal shares most of the key conspiracy theories identified with Qanon.

The Satanic Cabal.    Sabal believes that "[a]t the highest level of politics and finance, there's a shadowy Cabal of pedophiles who use their power to hide the crimes they commit against children", including sexually abusing and killing them. App. 0271; Sabal at App. 0075:5-

21;0081:5-0085:9; App. 0275.[7] Accordingly, Sabal claims corporations often incorporate "pedo code" in their products, like the word "pizza". *See, e.g.*, App. 0272; Sabal at App. 0076:6-0077:1. He believes some companies are run by satanic cannibals who sacrifice children, and that many politicians and celebrities likely do as well, such as Tom Hanks. Sabal at App. 0077:23-0078:15; App. at 0079:17-0080:22, App. 0273; Sabal at App. 0080:25-0081:16, App. 0274; Sabal at App. 0082:10-0083:25; App. at 0084:2-0086:16. Sabal believes the cabal kills children to extract their adrenalized blood – "adrenochrome" – and drink it as a youth serum. Sabal at App. 0094:17-0095:14, App. 0278; *see also* Sabal at App. 0087:1-0090:9, App. 0276.

New World Order ("NWO").    Sabal believes the goal of the cabal is to create a "New World Order".  He describes the NWO as "a worldwide communist dictatorship/ surveillance state" that advocates for "massive depopulation of the planet". Sabal at App. 0055:16-0057:12.

The Plan.  Like most Qanon adherents, for years Sabal believed there was a "Plan" to destroy the cabal, which he calls "the Q plan", whereby President Trump was working behind the scenes to plan "the Great Awakening". App. 0240 at 22:41-23:18; Sabal at App. 0061:12-0063:05. *See also* App. 1441 ("The Cabal is VERY crafty . . . This is part of the PLAN . . . .There has NEVER been a threat to the Establishment like Trump.  EVER."). More recently, Sabal has come to think he may have misinterpreted some of Q's messages and their purpose may have been more generally educational. Sabal at App. 0063:6-0065:9.

Sealed Indictments.  Sabal thinks there is a "high likelihood" there are hundreds of thousands of sealed indictments waiting to be unsealed when the cabal is finally attacked.  Sabal at App. 0119:9-0120:9. *See also* App. 1436 ("200k+ Sealed Indictements . . . That is a FACT."); App. 1633. Sabal has also repeatedly predicted the coming of "The Storm", which he calls a

---

[7] *See also Patrick v. Daily Beast Co., LLC*, 674 F. Supp. 3d 159, 161 (E.D. Pa. 2023) ("QAnon supporters believe, without evidence, that President Trump was elected to defeat a purported cabal of cannibalistic pedophiles in the government.").

"mass arrest scenario" to overcome the cabal. Sabal at App. 0120:12-0121:15; App. 1439 (Sabal post stating "Anons are going to look REAL good when Trump is back in the White House and the Storm occurs"); App. 1439 ("WE are READY for the STORM Q.  Bring it on!).

<u>Military Tribunals and Executions.</u>  Like many Q followers, Sabal has advocated that military tribunals, not regular courts, be convened to adjudicate the alleged crimes of members of the cabal.  App. 0523; Sabal at App. 0179:14-0138:13.[8]  *See also* App. 1442 (January 2023 post by Sabal stating "MILITARY TRIBUNALS!"); App. 1654 (September 2022 post by Sabal stating "I want to see Military Tribunals.  I want to see Nuremberg 2.0.  THE ONLY WAY.").

<u>Military Mutiny/Rebellion.</u>  In August 2021, Sabal demanded that the military rebel and remove President Biden after soldiers died exiting Afghanistan. App. 0528 ("the US Military has an OBLIGATION to act against, and REMOVE this rogue actor."); App. 0980 ("I am officially calling for a TOTAL MILITARY MUTINY . . . against this ROGUE ADMINISTRATION"); Sabal at App. 0184:11-0186:9. After Sabal received widespread criticism, he followed up by claiming that he was calling for a nonviolent "mutiny", i.e., an "open rebellion against the proper authorities", and he also encouraged soldiers to "go[] AWOL from your position in the Military before your term is up". App. 0529-0530. Sabal acknowledges that by calling for open rebellion and desertion he was calling for soldiers to commit crimes. Sabal at App. 0187:18-0188:1.

Sabal's comments proved too extreme even for some of his Qanon allies.  Sabal was part of a group of Anons called "We the Media", that had a Telegram channel and an entry in the Glossary. App. 0571, App. 0979. We the Media apologized for Sabal's postings "regarding ANY type of rebellion or mutiny or coup, etc." and announced that Sabal "has been removed from WTM effective immediately." App. 0982; Sabal at App. 0189:10-20.

---

[8] Sabal now thinks his advocacy of military justice may have been "wishful thinking", because "it seems the military has gone woke." Sabal at App. 0183:4-18.

<u>Sabal and January 6</u>. On January 3, 2021, Sabal posted on Parler a picture of himself saying that he was "DC Bound for @realDonaldTrump with my love @QueenAnonAmy! . . . #StopTheSteal." App. 1317. However, Sabal invoked the Fifth Amendment privilege in response to all questions relating to his activities on January 6, including whether he was in Washington, entered the Capitol or engaged in violence. *See* Sabal at App. 0042:16-0044:19.

**B.    Sabal Sought to Be, and Became, a Qanon and "Patriot Movement" National Influencer**

**1.    By 2020 Sabal Was One of Qanon's Most Prominent Supporters**

Sabal describes himself as "one of the progenitors I guess you could say of people who were sharing the Q drops." Sabal at App. 0069:14-0070:3. On the multiple social media platforms he has posted on, Sabal has had hundreds of thousands of followers and received millions of views. *Id.* at App. 0032:4-16. In 2020 Sabal began to promote Qanon on an even larger public stage. He was the principal Qanon activist featured in a CBS News documentary, *The QAnon Effect*. App. 0240.  He decided to participate "because I wanted people to see that it [QAnon] wasn't this crazy thing that the mainstream media was making it out to be, so I wanted to bring light and, you know, a positive outlook." Sabal at App. 0044:21-0045:22.

In the documentary Sabal proudly stated that he follows QAnon (App. 0240 at 1:40] and wore a QAnon t-shirt. Sabal at App. 0046:22-0047:14. *See also* App. 0240 at 2:30 ("we are all Q" and "everyone who supports Trump, whether they like it or not, is a part of the QAnon operation."). He stands by those words today. Sabal at App. 0047:10-14. Sabal also proudly displayed on-camera a Q drop in which Q featured one of Sabal's posts. App. 0240 at 3:54; Sabal at App. 0051:2-0052:3. He told CBS's audience that "[w]e are literally rescuing our world from an evil satanic cabal that wants to bring in a New World Order, one world government system." Sabal at App. 0053:9-0054:13. Sabal showed excerpts from the Disney book *Pinocchio*

and claimed that it is describing child sex trafficking. App. 0240 at 6:21; Sabal at App. 0052:4-0053:22. Sabal also said that Joe Biden will never be President because "Q has told us". App. 0240 at 22:41; Sabal at App. 0061:3-25.

When the reporter asked Sabal whether people might think he is a "nut job", Sabal responded:  "I totally expect that and I welcome and embrace that . . . it's up to you to, you know, form an opinion on it . . . I do care that this information gets out." App. 0240 at 21:16; Sabal at App.  99:11-100:6. Sabal was also the lead QAnon activist profiled in an October 2020 article and video by *Business Insider*. Sabal told the reporter "Q is everywhere" and "[t]here's people in your grocery stores who follow QAnon". App. 0244; Sabal at App. 0066:9-0068:15.

### 2.    Sabal's Political Conferences Gained a Mass Audience and Generated Regular National Media Coverage of His Political Views

After Biden was inaugurated, Sabal and his girlfriend decided to organize political conferences. In a March 2021 podcast interview promoting the first conference in Dallas – where they were introduced as "leaders in the Patriot movement" – Sabal explained that after the election many patriots "feel like The Plan didn't work out" and "Trump abandoned us." App. 0270 at 20:24. Sabal, however, believed that "The Plan is still moving forward" and the Dallas conference would reinforce that. App. 0270 at 20:33. Sabal also promised "Q themed" music (App. 0270 at 52:09); the conference logo was a hat with "WWG1WGA" emblazoned on it (App. 1028), and many of the speakers were well-known influencers among QAnon followers. Sabal at App. 0074:14-22; App. at 0192:13-0193:1; App. 0531. Moreover, Sabal's intent was to reach an even broader audience, by emphasizing a "general America first theme" (Sabal at App. 0193:2-8), and said "I want to make CPAC look like a puppy show." App. 0270 at 23:47.

The mere announcement and promotion of each conference sparked widespread local, national and even international coverage of Sabal. App. 1404. Many journalists considered them

to be the first post-inauguration political events run by President Trump-era Q supporters, that would therefore provide a window into the state of QAnon at that point. *See, e.g.*, App. 1027-1028, App. 1258-1260; App. 1274-1276 (Dallas Observer, calling Sabal and his girlfriend a "QAnon Power Couple"); App. 1283-1286 (VICE); App. 1287-1288. *See also* App. 1251-1252 ("In Dallas, Gilley's Says It's Dropped Controversial QAnon Convention").

The conferences themselves raised Sabal's profile even higher. Both were livestreamed, which gave them an impact far beyond those attending. Sabal at App. 0026:23-0027:10; App. 0533:12-25 ("[w]e had made such a name for ourselves with two very successful events that went extremely viral . . . the reach that those events have had in terms of clicks, in terms of the livestream, the clicks after the fact . . . its was so far-reaching."). According to Sabal, the conferences received more media attention than other conservative conferences like CPAC. Sabal at App. 0028:17-0029:5 ("We're the only ones like written about in Forbes and AP and Reuters."). *See, e.g.*, App. 1323. In an interview with Roger Stone, Sabal said his conferences were "so effective and I think so damaging to the mainstream narratives that they put out where we kind of bypass a lot of the mainstream media. We often get targeted and hit pieces written by leftist journalists." Sabal says the media focused on his events because "of the type of speakers we have", who are "considered controversial" but are "very timely and very important for the American people". Sabal at App. 0025:12-0026:21; App. at 0029:10-0030-6. As proof of the conferences' impact, one commentator noted that a speech by the actor Jim Caviezel, called "The Storm is Upon Us", quickly amassed over 300,000 views on YouTube. App. at 1118.[9]

Media coverage emphasized that the conferences showcased many Republican political candidates and popular conservatives like General Flynn. . App. 1174; App. 1179; App. 1245. At

---

[9] The speech has since  received well over a million views. *See, e.g.*, https://www.youtube.com/watch?v=_1CiCur4QVw; https://www.youtube.com/watch?v=ls-vfo5vdeM.

the Las Vegas conference, Jim Marchant, a candidate for Secretary of State in Nevada, announced a national coalition of conservative candidates for secretary of state and gubernatorial offices. App. 0971; App. 1842; App. 1839. The remarks of numerous speakers were covered in depth. *See, e.g.*, App. 1095; App. 1104. In fact, in the 2022 election cycle, general media political coverage often discussed whether a candidate had attended Sabal's conferences, as an indicator of the candidate's views about QAnon. *See, e.g.*, App. 1847; App. 1849.

Media coverage also highlighted the frequent references to Q and Q-themed messages at the conferences and credited Sabal as a "prominent QAnon influencer." App. 1027-1028, App. 1060. *See also* App. 1029-1030; App. 1030-1041; App. 1223-28; App. 1246-47. For example, one speaker at the Dallas conference showed supposed evidence that Disney engages in child sacrifice. App. 277 at 1:11:07-30; Sabal at App. 0091:13-0093:15. Q iconography was widely present, including Sabal wearing a Q hat and Nutall-Zwaan sporting a t-shirt saying "Great Awakening" and "WWG1WGA". App. 0531. They did that to publicly show "we were supporting Q". Sabal at App. 0192:15-23. The logo for Las Vegas featured two playing cards – a Queen and a 7 (adding to 17), with 17 dominoes and sides of two dice adding up to 17:



That logo was referencing Q. Sabal at App. 0194:23-0195:24. *See also* App. 1192 (Las Vegas Review-Journal reported the promotional video "is full of Q messaging and references to

its conspiracy theories, even calling the event the "Great Awakening Weekend"). That video also "featured Caesars Palace logo replaced with a large "Q." *Id.* According to Sabal, Caesar's displeasure with the Q icon on its logo caused Caesar's to pull out of hosting the event. Sabal at App. 0190:18-0191:18. *See also* App. 1191; App. 1208. Indeed, videos shown at the conferences contained numerous references to QAnon concepts and slogans.[10]

After the conferences, multiple journalists followed Sabal's Telegram channel. His views about national political issues were often considered newsworthy and were quoted due to his status as a "prominent QAnon influencer". *See, e.g.*, App. 1129-1130 (quoting Sabal's reaction to the Derek Chauvin guilty verdict); App. 1085-1088 (quoting Sabal's comments that Biden may not be the real President). When divisions among QAnon supporters began to attract public attention, Sabal's postings were quoted as an authority for the direction of the movement. *See, e.g.*, App. 1119-1121 (Sabal's postings about a public spat between Lin Wood and Marjorie-Taylor Greene); App. 1665-1679; App. 1416-1418 (Rolling Stone); App. 1756-1766 (Rolling Stone) (Sabal criticizes another Q influencer for claiming JFK, Jr. will reappear).

Similarly, Sabal's posts calling for the military to remove President Biden and his subsequent censure by We the Media received widespread coverage. App. 1201-1207; App. 1215-1222; App. 1149-1163; App. 1180-1184. In addition, his views about Jews began to gain notice. For example, one journalist wrote that "one of the movement's biggest influencers" (Sabal) promoted the neo-Nazi *Europa* film, which the journalist saw as "a testament to how

---

[10] *See, e.g.,* App. 0297, 00:21 ("This is the Great Awakening"); App. 0298, 2:41 ("high risk of cabal exposure"); App. 0299, 3:41 ("Blood Harvest, Baby Farms, Adrenochrome"); App. 0300, 3:50 ("Ritual Child Sacrifice, Satanic City"); App. 0301, 4:58 ("The Awakening is Expanding"); App. 0302, 5:23 ("The Only Way, Military Justice"); App. 0303, 5:48 ("Unsealed Indictments"); App. 0304, 6:03 ("The Storm is Upon Us"); App. 0305, 6:08-09 ("Satanic, Blood Cult"); App. 0306, 6:43-45 ("500,000 Arrested"); App. 0307, 6:46 ("Military Tribunals"); App. 0308, 6:49 ("Executions"); App. 0309-0310, 7:15-17 & 8:25 (Where We Go One, We Go All"); App. 0311, 7:25 ("We Are "The Plan""). *See also* Sabal at App. 0117:6-0120:18, App. 0123:2-23.

antisemitic thinking has become normalized within the movement." App. 1137-1148. Another commentator expressed the view that "antisemitic undercurrents were common themes among the speakers" at conferences. App. 1756-1766. When in January 2022 Sabal posted the "sabbatean frankism"/synagogue of satan" message, journalists covered it as another indicator of Sabal turning to antisemitism. *See, e.g.*, App. 1019-1026 ("he's [Sabal] now sharing even more antisemitic content"). Sabal's vocal support for Russia's invasion of Ukraine the following month likewise received widespread coverage, including criticism on the HBO program Real Time with Bill Maher. *See, e.g.*, App. 1004-1006; App. 1012-1013; App. 1738-1755; App. 1724-1737. *See also* App. 1767-1777; App. 0984 ("[o]ne of the most prominent QAnon accounts on the platform right now [X after Elon Musk purchased it] is one being run by John Sabal, known to his followers as QAnon John.").

Sabal also continued to speak out specifically about Q.  In June 2022, after an 18-month hiatus, several new Q drops were posted, which generated debate over whether they were genuine.  Sabal heralded the resurgence of the movement.  *See* App. 0991; App. 1652 (June 2022 post by Sabal stating "Q just asked the Anons if we are ready to serve our country again"); App. 1653 ("I have NEVER ONE TIME faltered or second guessed on either POTUS Trump, The Plan, or Q."). A few months later, VICE reported that Sabal claimed "President Trump himself is making it UNDENIABLE that he is 100% aligning with the Q Operation." App. 1709-1715. Even Sabal's public spat with Lin Wood attracted attention. App. 1716-1723, Business Insider.

## III.    ADL AND THE CENTER ON EXTREMISM

ADL's mission is "[t]o stop the defamation of the Jewish people and to secure justice and fair treatment for all." App. at 1785:3-7. In 2006 ADL created its Center on Extremism ("COE"), which "tracks extremist trends, ideologies, and groups across the ideological spectrum. Our staff of investigators, analysts, researchers and technical experts strategically monitor, expose and

disrupt extremist threats." COE's definition of "extremism" is in the Glossary of Extremism:

> Extremism is a concept used to describe religious, social or political belief systems that exist substantially outside of belief systems more broadly accepted in society (i.e., "mainstream" beliefs). Extreme ideologies often seek radical changes in the nature of government, religion or society. Extremism can also be used to refer to the radical wings of broader movements, such as the anti-abortion movement or the environmental movement. Not every extremist movement is "bad," the abolitionist movement is one example of an extreme movement that had admirable goals, but most extremist movements exist outside of the mainstream because many of their views or tactics are objectionable.

App. 0907. *See also* App. at 1786:14-24; O. Segal Tr. at 12:5-13:22,[11] *Id.* at 55:18-56:9. ADL's definition focuses on ideas: "belief systems" and "ideologies." ADL thus follows and writes about movements and individuals who advocate beliefs that ADL considers to be extremist and/or hateful, but do not personally commit crimes. App. at 1787:4-16, 1788:19-1789:11; App. 1811-12 at Declaration of Jessica Reaves ("Reaves Decl."), ¶ 10. In the view of ADL's experts, history teaches that extremist idealogues are dangerous because their ideas tend to induce others to engage in violence and other antisocial conduct. *Id.* ADL also monitors and, where possible, seeks to disrupt extremists who do engage in criminal activity. App. 1812, Reaves ¶ 12.

In ADL's view, conspiracy theories are a particularly dangerous form of extremist ideology. App. 1811-12, Reaves ¶ 10. By their very nature, conspiracy theories single out persons, groups and institutions as the secret source of evil, which usually inspires believers to take action against them. *Id.* Antisemitism is a prime example, embracing conspiracies about or stereotypes of Jews to blame them for society's ills. App. 1812, Reaves ¶ 11. It is surely no exaggeration to recognize that antisemitic ideas have led to the persecution of, and indeed murder of, millions of Jews throughout history.

### A.     Publications by ADL of COE Material

---

[11] Sabal's Counsel deposed Oren Segal, the VP of the COE, on May 29, 2024. The certified transcript is not yet available, and the rough transcript is not a viable substitute. Accordingly, ADL has cited to that transcript but will file a supplement to its Appendix as soon as the certified transcript is ready.

COE staff writes material such as reports and backgrounders on extremist groups, trends and activities. App. 1809, Reaves ¶ 4. COE has general editorial guidelines for its written work product that require multiple levels of review before publication on ADL's website. *Id.* For example, when a researcher wants to write on a topic, that employee first pitches the idea to their manager. *Id.* at ¶ 5. If the manager approves, the staff member then drafts an outline. *Id.* The outline then needs to be approved by a member of ADL's editorial team, led by Jessica Reaves. *Id.* Once approved, the staffer drafts the piece. The draft is then reviewed by (1) the employee's manager, then by (2) a member of the editorial team, then by (3) either Oren Segal, the Vice President of the COE, or Aryeh Tuchman, Director at the COE, and finally by (4) a group of ADL executives. *Id.*

When COE management decides that ADL should publish a particular project, such as the Texas Report, the process is similar but slightly different. App. 1810, Reaves ¶ 6. The editorial team typically assigns employees to draft portions of the report that correspond to their subject-matter expertise. *Id.* Once those portions are drafted, the editorial team produces a larger draft report. *Id.* That draft is in turn is reviewed by Mr. Segal, and then by the Clearance group. *Id.*

### B.      The ADL Publications at Issue

#### 1.      The QAnon Backgrounder

In the Spring of 2021 Katie McCarthy, an ADL researcher, assumed the primary responsibility for monitoring QAnon. App. at 1784:3-1784A:7; App. 1831 at Declaration of Katie McCarthy ("McCarthy Decl."), ¶ 4. ADL researchers use public, open-source material to monitor individuals, groups, movements and ideas. *Id.* This can include social media postings, news reports, podcasts, and more. *Id.*. Sabal caught her attention when he announced the Dallas

conference. App. at 1792:17-1794:6.  She knew him to promote many common QAnon beliefs. App. at 1800:16-1801:22; Aff. 1833, McCarthy Decl. ¶ 10.

Over the course of 2021 and 2022, Ms. McCarthy captured and made notes about dozens of Sabal's social media postings she thought were particularly noteworthy. App. at 1795:6-1796:16; App. 1833, McCarthy ¶ 10. She found some of those posts to be antisemitic, and her contemporaneous notes and communications reflect that. *See, e.g.*, App. 1833, McCarthy Decl. ¶; App. 1836, *Id.* ¶ 19; App. 0971-0972 ("[L]ate last night, QAnon John shared a video that straight up promotes blood libel."); App. 0969-0970 ("QAnon John (John Sabal) promoted antisemitic tropes about the Synagogue of Satan and the Khazarian mafia . . ."); App. 0976-0978; *see also* App. at 1804:23-1805:24. She viewed Sabal's antisemitism as "very concerning given that QAnon John is one of the most visible/well-known QAnon influencers and has been able to successfully organize offline." App. 0976-0977.

McCarthy and others at COE considered Sabal to be a prominent "QAnon influencer" because, in addition to his large online following, he commanded a broader audience through his livestreamed conferences, which McCarthy followed closely. App. 1832, McCarthy ¶ 7. She perceived them to be replete with QAnon iconography and speakers well-known to her as QAnon influencers. App. at 1803:2-23. McCarthy and others at COE were also aware of his statements advocating a military mutiny to oust President Biden. App. 1837, McCarthy ¶ 25. She viewed those as a call for a violent coup. App. at 1309-:13-1311:5.

ADL first published a QAnon Backgrounder in 2020. App. 1834, McCarthy ¶ 14. In 2022, Ms. McCarthy pitched to her manager the idea of writing an update to account for more recent developments. App. 1814, Reaves ¶ 18. She drafted an outline that was approved and drafted the update, which then went through the editorial process and was published in October

2022. *Id.* ¶ 19. As the Backgrounder states, McCarthy does not consider most QAnon followers to be personally violent and has no knowledge of Sabal engaging in any violence. App. at 1308:4-16. But consistent with ADL's general views about extremism, she believes the movement is a dangerous conspiracy theory that can and has inspired people to commit violent acts. App. at 1314:25-1314A:7; O. Segal Tr. at 57:13-58:18.

McCarthy and others at COE also believe that some of the beliefs common to many QAnon followers resemble antisemitic tropes. App. 1835-36, McCarthy ¶ 18. For example, the belief that a cabal secretly tortures and drinks the blood of children resembles the blood libel trope. *Id.* McCarthy does not think that all people who espouse Qanon's satanic cabal beliefs also believe in the blood libel trope, or are antisemitic. App. at 1802:3-15 App. 1831-32, McCarthy ¶ 6. Rather, she thinks the spread of the cabal belief tends to make people more receptive to the antisemitic antecedent it resembles. *Id.* The view that many of Qanon's conspiracy theories closely resemble similar antisemitic tropes, and thus inherently contribute to the spread of those tropes, is fundamental to ADL's view of QAnon. App. 1780 at Declaration of Marilyn Mayo ("Mayo Decl."), ¶ 3; App. 1780, Reaves Decl. ¶ 14. ADL also knows that the antisemitic tropes Sabal and some other Qanon influencers propagate have a track record of inspiring people to attack Jews. For example, in 2019 two gunmen killed three persons at a kosher supermarket in Jersey City, New Jersey. ADL found that one of the shooter's social media postings routinely referred to Jews as "ASHKENAZIS-KHAZARS." App. 1812, Reaves Decl. ¶ 11.

The Complaint alleges that the following in the QAnon Backgrounder is defamatory:

It is important to note that several aspects of Qanon lore mirror longstanding antisemitic tropes, and multiple Qanon influencers, such as GhostEzra (Robert Smart), IET (Craig Longley), Negative48 (Michael Protzman) and Qanon John (John Sabal), have been known to peddle antisemitic beliefs. The belief that a global "cabal" is involved in rituals of child sacrifice has roots in the antisemitic trope of blood libel, the false theory that Jews murder Christian children for

27

ritualistic purposes.

The Complaint first challenges the statement that Sabal "has peddled antisemitic beliefs". That statement was based on the numerous examples ADL had collected of Sabal doing just that. Aff. 1835, McCarthy Decl. ¶ 17. The persons involved in drafting the Backgrounder believed that statement to be accurate when it was published, and today. Aff. 1835-36, McCarthy Decl. ¶ 18. Moreover, they believed that Sabal's response to accusations of antisemitism – such as his purported ability to distinguish between "real" Jews and "infiltrators" – is itself an antisemitic trope used by many to deny they espouse antisemitism. Aff. 1833-34, McCarthy Decl. ¶ 11.

Second, the Complaint alleges the Backgrounder accuses Sabal of espousing the blood libel trope. ADL did not intend to imply that Sabal and the three other QAnon influencers mentioned in that paragraph personally espoused that trope. Aff. 1835-36, McCarthy Decl. ¶ 18. Rather, its intent was to provide the first of several examples to illustrate its long-held view that "several aspects of QAnon lore mirror antisemitic tropes" – including the belief in a cabal sacrificing children, singling out George Soros, and an obsession with a supposed global elite of bankers. In any event, the point is academic because Sabal has peddled the blood libel trope. *Id.* ¶ 19.

### 2. The Glossary of Extremism

In 2021, COE management decided to compile a Glossary of Extremism. Aff. 1811, Reaves Decl. ¶ 8. The intent was to put information COE has compiled about extremism into a single, user-friendly database for the public and media to access. O. Segal. Tr. at 68:5-69:15; 94:15-25. The Glossary includes the names of about 300 persons, as well as entries for ideas, movements, symbols, and other categories of information. *Id.* The Glossary was compiled under the direction of COE's Editorial Director Jessica Reaves and approved by senior management,

and multiple ADL staffers contributed to its content. *Id.*

Consistent with COE's definition and general approach to "extremism", more than half of the individuals included in the Glossary are described as propagating extremist ideas, and their entries make no mention of criminal activity. App. 1812, Reaves Decl. ¶ 12. Other entries do make mention of criminal activity, ranging from non-violent crimes to terrorism. *See, e.g.*, App. 0902 (Winston Shrout, sovereign citizen advocate who created popular videos and seminars and was sentenced to 10 years in prison in connection with a debt elimination scheme); App. 0631 (Brenton Tarrant, white supremacist who killed 51 people in 2019 Christchurch shootings). To note just a few examples of entries involving only promoting ideas, the Glossary includes entries for Kanye West (Ye) (App. 0904); Adam Green, a podcaster who "claims that Jews manipulate world events for the own benefit" (App. 0584); Andrew Torba, who founded Gab; Arthur Butz, a professor at Northwestern who has published articles denying the Holocaust (App. 0605); Lana Lofteff, a white supremacist who runs a television channel (App. at 0762); Michelle Malkin, a pundit and author; Peter Brimelow, a writer and magazine editor (App. at 0793); and Archbishop Carlo Maria Vigano, the former papal nuncio to the United States, who (now retired) writes about antisemitic conspiracy theories (App. 0609).

The decision to include Sabal in the Glossary was made by Ms. Reaves, the Editorial Director. Aff. 1812-13, Reaves Decl. ¶ 14. She thought Sabal merited inclusion because he was a well-known, influential leader, who helped shape the direction of the QAnon movement. *Id.*; *see also* OS App. at 14:8-15. Ms. Reaves also thought it relevant that Sabal had shared antisemitic content. *Id.* The entry for Sabal was finalized by Marilyn Mayo, a long-time ADL staffer who was responsible for QAnon before Ms. McCarthy. Aff. 1781, Mayo Decl. ¶ 6. The entry states:

> John Sabal, also known as "QAnon John," is a QAnon influencer who runs The
> Patriot Voice website, which he uses to advertise QAnon-related conferences.

These conferences, the first of which was held in May 2021, have showcased the mainstreaming of QAnon and other conspiracy theories.

By including that entry ADL did not intend to imply, and does not believe it did imply, that Sabal was a terrorist, mass murderer, or a criminal.[12] Aff. 1781-82, Mayo Decl. ¶ 7. Rather, like numerous others in the Glossary, ADL believed Sabal was an example of an extremist leader who propagates ideas that can inspire others to engage in criminal activity. Aff. 1812-13, Reaves Decl. ¶ 14; Aff. 1837, McCartney Decl. ¶ 25. There are also 60 other entries in the Glossary that mention QAnon, including one for "QAnon" itself and other "QAnon influencers". App. 0909. Only one entry mentions any criminal activity, specific to one individual. Aff. 0968 (Romana Didulo).

The Glossary, including Sabal's entry, was first published in January 2022. Sabal's entry has remained the same since it was first published. Aff. 1813, Reaves Decl. ¶ 17.

### 3. The Texas Report

COE has also published several reports about extremist activity in specific states, including Texas. Aff. 1815, Reaves Decl. ¶ 21. Ms. Reaves oversaw the project and multiple employees contributed content in their areas of expertise. *Id.* Like other COE publications, the Report discusses a wide variety of extremists. *Id.* The descriptions of some (like Sabal, Sidney Powell, Louis Farrakhan, and Goyim Defense League) involve putting on events, distributing propaganda or making speeches. *Id.* Others are specifically identified as involved in violence, like the Proud Boys. *Id.*; *see also* App. 0908.

Ms. McCarthy drafted the paragraphs about QAnon, including the following:

---

[12] Consistent with that view, after Sabal announced the Dallas conference, the Irvine police department contacted a member of ADL's Texas staff to ask if ADL thought the conference raised any potential law enforcement issues. COE advised the staffer that it did not think the conference raised any law enforcement concerns, and communicated that response to the police department. App. at 1797:11-1798:12.

> Over the last few years, Texas has been at the heart of several notable QAnon events and incidents. The state has been home to multiple QAnon-themed conferences, highlighting the mainstreaming of QAnon and other conspiracies among conservative communities and the GOP. The most notable was "For God & Country: Patriot Roundup," which took place on Memorial Day weekend 2021. Organized by John Sabal, known online as "QAnon John" and "The Patriot Voice," the event featured then-Congressman Louie Gohmert (R-TX), then-Texas GOP chair Allen West, Lt. General Michael Flynn, attorney and conspiracy theorist Sidney Powell and various QAnon influencers. During the event, Michael Flynn seemingly endorsed a Myanmar-style coup in the U.S., although he has since backtracked on his remarks.

That paragraph linked to the QAnon Backgrounder, Sabal's Glossary entry, and two press articles about Sabal's Dallas conference. ADL did not intend to imply, and does not believe that it did, that Sabal was directly responsible for criminal activity. Rather, ADL included him (and others) because it believes the extremist ideas he promotes can induce violence by others. App. 1812, Reaves Decl. ¶ 11.

In fact, Ms. McCarthy and others involved at ADL believe that while they have no knowledge that Sabal himself has ever committed any crime, he has advocated ideas, both directly and through his conferences, that do call for political violence. That includes General Flynn's remarks at Sabal's Dallas conference, which ADL believed did call for a coup, and Sabal's own advocacy of a coup-like, military mutiny. App. at 1789:13-1791:5. ADL also believes the very notion of a "day of reckoning" like "The Storm" calls for unlawful, violent domestic military conduct and has an inherent tendency to inspire violent activity, like those who engaged in violence on January 6. Finally, ADL believes that the antisemitic beliefs and many of the conspiracy theories Sabal has peddled preach hate.

## STANDARD OF REVIEW

Summary judgment is warranted if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). "Then, "[o]nce the moving party has shown 'that there is an absence of evidence to support the non-moving party's cause,' . . . the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citations omitted). Moreover, "'summary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern.'" *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) (citation omitted).

## ARGUMENT

### I.    THE CHALLENGED STATEMENTS ARE NOT ACTIONABLE BECAUSE THEY ARE SUBSTANTIALLY TRUE, OR NON-ACTIONABLE OPINION, AND/OR NOT ACTIONABLE ON OTHER GROUNDS

In any defamation case involving speech about a matter of public concern, the First Amendment places the burden on the plaintiff to prove the speech is materially false.[13] *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986). Therefore, summary judgment is required where the plaintiff "cannot prove an essential element of the defamation cause of action. Namely that Defendant's statement is false." *Robinson v. Radio One, Inc.*, 2010 WL 11698068, at *3 (N.D. Tex. June 9, 2010) (O'Connor, J.).

Importantly, the standard is not whether statements are completely, literally true; instead, a claim must be dismissed when a statement is substantially true, meaning that it conveys the same "gist" or "sting" as the literal truth. *See, e.g.*, *Dolcefino v. Turner*, 987 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103 (Tex. 2000) (citation omitted). "The test is whether a statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have

---

[13] "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted). The challenged publications address topics including political and social extremism, antisemitism, and one of the most influential conspiracy theories in the contemporary political landscape. There can be no question those are matters of public concern.

been." *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

ADL also seeks summary judgment with respect to specific publications on the grounds that they are protected opinion, do not support the alleged defamatory implication, and in one instance is time-barred. Because most of those legal standards were extensively addressed in this Court's April 30 Order, they are not repeated at length here.

A.     **The QAnon Backgrounder:  Antisemitism and the Blood Libel Canard**

The Complaint alleges that the Backgrounder falsely accuses Sabal of being "known to peddle antisemitic beliefs, including the antisemitic trope of blood libel."  Compl. ¶ 8.  In its April 30 Order, this Court held those statements were verifiable because "either Sabal has made such statements, or he has not." ECF No. 35 at 9.  The undisputed facts show that he has.

On multiple occasions, Sabal shared content accusing Jews of unspeakable atrocities.  In fact, as grotesque as it sounds, Sabal's version of the blood libel trope went even farther than the ancient canard.  It could more accurately be called a combined *blood, flesh* and *greed* libel – claiming Jews kill gentile children to use their blood for Passover rituals, then make money by selling their flesh to make hamburgers.  Other Sabal and TPV posts promoted other variations of the trope, including labeling Ashkenazic Jews "Khazars" who sacrifice children and memes depicting a hook-nosed caricature of a Rothschild family member drinking a child's blood.

Sabal has also shared content promoting *The Protocols of the Elders of Zion*, modern history's most infamous antisemitic text; claiming that Jews who trace their ancestry to Europe are genetically linked to a sect of child-sacrificing converts that make up a "Synagogue of Satan" that controls the world; making similar claims about other supposed "satanic" Jewish sects while disparaging some of Judaism's holiest books, like the Kabbalah; promoting documents and videos assigning responsibility for the Holocaust, major world wars, and control of the world's money supply to a prominent Jewish family that has long been the target of antisemitic canards;

suggesting that Israel and Jews were partly responsible for the 9/11 attacks; promoting antisemitic rhetoric by Kanye West; and promoting multiple other antisemitic social media channels by forwarding their content on his own.  *See* Statement of Facts at § I.  Put simply, no reasonable juror could find the statement that Sabal "peddled antisemitic beliefs", and the alleged implication that he "espoused the blood libel trope", to be materially false. *See, e.g.*, *Williams.*, 26 F. Supp. 3d at 632  (granting summary judgment because statements were substantially true); *Waring v. William Morrow & Co.*, 821 F. Supp. 1188, 1190 (S.D. Tex. 1993) (relying on deposition testimony to conclude "the challenged statements are substantially true and correct" because "the underlying facts are undisputed and conform to the statements in the book").

Sabal has offered several responses to this content – all of which reinforce why summary judgment is required.  First, he *admits* that several posts he made or forwarded contain antisemitic content, including the blood libel trope.  That alone negates any conceivable fact dispute.  Other times, he doubles down by suggesting, with no evidence, that some of those canards are *true* and Jews need to clean up their own house.  No reasonable juror could find that to be anything other than peddling more antisemitism.  Finally, Sabal claims that he does not target all Jews, merely the fake and/or bad ones – like the Ashkenazic Khazars or other "infiltrators."  The notion that, in addition to spreading hateful tropes about Jews, *also* denying their Jewish identity is somehow a defense to a charge of antisemitism is preposterous.

Alternatively, at a minimum the undisputed evidence makes clear that ADL's statements are protected as opinions.  That point is most starkly illustrated by, on the one hand, Sabal's contention that his membership in a pro-Israel church somehow negates the antisemitic nature of the material he has promoted, and on the other the testimony of Pastor Golliday, whose view is that material is antisemitic and contrary to the teachings of their Church. *See supra* p. 14.

34

The First Circuit considered an analogous claim in *Cheng v. Neumann*.  There, the plaintiff challenged a statement describing a news outlet as having "promoted anti-vaccine misinformation and ... QAnon." 51 F.4th 438, 447 (1st Cir. 2022). The court found that the news outlet had "in fact published articles that include discussions of theories which in the opinions of others could be called 'anti-vaccine' and/or favorable to QAnon." *Id.*  Therefore, the court concluded that the "allegedly defamatory statements are opinions which reflect subjective judgments about the nature of [] coverage". *Id.  See also Flynn*, 2024 WL 1765566, at *5-6 (holding on summary judgment that whether General Flynn's brother and sister-in-law were "QAnon followers" is non-actionable opinion).  Here too, Sabal has posted content that in others' opinion certainly could be called antisemitic.  The challenged statements in the Backgrounder are therefore, if not substantially true, are not provably false and are thus non-actionable opinion.

### B.      The Glossary of Extremism

Sabal's inclusion in the Glossary is also not actionable.  First, based on the current record Sabal's Glossary entry is not capable of supporting that ADL intended to imply that he is responsible for terrorism or mass murder.  Second, to the extent the Glossary entry is construed to imply any connection at all to violence and/or criminal activity, any such implication would be substantially true or, alternatively, nonactionable opinion.  Finally, this claim is time-barred.

### a.      The Glossary Entry Does Not Imply that Sabal is a Terrorist or  Mass Murderer

In its April 30 Order, this Court held that the Complaint "pleads sufficient facts at this stage" to conclude that "it is plausible" that Sabal's inclusion in the Glossary "factually implies that he is a particular type of dangerous criminal who engages in, or is otherwise responsible for, similar criminal activity" as about a half-dozen others in the Glossary identified in the Complaint,  who are terrorists and mass murderers. ECF No. 35 at 12-13.   The Court held it to

be plausible that "all persons on this list are similarly dangerous or abhorrent". However, at this stage the record is vastly more comprehensive than the limited allegations of the Complaint. So even assuming *arguendo* such an implication was plausible based on those allegations, at this stage Plaintiff cannot "make [the requisite] especially rigorous showing' of the publication's defamatory meaning" that is required to survive summary judgment on a claim for defamation by implication. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 633 (Tex. 2018).

Put simply, the Complaint cherry-picked a handful of the worst actors contained in the Glossary and compared them to Sabal. *See Waring*, 821 F. Supp. at 1190 ("Plaintiff cannot avoid summary judgment, however, by taking statements out of context in an attempt to argue that they are capable of a libelous meaning."). But a review of the *full* context of *all* the persons in the Glossary makes clear that it cannot support that ADL intended to imply that "all persons on this list", including Sabal, are similar to those examples. And the record cannot meet the rigorous requirement that "[p]laintiffs prove that the alleged implication is the *principal* inference a reasonable reader or viewer will draw'" from Sabal's entry in the Glossary. *Dallas Moring News,* 554 S.W.3d at 629 (quoting *Sassone v. Elder*, 626 So.2d 345, 354 (La. 1993)).

Rather, the full context produces the conclusion that ADL meant to communicate that each Glossary entry simply means what it says – and nothing more. More than half the nearly 300 entries for individuals say nothing at all about any criminal activity, let alone terrorism or mass murder. Even among those that do mention some connection to criminal activity, most are not terrorists or murders. Moreover, the Glossary includes celebrities like Kanye West and Alex Jones, professors at well-known universities, podcasters, television hosts, authors, religious prelates, and all manner of persons who are plainly not terrorists or murderers.

Looking at the Sabal entry itself, it simply describes his connection to QAnon and makes

no mention of criminal activity, let alone terrorism or mass murder.  Nor does the separate entry for QAnon itself or 58 other entries mentioning QAnon, including "QAnon influencers". Indeed, the word "influencer" connotes a person who has a large following on social media for their ideas. Finally, the main landing page for the Glossary explains that the entries include individuals "associated with movements and groups that subscribe to and/or promote extremist or hateful *ideologies*." Summary judgment is therefore warranted because, viewed in its full context, Sabal's entry in the Glossary does not support the claim that ADL intended to imply that he engages in, or is responsible for, terrorism and mass murder.

> **b.    Sabal Has Advocated Criminal and Violent Conduct**

Because the only defamatory meaning the Complaint alleges with respect to the Glossary is the implication of conduct akin to terrorism, there is no need to address Sabal's actual views. But if it were necessary, it is substantially true that Sabal has used his platform to advocate extremist ideas that go beyond anything in his Glossary entry – i.e., calling for others to engage in violent, criminal conduct. At a minimum, it is protected opinion to believe that. The Court may also draw the inference that Sabal himself has engaged in unlawful violence.

For example, Sabal has advocated that the military engage in "open rebellion" to remove the President, a serious felony. *See* 18 U.S.C. § 2383 (criminalizing rebellion or insurrection, where anyone "incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof"). Sabal's call for a mutiny was viewed as too extreme even within QAnon.  More generally, Sabal has repeatedly called for the military to make arrests and conduct tribunals to try tens if not hundreds of thousands of American citizens. But military courts exist to try members of the military for crimes falling within their jurisdiction (*Burns v. Wilson*, 346 U.S. 137, 147 (1953) (Minton, J., concurring)), and the use of a military

tribunal to try a civilian is unconstitutional. *Ex parte Milligan*, 71 U.S. 2, 127 (1866). *See also id.* at 34 ("military tribunals for civilians, or non-military persons, whether in war or peace, are inconsistent with the liberty of the citizen, and can have no place in constitutional government").

Finally, there is evidence to infer that Sabal traveled to Washington, D.C. on the eve of the January 6 insurrection to assist with "Stop the Steal." Based on his invocation of the Fifth Amendment in response to all questions about that day, including whether he committed any violent criminal conduct, the Court is permitted to make an adverse inference that he did.[14]

Finally, under any standard the large trove of antisemitic content Sabal has disseminated would alone support calling him both an "extremist" and a purveyor of "hate." At a minimum, that is a protected opinion. Thus, summary judgment is warranted on the Glossary entry.

### c.    Sabal's Claim Regarding the Glossary is Time-Barred

Finally, Sabal's claim based on the Glossary entry is barred by Texas' one-year statute of limitations for defamation (Tex. Civ. Prac. & Rem. Code §16.002(a)), which "begins to run on the first day the publication is posted on the Internet." *Hamad v. Ctr. For Jewish Cmty. Stud.*, 265 F. App'x 414, 417 (5th Cir. 2008); *Nationwide Bi-Wkly. Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 146 (5th Cir. 2007)). Sabal's Glossary entry was first published on ADL's website in January 2022 and has not been changed since. Sabal filed this action on October 3, 2023.

The Complaint appears to implicitly acknowledge this and alleges that the Texas Report,

---

[14] "'In the Fifth Circuit, courts may draw an adverse inference from a defendant's refusal to testify in a civil case,'" and "'[t]his inference is available to the court on summary judgment.'" *Langiano v. City of Fort Worth, Tex.*, 2022 WL 6813630, at *11 (N.D. Tex. Sept. 10, 2022) (O'Connor, J.) (citations omitted). Because Sabal has not come forward with any "contrary evidence" about his activities during the January 6th insurrection, his "decision to assert his Fifth Amendment rights precludes him from offering a contrary account of events" because "'[t]o hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do.'" *Id.* (citation omitted). *See also, e.g.*, *Howard v. State Farm Lloyds*, 2005 WL 2600442, at *9 (S.D. Tex. Oct. 13, 2005) ("This court finds that an adverse inference is appropriately drawn from [the plaintiff's] invocation of the Fifth Amendment privilege and refusal to testify . . .").

which was published in 2023, contained a link to Sabal's Glossary entry. Compl. ¶ 17. That is irrelevant, as courts have consistently held that linking to material already on the internet does not restart the statute of limitations. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) ("Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not based on a determination that a link is akin to the release of an additional copy of the same edition of a publication because it does not alter the substance of the original publication.").

And even if that were not so, it would make no difference. The link in the Texas Report goes exclusively to the URL for John Sabal's Glossary entry. The Complaint does not allege, nor could it, that Sabal's entry is actionable standing alone. And there is no authority for the proposition that by linking to one page or article on a website, that is a republication not only of that page, but of everything else that could be found on the same website, including other links that could be accessed by starting with that page. Such a proposition would eviscerate the single publication rule for the internet. Thus, even if the link could somehow be a republication of Sabal's single entry, it is not actionable. Summary judgment is therefore warranted.

## C.     The Texas Report

In its April 30 Order, this Court ruled that Sabal plausibly pled the Texas Report "implies [he] is a particular type of extremist who engages in, or is otherwise responsible for, dangerous criminal activity." ECF No. 35 at 13. The Court noted that Sabal's pleadings regarding the Glossary entry further support the claim that ADL intended this alleged implication, because the Report links to it. However, the full record supports the opposite conclusion.

As set forth above, the Glossary does not support this implication. Nor does the QAnon Backgrounder, to which the paragraph about Sabal's conferences in the Texas Report links. The

Backgrounder states "most QAnon believers are not violent and limit their involvement to furthering the conspiracy online". App. 1706. And where it provides a few examples of QAnon adherents that have been linked to criminal activity (App. 1706-07), Sabal is not remotely connected to any of them. Likewise, the paragraph in the Texas Report links to two news articles about Sabal's conferences that make no mention of criminal conduct. To the contrary, they report the conferences were public events with well-known public figures. App. 1585.

Moreover, in the Texas Report, the first sentence in the paragraph following the one discussing Sabal says that "QAnon activity in Texas is not limited to conferences" and proceeds to describe a different QAnon influencer who advocates that JFK, Jr. will reappear at Dealey Plaza. App. 1585. Not only is that JFK, Jr. activity also non-violent, if anything the context implies that Sabal's QAnon activities are "limited to conferences." *Id.* And the same is true with respect to other non-violent extremists discussed in the Texas Report, such as the Nation of Islam and persons associated with it like Louis Farrakhan. App. 1588.The Report itself does not connect them to any crimes, nor does the ADL report about the Nation of Islam that paragraph links to. *Id.* Finally, the first paragraph of the Texas Report refers to "extremists who continue to target the LGBTQ+ community and QAnon supporters who have gathered for conferences and rallies across the state" App. 1577. Here too, QAnon supporters are solely linked to gathering for conferences and rallies, while other extremists are said to be involved in more nefarious conduct.

Thus, the context of the summary judgment record does not support the conclusion that the principal inference ADL intended to communicate, or did communicate, was that Sabal engages in or was responsible for dangerous criminal activity. To the contrary, as with the Glossary, the record supports the conclusion that ADL simply meant what it wrote about each particular person, group or movement. That conclusion alone requires summary on the Texas

Report.

At most, the paragraph in the Texas Report that mentions Sabal's conferences mentions and links to news articles that discuss *advocating* forms of political violence or unlawful activity – such as military coups or the execution of public figures like Hilary Clinton. That is not the defamatory implication the Complaint alleges, but even if it was those statements are either substantially true, or are opinion based on disclosed facts. For example, the statement that General Flynn "seemingly" called for a military coup, then seemed to "backtrack" on those remarks, is supported by video of those original remarks and reporting about General Flynn's subsequent response. And even on their face, words like "seemingly" and "backtrack" are subjective characterizations that are not provably false.

In any event, Sabal called for "open rebellion" by the military to remove President Biden. And more broadly, he supports the use of military tribunals, rather than law enforcement and the courts, to round up and prosecute hundreds of thousands of members of the supposed "cabal." Finally, the numerous antisemitic conspiracy theories Sabal has peddled unquestionably reflect both "antisemitism" and "hate." Indeed, given that Sabal accuses Jews of slaughtering gentile children in synagogues and drinking their blood, basic common sense and decency suggests there is no plausible basis to contend that he has been defamed by being included in a report about extremism, antisemitism, and hate. In short, to the extent the Texas Report could be construed to imply that Sabal has been responsible for advocating unlawful political violence, and/or antisemitism, those implications would be substantially true and/or protected opinion.

## II.    SABAL CANNOT PROVE THAT ADL ACTED WITH FAULT

In its April 30 decision, this Court deferred deciding Sabal's public figure status, and noted that it was a "close call" based on the record at the pleadings stage. ECF No. 35 at 18. The much larger summary judgment record, including Sabal's testimony, shows that he is a limited-

purpose public figure and there is no clear and convincing evidence of actual malice.  In any event, the actual malice standard applies here for another, independent reason. Sabal is relying on a claim of presumed reputational damages, not actual damages, which requires that he prove actual malice. Finally, summary judgment is warranted even if the standard were negligence.

### A.    The Actual Malice Standard Applies to this Case

### 1.    Sabal is a Limited-Purpose Public Figure

This Circuit applies a three-part test (adopted from the D.C. Circuit) to determine limited public figure status: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987). Moreover, the underlying principles this test applies are especially relevant here.

The limited public figure doctrine is premised on a kind of assumption of risk. When a person steps forward to assume "special prominence in the resolution of public questions", they "invite attention and comment." *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1291-92 (D.C. Cir. 1980) (citation omitted). By doing so, "[t]hey thus accept the risk that the press [or advocacy organizations] . . . will focus on them and, perhaps, cast them in an unfavorable light." *Id.* at 1292. This Court need look no farther than Sabal's own words to recognize that process describes him  exactly. He says his conferences were "so effective" because they communicated "messages . . . [that] are very timely and important for the American people to hear right now" and were "so damaging to the mainstream narratives" that they reached a mass audience and effectively "bypass[ed] a lot of the mainstream media". Sabal at App. 0025:8-0027:7. As a result,

Sabal contends that he both reached a mass audience and caught the attention of "leftist journalists" who responded by publishing numerous "hit pieces" about him, his conferences, and their speakers. *Id. See also* Sabal at App. 0028:25-0030:11 ("We're the only ones, like, we've got written about in Forbes and AP and Reuters."). In turn, Sabal contends his conferences and their negative press coverage caught ADL's attention. *Id.* at App. 0025:8-0026:5; 48:16-22. In a nutshell, that summarizes exactly the dynamic that makes a person like Sabal a limited public figure for purposes of a defamation case challenging what ADL wrote about him.

Looking specifically at the *Trotter* test, there can be no question that for many years there has been a robust public controversy over QAnon, the ideas associated with it, and the impact it has had on the political direction of the country. And that is so regardless of semantics, i.e. whether one characterizes the phenomena as "QAnon", "Q supporters", "Anons following Q", the "patriot movement", or anything else. Given its broad impact, the political and social issues they touch on are the kind that "people other than the immediate participants in the controversy are likely to feel the impact of [their] resolution." *Mohamed v. Ctr. for Security Policy*, 554 S.W.3d 767, 774 (Tex. App.—Dallas 2018 pet. denied). Indeed, Sabal himself describes his conferences and their speakers as "controversial", with the "leftist media" and the "patriot side" holding sharply opposing views. Sabal at App. 0029:10-0030:11.[15] In fact, another federal district court held one of the speakers at his conferences to be a limited-purpose public figure. *Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 566 (S.D. Tex. 2022). And within that broader controversy, the subject of whether QAnon and some its biggest influencers are antisemitic has attracted widespread attention and has international impact – starting, most

---

[15] *See also, e.g.*, *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998) (failed law enforcement raid was a public controversy because "numerous commentators, analysts, journalists, and public officials were discussing the raid . . . as well as reports by *The Dallas Morning News* and the *Fort Worth Star Telegram,* [and] the press was actively covering the debate over why the ATF raid failed.").

obviously, with its impact on Jews. *See supra* p. 19, 23.

Second, the record makes clear that Sabal's involvement in these controversies has been far more than trivial or tangential. He is a self-described progenitor of the QAnon movement, has had hundreds of thousands of followers, his views were read millions of times and he is widely considered one of that movement's most influential advocates. That alone would suffice to make him a limited public figure. In today's world, the very concept of a social media "influencer" is a person who invites attention and comment, in some cases by speaking out about controversial issues. Such persons, often attract far larger audiences and have a much greater impact on public opinion than numerous persons have been found to be limited public figures based on conduct like traditional media interviews. Merely because the doctrine was developed in the pre-internet era does not mean that the same principles do not readily apply to contemporary media. *See, e.g.*, *Depalma v. Kerns*, 2023 WL 6164312, at *14 (M.D. Ga. Sept. 21, 2023) (deeming "a self-proclaimed social media influencer", a limited-purpose public figure because "[a]s a content creator on social media, [plaintiff] seeks public validation of her ideas, and it is sufficient that she voluntarily engaged in a course that was bound to invite attention and comment").

However, while as this Court noted in its April 30 Order that the application of the public figure doctrine to social media is less well-developed (ECF No. 35 at 17-18), this case does not require a deep dive into that issue. By the time ADL began writing about Sabal in 2022, he had "made such a name" for himself by appearing on national television, print and podcast media and organizing controversial conferences containing QAnon themes and iconography whose messages reached millions. *See McCollum v. Baldwin*, 2023 WL 5392684, at *7 (S.D.N.Y. Aug. 22, 2023) (finding limited public figure status on the basis of media interviews). Sabal commanded the attention of numerous politicians and his views were followed and written about

by multiple national journalists on a regular basis, including his views about Jews.

And finally, each of the Challenged Statements is germane to Sabal's involvement in promoting QAnon, the core beliefs associated with it, and moving beyond the "Q" label to try to spread those beliefs into more mainstream political narratives. *See, e.g., WFAA-TV*, 978 S.W.2d at 573 (third element satisfied where the "defamatory comments are indeed germane to [the plaintiff's] participation in the controversy"). In sum, because Sabal "chose to participate in activities that were bound to invite attention and comment," he is a limited purpose public figure subject to the actual malice standard of fault. *Immanuel*, 618 F. Supp. 3d at 566.

### 2. The Actual Malice Standard Also Applies Because Sabal Seeks Only Presumed Damages

The actual malice also independently applies based on Sabal's theory of damages. It is well-settled that "the First Amendment prohibits awards of presumed and punitive damages unless the plaintiff can prove that the statements were made with actual malice." *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1332 (5th Cir. 1993). When asked to articulate the damages he suffered as a result of ADL's statements, Sabal said:

> Let me put it to you like this. We're talking about this damaging me many, many, many, years into the future, because God knows how long the ADL's going to keep me on their website and all that stuff. So with that being said, this is -- it's per se defamation and it's presumed damages because I can't even -- I mean, I'm probably unhirable because when you search my name on Google, the first thing that pops up because of I guess ADL's SEO, they, you know, made it so my name pops up right away, is John Sabal Glossary of Extremism. I mean, that's horrific.

Sabal at App. 0199:23-0200:22. Moreover, Sabal specifically confirmed that he was not seeking to substantiate any actual damages, other than a possible connection between ADL and another payment processor that cancelled its services in 2023, called TSYS:

> Q: So you don't intend to try to substantiate any actual damages, is that what you mean?
> A: I won't say that because there is a possible connection between TSYS and the ADL which we are looking into.

> Q: What is that possible connection?
> A: I cannot speak to that at the moment.

Sabal at App. 0201:18-25. However, Sabal has produced no evidence of any "connection" between TSYS's cancellation and ADL, nor to ADL's knowledge is there any. O. Segal. Tr. 83:22-85:6. ADL is therefore entitled to summary judgment on Sabal's sole claim to actual damages, leaving him to seek only presumed and punitive damages. To do so, he must establish actual malice.

### B.    The Record Contains No Clear and Convincing Evidence of Actual Malice

There is no evidence of actual malice in this case. To the contrary, the record is replete with testimony and contemporaneous communications that shows those responsible at ADL for the challenged publications believed them to be true.

Actual malice "means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744 (5th Cir. 2019). To "establish reckless disregard, the publisher must have "entertained serious doubts as to the truth of his publication." *Id.* (quotation and citation omitted). Moreover, "reckless disregard" is not an objective "recklessness" standard akin to gross negligence. "Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice." *Duffy v. Leading Edge Prod., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995).

Rather, actual malice is a subjective standard, requiring a "subjective awareness of probable falsity." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978). Proving actual malice is a heavy burden[,]" *Peter Scalamandre & Sons, v. Kaufman*, 113 F.3d 556, 560-61 (5th Cir. 1997), because "only clear and convincing proof will support recovery." *Duffy,* 44 F.3d at 313. The clear and convincing standard applies at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). Nor is actual malice akin to

common law malice, so "[p]roof that a defendant spoke out of dislike, or with ill will towards another, also does not automatically meet the test of actual malice . . .". *Peter Scalamandre*, 113 F.3d at 561. That a challenged statement is allegedly motivated by political bias is also insufficient to establish actual malice. *See, e.g.*, *Turner*, 38 S.W.3d at 123 (evidence that source was motivated by strong political bias did not amount to evidence of actual malice).

Moreover, when a plaintiff's "claim rests primarily on the false and defamatory message created by the [publication] as a whole, not individual statements", the actual malice standard contains an additional requirement. *Id.* at 120. "In this type of case, a public figure must present clear and convincing evidence that the defendant knew or strongly suspected that the publication as a whole could present a false and defamatory impression of events." *Id. See also Newton v. National Broad. Co.,* 930 F.2d 662, 680 (9th Cir. 1990) (defendant must know that the broadcast's arrangement of material created a false impression).

Applying those standards to the record, summary judgment is warranted. The various tropes Sabal promoted, including the blood libel trope, are claims about Jews that ADL has long followed and are widely considered to be antisemitic. ADL conducted extensive factual research about Sabal, and the ADL employees involved repeatedly expressed their belief that each of the Challenged Statements is true, both now and at the time. *See, e.g.*, App. 0971. Contemporaneous evidence that the author of a challenged statement believed what she was writing was not false is powerful evidence rebutting actual malice. *See, e.g.*, *Duffy*, 44 F.3d at 314; *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 766 (4th Cir.), *cert. denied*, 144 S. Ct. 5 (2023) (no evidence of actual malice where "contemporaneous evidence indicates that" the author of the challenged publication "did not realize the [challenged] language was false"). Moreover, not only did ADL believe that Sabal's postings were antisemitic, it found his efforts to deny he was antisemitic to

be yet more examples of antisemitism.  App. 1833-34, McCarthy ¶ 11; App. 0971.

Turning to the Glossary and the Texas Report, Sabal's claim rests on the proposition that those publications as a whole created a defamatory impression, not just the specific words about Sabal. Here, there is no clear and convincing evidence that any of the responsible ADL employees intended, knew or strongly suspected that the Glossary implied that each of the 300 persons included, including Sabal, was a dangerous criminal akin to convicted terrorists. To the contrary, ADL does not define "extremism" to require murder or similar crimes, and it has consistently monitored and published about both nonviolent and violent extremists. Contemporaneous emails show Sabal was included in the Glossary because he was a leading QAnon influencer, not because ADL suspected he was a mass murderer or anything of the kind. And the complete record shows that when ADL intended to report that a particular person had engaged in terroristic or even less heinous criminal activity, it said so explicitly, including describing specifically the nature of those crimes. Simply put, there is no evidence that anyone at ADL intended to imply that Sabal had engaged in any real-life violent or criminal conduct. *See, e.g.*, *Turner*, 38 S.W.3d at 120 (a "publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading."); *Williams v. Roc Nation, LLC*, 2020 WL 6158242, at *5 (E.D. Pa. Oct. 21, 2020) (to succeed on an implication claim, the "plaintiff must demonstrate . . that the defendant intended to communicate the defamatory implication") (citation omitted) (emphasis in original).

The same is true for the Texas Report. There is no evidence ADL intended to imply that Sabal engaged in or was personally responsible for dangerous criminal activity. Both the text of the paragraph about Sabal and the sources it links to are consistent with that. Rather, the record shows that ADL writes about many nonviolent individuals who take a leadership role in

propagating what ADL considers to be extremist and/or hateful ideas, and that it does so because it believes history shows that extremists ideas tend to inspire extremist acts. This is no idle concern; for example, people throughout history, including quite recently, have been inspired to attack Jews by the same tropes that Sabal disseminated. People are of course free to disagree with what ADL considers to be extremism and hate. But there is no evidence ADL intended to make any false statement or implication about Sabal, or knew or strongly suspected that it had. Because the undisputed facts preclude a finding of actual malice, ADL is entitled to summary judgment. *See, e.g.*, *LaRavia v. Cerise*, 462 F. App'x 459, 463 (5th Cir. 2012).

### C. Alternatively, ADL Did Not Act with Negligence

Even if this Court concludes that Sabal is not subject to the actual malice standard, the record also cannot support a jury finding that ADL published the Challenged Statements with negligence. Under Texas law, to establish negligence Sabal must prove that the ADL "knew or should have known that the defamatory statement[s were] false." *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976). The record in this case is devoid of any such evidence.

ADL's publications were based on extensive research, and it employed an editorial process requiring multiple levels of review for any published article, including the challenged publications. *See, e.g.*, *Scudday v. King*, 2022 WL 2230730, at *7 (Tex. App.—San Antonio June 22, 2022, pet. denied); *Holly v. Cannady*, 669 S.W.2d 381, 384 (Tex. App.—Dallas 1984, no pet.). Summary judgment may therefore be entered under any standard of fault.

### III. THE INJURIOUS FALSEHOOD CLAIM SHOULD BE DISMISSED

Sabal's injurious falsehood claim must be dismissed on multiple grounds.

*First*, to the extent the injurious falsehood claim is based on the same statements as defamation, summary judgment follows for the same reasons. *See, e.g.*, *Am. Energy Servs., Inc. v. Union Pac. Res. Co.*, 2001 WL 953736, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001,

no pet.); *Hellmuth v. Efficiency Energy, L.L.C.*, 2016 WL 642352, at *4 (S.D. Tex. Feb. 18, 2016). *Second*, the injurious falsehood claim fails independently because there is no evidence ADL communicated any injurious statement, or that it caused him any financial damages. "[A] plaintiff must establish (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Corrosion Prevention Techs. LLC v. Hatle*, 2020 WL 6202690, at *5 (S.D. Tex. Oct. 22, 2020).

The April 30 Order held this claim could proceed to discovery because Sabal "contends that ADL coordinated with PayPal to cancel services with Sabal, which prevented the sell of tickets for events." ECF No. 35 at 21. That allegation is false. No one at ADL coordinated or communicated with PayPal about its relationship with Sabal or The Patriot Voice. *See* App. 1627-28. Nor could any of the challenged publications relate to PayPal's decision, because they were all published after PayPal cancelled its relationship with Sabal in October 2021. Sabal at App. 0195:25-0196:15; App. 1664. Moreover, in a separate lawsuit filed by The Patriot Voice against TSYS, another payment processor that cancelled its services, TPV maintains that it was TSYS that "effectively destroyed TPV's reputation as an event hosting business", an allegation Sabal confirms to be accurate. Sabal at App. 0197:24-0199:22; App. 1684-85, ¶¶ 21-22. That sworn testimony negates any claim that it was ADL that "forced [Sabal] to cancel several planned events." Compl. ¶ 39. In sum, the claim must be dismissed because there is no evidence that ADL had anything to do with TPV's difficulties in securing a payment processer.

## CONCLUSION

For all of the foregoing reasons, ADL respectfully requests that its Motion for Summary Judgment be granted and Plaintiff's claims be dismissed with prejudice.

Dated: June 7, 2024                    /s/ Nathan Siegel
                                        Nathan Siegel (admitted *pro hac vice*)

**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:     (202) 973-4499
nathansiegel@dwt.com

Katherine M. Bolger (admitted *pro hac vice*)
Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
Fax:     (212) 489-8340
katebolger@dwt.com
jessefeitel@dwt.com

Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102
817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

*Attorneys for Defendant Anti-Defamation League*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document has been served on all counsel of record, via the Court's CM/ECF system, in accordance with the Federal Rules of Civil Procedure, on this 7th day of June, 2024.

/s/ Nathan Siegel
Nathan Siegel