IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOHN SABAL,

       *Plaintiff,*

v.

       Case No. 4:23-cv-01002

ANTI-DEFAMATION LEAGUE,

       *Defendant.*

**OPPOSITION BRIEF IN RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES................................................................................ ii

STATEMENT OF FACTS .................................................................................. 2

STANDARD OF REVIEW .............................................................................. 14

ARGUMENT...................................................................................................... 15

    I.    Mr. Sabal is not a public figure, and even if he were, there is a genuine issue of material fact as to whether Defendant made the statements with actual malice. ........................................................................................... 15

        a.    Mr. Sabal's prior affiliation with QAnon does not make him a limited public figure. ....................................................................................... 17

        b.    Because Mr. Sabal is not a public figure, a negligence standard applies. 25

        c.    Even if this Court finds that Plaintiff is a limited purpose public figure or that presumed damages require proof of actual malice, Defendant made the statement with actual malice. .............................................. 27

    II.    Defendant has failed to establish the affirmative defense of truth. ........ 38

    III.    ADL's statements are not simply opinion and are actionable. ............... 41

    IV.    Plaintiff's claims are not time-barred. .................................................... 43

CONCLUSION ................................................................................................. 45

CERTIFICATE OF SERVICE ........................................................................ 46

## TABLE OF AUTHORITIES

### Cases

*Atlas Roofing Company, Inc. v. Occupational Safety & Health Review Comm'n*,
430 U.S. 442 (1977) ................................................................... 32

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002) ................................................... 34, 42

*Bostic v. Daily Dot, LLC*,
No. 1:22-CV-158-RP, 2023 WL 2317789 (W.D. Tex. Mar. 1, 2023) ....... 18

*Butowsky v. Folkenflik*,
No. 4:18- cv-442, 2019 WL 3712026 (N.D. Tex. Aug. 7, 2019) ............... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................... 14

*Clyburn v. News World Communications, Inc.*,
903 F.2d 29 (D.C. Cir. 1990) ...................................................... 21

*Davis v. Fort Bend Cty.*,
765 F.3d 480 (5th Cir. 2014) ...................................................... 14

*Dolcefino v. Turner*,
987 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103 (Tex. 2000) ........................................... 40

*Eramo v. Rolling Stone, LLC*,
209 F. Supp. 3d 862 (W.D. Va. 2016) ............................................ 30

*Fairfax v. CBS Broadcasting Inc.*,
534 F. Supp. 3d 581 (E.D. Va. 2020) ............................................. 30

*Fontenot v. Upjohn Co.*,
780 F.2d 1190 (5th Cir. 1986) ..................................................... 14

*Foster v. Laredo Newspapers, Inc.*,
541 S.W.2d 809 (Tex. 1976) ....................................................... 25

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ............................................................... 28, 30

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ................................................................... 35

*Herbert v. Lando,*
      441 U.S. 153 (1979) ........................................................ 28

*Hutchinson v. Proxmire,*
      443 U.S. 111 (1979) ........................................................ 22

*Klentzman v. Brady,*
      312 S.W.3d 886 (Tex. App. 2009) ...................................... 17

*Klentzman v. Brady,*
      456 S.W.3d 239 (Tex. App. 2014), *aff'd,* 515 S.W.3d 878 (Tex. 2017).................... 25

*Klocke v. Watson,*
      No. 22-10348, 2023 WL 2823060 (5th Cir. Apr. 7, 2023) ........................................ 38

*La Liberte v. Reid,*
      966 F.3d 79 (2d Cir. 2020) .............................................. 22

*Leyendecker & Assocs. v. Wechter,*
      683 S.W.2d 369 (Tex.1984) ............................................. 27

*McFarlane v. Sheridan Square Press, Inc.,*
      91 F.3d 1501 (D.C. Cir. 1996) ........................................ 35, 36

*McIlvain v. Jacobs,*
      794 S.W.2d 14 (Tex. 1990) ............................................. 40

*Morris v. Blanchette,*
      181 S.W.3d 422 (Tex. App. 2005) ...................................... 42

*Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.,*
      No. 3:19-CV-2074-G, 2021 WL 3618113 (N.D. Tex. Aug. 16, 2021) .......... 18, 20, 23

*Parker v. Spotify USA, Inc.,*
      569 F. Supp. 3d 519 (W.D. Tex. 2021) ................................. 41

*Peter Scalamandre & Sons, Inc. v. Kaufman,*
      113 F.3d 556 (5th Cir. 1997) ......................................... 30

*Randall's Food Mkts., Inc. v. Johnson,*
      891 S.W.2d 640 (Tex. 1995) ............................................ 38

*Reuber v. Food Chemical News, Inc.,*
      925 F.2d 703 (4th Cir. 1991) (en banc) ............................... 30

*Snead v. Redland Aggregates Ltd.,*
      998 F.2d 1325 (5th Cir. 1993) ........................................ 27

iii

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) ............................................................................... 28, 35

*Tavoulareas v. Piro,*
  817 F.2d 762 (D.C. Cir. 1987) .............................................................. 28, 30

*Trotter v. Jack Anderson Enters., Inc.,*
  818 F.2d 431 (5th Cir. 1987) ...................................................... 15, 16, 17, 24

*TSM AM-FM TV v. Meca Homes, Inc.,*
  969 S.W.2d 448 (Tex. App. 1998) .................................................................. 21

*Turner v. KTRK Television, Inc.,*
  38 S.W.3d 103 (Tex. 2000) ............................................................................ 42

*Waldbaum v. Fairchild Publications, Inc.,*
  627 F.2d 1287 (D.C. Cir. 1980), *cert. denied*, 499 U.S. 898 (1980)............. 18, 21, 24

*Walker v. Beaumont Indep. Sch. Dist.,*
  938 F.3d 724 (5th Cir. 2019) ......................................................................... 28

*Warren v. Fed. Nat'l Mortgage Ass'n,*
  932 F.3d 378 (5th Cir. 2019) .............................................................. 14, 15, 38

*Washington Post Co. v. Keogh,*
  365 F.2d 965 (D.C. Cir.1966), *cert. denied,* 385 U.S. 1011 (1967)......................... 28

*WFAA-TV, Inc. v. McLemore,*
  978 S.W.2d 568 (Tex. 1998) ............................................................. 15, 18, 22, 24

*Williams v. BNSF Ry. Co.,*
  No. 4:23-CV-00151, 2024 WL 371546 (S.D. Tex. Jan. 31, 2024) .......................... 14

*Wiswell v. Verticalscope, Inc.,*
  2011 WL 13324271 (W.D. Tex. Oct. 3, 2011).......................................................... 44

*Wolston v. Reader's Digest Ass'n, Inc.,*
  443 U.S. 157 (1979)...................................................................................... 17

### Rules

FED. R. CIV P. 56(a) ....................................................................................... 14

TEX. CIV. PRAC. & REM. CODE § 73.005(a) .......................................................... 38

Defendant, the ironically named Anti-Defamation League, put John Sabal on a *de facto* terrorist watchlist, yet it now seeks to avoid responsibility by claiming his prior affiliation with QAnon makes him a limited purpose public figure. Defendant attempts to distort and conflate the issues raised by its defamatory statements, broadly and self-servingly defining the "controversy" as about QAnon. QAnon, however, is not the issue. Rather, the controversy is Defendant's false claims that Mr. Sabal is a dangerous, criminal extremist and anti-Semite.

It simply cannot be that a person's prior affiliation with a nebulous and ill-defined phenomenon like QAnon makes them a public figure just because Defendant thinks QAnon conspiracies and their adherents are somehow dangerous. Given the ubiquity of social media, the ease with which average people can garner large networks of so-called "followers," and the divisive state of American culture and politics, Defendant's argument would set a dangerous precedent. It would essentially strip individuals of protection from defamation if they have ever been affiliated with a controversial topic or have had a significant number of social media "followers."

In its defamatory statements, and even in the research behind them, Defendant exposed its ideologically-based ill-will towards Mr. Sabal. Defendant's entire argument boils down to: trust us, we can identify who is a dangerous extremist. But it has not provided any satisfactory evidence to support this conclusion. Instead, it merely argues that Mr. Sabal has expressed beliefs they consider to be dangerous, extremist, or antisemitic. Such bald statements are not proper evidence and fail in

light of the jury's province to determine the facts. This Court should deny summary judgment and allow the case to proceed to a jury trial.

STATEMENT OF FACTS

**a.    The Parties**

1.    Plaintiff, John Sabal, is a resident of Texas. Pl. App.[1] 2 at 13:12–13. Mr. Sabal is a disabled United States Navy veteran, having served for four years. Pl. App. 2–6 at 13:18–17:7.

2.    Defendant, Anti-Defamation League, is a non-profit organization incorporated in the District of Columbia.

**b.    Mr. Sabal's History and New Beginnings Church**

3.    After leaving the United States Navy, Mr. Sabal went on to work for a solar panel company for several years before creating The Patriot Voice ("TPV") in 2020. Def. App. 12 at 18:1–11.

4.    After living in Pennsylvania and California, Mr. Sabal decided to move to the Dallas, Texas, area shortly after creating TPV. Part of the reason Mr. Sabal wanted to move to the area was because his church, New Beginnings, was located there. New Beginnings is a pro-Israel and pro-Jewish Christian church. Def. App 13 at 20:13–25. Mr. Sabal had previously attended this church online, beginning in 2018. Def. App. 14 at 21:21–25.

---

[1] References to the Plaintiff's Appendix will be by "Pl. App." and references to the Defendant's Appendix will be by "Def. App.".

5.    New Beginnings Church frequently supports Israel by buying bomb shelters and providing support for IDF soldiers. Pl. App. 34–35 at 16:10–17:7. The church also takes care of Holocaust survivors. *Id*.

6.    A large portion of the money donated to New Beginnings goes directly to support Israel. Pl. App. 23 at 85:20–25.

7.    During Mr. Sabal's time with New Beginnings Church, he has made countless monetary donations to pro-Israel and pro-Jewish causes. Pl. App. 124–64.

8.    Mr. Sabal has posted in the past describing his anti-war stance and his support for the people of Israel. Pl. App. 123, 165, 167.



**The Patriot Voice**    October 7, 2023

I can promise you if Trump was in office right now this HORRIFIC attack on Israel by Hamas would have NEVER happened.

Iran wouldn't have been funded $6 BILLION from Biden, and therefore shouldn't have been able to facilitate the invasion of Israel through Hamas.

Trump is ANTI-WAR. He would have found a way to deescalate this situation, and never would have funded it in the first place.

WE NEED TRUMP BACK!!!



SABAL00017

4



9.     Mr. Sabal has called threats of violence against Jewish people "outrageous," voicing his support for the Jewish community. Pl. App. 166.



10.    While Mr. Sabal had been known as QAnon John in the past, he began distancing himself from this affiliation in 2021. Def. App. 47–48 at 83:23–84:22. Mr. Sabal merely used this name because somebody gave it to him as a nickname and it stuck because it was catchy. Def. App. 69 at 109:13–19.

c.    **TPV's History**

11.    TPV intended to start as a podcast but began hosting events in an attempt to bring people together who supported President Trump and felt alienated because of such support. Pl. App. 19–21 at 58:24–60:1. TPV events hosted America

First speakers such as General Michael T. Flynn and Sidney Powell. Def. App. 30 at 46:1–2.

12.    One of the pastors at New Beginnings Church, Sean Golliday, spoke at a TPV event, where he led religious services. Pl. App. 29–41 at 11:11–21. Importantly, Mr. Golliday did not witness any anti-Semitic happenings at the TPV event. *Id.* Eventually, TPV began operating a Telegram channel to share America First content. Def. App. 17 at 27:1–12. Mr. Sabal gave administrative access to the TPV channel to several people, meaning they had the ability to post their own content on the channel. *Id.* A few of these individuals Mr. Sabal had never met in person. Def. App. 13 at 27:7–23.

13.    Mr. Sabal attempted to ensure that nothing on the TPV Telegram channel came across as hateful or anti-Semitic. Def. App. 115 at 190:19–23; 132 at 213:17–20; 168 at 278:8–9. Upon learning that a post on the TPV channel fit that definition, Mr. Sabal immediately deleted and removed it. Def. App. 144 at 229:19–24. Mr. Sabal explicitly wrote on the TPV Telegram channel that antisemitism and racism would not be allowed on the channel. Pl. App. 96 at 28:13–18.

14.    Mr. Sabal still seeks to ensure that the TPV Telegram channel never espouses anything that could be construed as supporting violence. Pl. App. 13 at 97:1–15; Def. App. 89 at 140:16–18. Mr. Sabal considers himself a peaceful person and is opposed to violence in nearly every situation. *See Id.*

15.    Unfortunately, due to the sheer amount of content that is shared with Mr. Sabal or otherwise posted by other administrators from the TPV Telegram

channel, sometimes things slip through the cracks. Mr. Sabal has had experiences in the past where people have forwarded him inaccurate information, requiring him to take corrective action. Def. App. 20 at 33:10–17. Further, Mr. Sabal is not always able to watch all the videos that are posted to the TPV Telegram channel, and there are posts on the channel that he does not see before they are posted. Pl. App. 15 at 167:5–6; Def. App. 105 at 171:6–8. If it comes to Mr. Sabal's attention, however, that content on the channel does not fit his morals, he takes corrective action. Pl. App. 168.



16.    Mr. Sabal does not subscribe to any stereotypes about any religion, rather, he calls out bad acts regardless of where they come from. Pl. App. 12 at 71:17–23; Def. App. 56–57 at 93:1–94:5, 130 at 211:1–8.

### d.    Defendant's Center of Extremism

17.    On its website, Defendant maintains the Center of Extremism ("COE"). The self-described purpose of the COE is "monitoring, exposing, disrupting extremist activity and threats across the ideological spectrum. It includes individuals associated with various extremist movements." Pl. App. 43–44 at 17:12–18:1. The COE "tracks, exposes, and combats extremism and hate across the ideological spectrum." Pl. App. 29 at 11:22–23. Defendant began this project in 2006. Pl. App. 29 at 11:6.

18.    The COE works with law enforcement agencies all over the country and provides training to the FBI. Pl. App. 45 at 20:1–24; Pl. App. 40 at 20:23–25.

19.    The COE has investigators that track American citizens. Pl. App. 30 at 12:3–5. When doing so, Defendant looks for "narratives that include hatred [and] militant language." Pl. App. 32 at 14:5–10.

20.    The COE also works with payment processing servers such as PayPal. Pl. App. 47 at 28:8–10. In fact, Defendant actively reaches out to payment processing servers, such as PayPal, to provide them with information on what ADL believes to be extremism and hate. Pl. App. 98–99 at 78:19–79:10.

### e.    Defendant Takes Aim at Mr. Sabal

21.    Defendant instructed its employees to search for persons who had affiliations with QAnon to see if they had said anything antisemitic. Pl. App. 84 at 103:1–10. In doing so, it set its sights on Mr. Sabal. This was despite Mr. Sabal never being charged with any crimes, and despite the fact that at deposition, Defendant

could not even recall a single anti-Semitic post that Mr. Sabal had made himself. Pl. App. 49 at 32:12–15; Pl. App. 86–87 at 126:4–127:5.

22.     In the spring of 2021, Defendant began checking Mr. Sabal's content two to three times per week, often memorializing anything that he would say. Pl. App. 54–55 at 40:2–41:16. This began happening after TPV hosted its first conference in Dallas. *Id.* Notably, Defendant did not start tracking Mr. Sabal because of anything he necessarily said, rather, it was because he had a former affiliation with QAnon. *Id.*

23.     At one point, Defendant began actively stalking Mr. Sabal. In one instance Mr. Sabal had posted a picture in which a receipt from 7/11 was visible. Defendant immediately began trying to track down where this 7/11 was located so that it could find out where Mr. Sabal lived. McCarthy Depo at 43:14–44:2.

24.     In emails, Defendant displayed its disdain for Mr. Sabal through its agents, referring to him as a grifter. Pl. App. 85 at 113:8–24.

**f.    The Glossary of Extremism**

25.     In January 2022, through the COE, Defendant first published its Glossary of Extremism ("Glossary"). Pl. App. 93 at 16:10–12.

26.     When crafting the Glossary, Defendant wanted to include persons with QAnon affiliations. Pl. App. 78–83 at 92:7–97:8. Internal ADL email exchanges show Mr. Sabal's name was brought up as a recommended addition to the Glossary, along with several others—including Lt. Gen. Michael T. Flynn, U.S. Army (ret.), Sidney Powell, and Lin Wood, because of their supposed affiliation with QAnon. Pl. App. 173–173. In these emails, ADL admits that adding such names to the Glossary could be

"controversial," questioning whether ADL is defining QAnon, broadly, as an "extremist movement," and noting that "many folks involved in QAnon" are not extremists. *Id.* Indeed, the same email notes that if these names are added, ADL should also consider adding "election fraud conspiracists like Mike Lindell and Patrick Byrne." *Id.* It is noteworthy that among those more prominent and influential names mentioned as potential additions—Flynn, Powell, and Wood—none were added to the Glossary. *Id.*; Pl. App. 83 at 97:9–12.

27.     According to ADL, the purpose of the Glossary was to make Defendant's resources more accessible to the public. Pl. App. 97 at 66:12–19. And as Defendant's website makes clear, the purpose is to expose *threats*. Compl. at ¶ 11.

28.     As part of the Glossary, Defendant sought out a broad range of persons affiliated with QAnon despite acknowledging that persons can subscribe to QAnon beliefs without being antisemitic and that not all QAnon adherents are extremists. Pl. App. 61–62, 64 at 54:16–55:11, 65:6–13; Pl. App. 169.

29.     It remains a question as to why then Defendant would include Mr. Sabal in the Glossary in the first place. ADL knew that he had never been charged with any crimes. Pl. App. 49 at 32:12–15; Pl. App. 86–87 at 126:4–127:5. ADL was also aware that Mr. Sabal had denounced QAnon influencers who had made antisemitic statements. Pl. App. 53 at 37:14–16. Even when the Irving (Texas) Police Department contacted ADL asking about TPV and Mr. Sabal's upcoming TPV event, ADL told the Department that they had no concerns. Pl. App. 59–60 at 49:12–50:25.

11

30.     Despite all this, Defendant chose to include Mr. Sabal in the Glossary with known terrorists and white supremacists. Pl. App. 48 at 29:3–17.

**g.     The QAnon Backgrounder**

31.     On October 28, 2022, Defendant drafted the QAnon Backgrounder ("Backgrounder"). In it, ADL attempts to link various crimes to QAnon beliefs. Pl. App. 65–74 at 70:9–79:16. In many instances, the crimes discussed had no relation to QAnon except for the fact that the perpetrator had some prior affiliation with QAnon. *Id.* at 73:6–14, 74:10–16, 77:25–78:9, 79:17–25. In the Backgrounder, Defendant wrote that Mr. Sabal is a "known to peddle antisemitic beliefs," and implies that he personally espoused "the antisemitic trope of blood libel, the false theory that Jews murder Christian children for ritualistic purposes." Compl. at ¶ 8.

**h.     The Hate in the Lone Star State Report**

32.     In September 2023, Defendant drafted the Hate in the Lone Star Report ("Report"). The purpose of this report was to show extremist and hate related activity in Texas. Pl. App. 75–76 at 86:17–87:2. It was to "educate the public about the extremist landscape" in Texas. Pl. App. 95 at 21:16–19. Reports such as this one are ultimately provided to law enforcement agencies. *Id.* at 21:20–22.

33.     The Report includes information and statistics on "antisemitic incidents" in Texas, "extremist plots and murders" in Texas, "white supremacist propaganda" in Texas, and "hate crimes" in Texas. Compl. at ¶ 17.

34.     The Report includes five policy recommendations for Texas policymakers, including a "Texas-specific Summit" to address "Hate-Fueled

12

Violence," preventing and countering "Domestic Terrorism," providing access to justice for "Targets of Hate," and increased reporting and penalties for "Hate Crimes." Compl. at ¶ 18.

35.    Despite Defendant not having evidence of Mr. Sabal being a danger, Defendant included a link to Mr. Sabal's Glossary entry in the Report, and he was included by name.

36.    Again, Defendant did so despite knowing Mr. Sabal had never been charged with any crimes. Pl. App. 49 at 32:12–15.

**i.    Mr. Sabal's Harm**

37.    Mr. Sabal has suffered tremendously because of Defendant's conduct. Shortly after Defendant started defaming Mr. Sabal, Mr. Sabal had his services canceled with payment processing companies such as PayPal and Total Systems Services, resulting in the required cancellation of TPV events. Pl. App. 22 at 70:1–20.

38.    Beyond that, the reputational harm to Mr. Sabal has been immense. Since his inclusion in the Glossary, this is the first thing that comes up when you Google Mr. Sabal's name. Pl. App. 24–25 at 102:18–103:17. Mr. Sabal had sent a demand letter to Defendant, in April 2023, demanding his name be removed from the Glossary, but rather than doing so, Defendant doubled down in September 2023 by republishing the Glossary entry by linking to it in the Report. *Id.*

39.    Apparently, the harm that Defendant caused Mr. Sabal was not enough. In internal communications, employees of Defendant complained that when searching Mr. Sabal's name on its website, it does not yield results for all of the

13

content it has written about Mr. Sabal. Pl. App. 77 at 91:2–16. It appears that ADL will stop at nothing to destroy Mr. Sabal's name.

## STANDARD OF REVIEW

A court may grant summary judgment only "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Williams v. BNSF Ry. Co.*, No. 4:23-CV-00151, 2024 WL 371546, at *1 (S.D. Tex. Jan. 31, 2024) (quoting FED. R. CIV P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The moving party bears the initial burden of identifying 'the basis for its motion' and any portions of the record that 'demonstrate the absence of a genuine issue of material fact.'" *Id.* (citing *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014) (quotations omitted)). "Where the moving party 'bears the burden of proof on an issue,' such as a defendant asserting an affirmative defense, then it 'must establish beyond peradventure *all* of the essential elements' for that affirmative defense to be entitled to summary judgment." *Id.* (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

"The burden then shifts to the non-moving party, who must 'go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.''" *Id.* (citing *Davis*, 765 F.3d at 484 (quotations omitted)). When reviewing the totality of the evidence, it "must be viewed in the light most favorable to the non-moving party, and reasonable inferences must be drawn in that party's favor." *Id.* (citing *Warren v. Fed. Nat'l Mortgage Ass'n*, 932 F.3d 378, 383 (5th Cir. 2019)).

## ARGUMENT

**I.    Mr. Sabal is not a public figure, and even if he were, there is a genuine issue of material fact as to whether Defendant made the statements with actual malice.**

A plaintiff asserting a defamation claim must establish the "requisite degree of fault regarding the truth of the [defamatory] statement." *Warren v. Fed. Nat'l Mortgage Assoc.,* 932 F.3d 378, 383 (5th Cir. 2019). As this Court previously determined, "[q]uestions concerning the defamation plaintiff's status are "a matter of law for the court to decide." Dkt. No. 35 at 16 (citing *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 433 (5th Cir. 1987)). A defamation plaintiff's status is what determines the requisite degree of fault. *Id.* (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (explaining that a defamation defendant must "act[] with either actual malice, if the plaintiff was . . . a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement")).

There are essentially three categories into which the Court may place a plaintiff: (1) public figure, (2) private figure, (3) limited purpose public figure. The Court declined to rule on this issue at the motion to dismiss stage. *See* Dkt. No. 35 at 18. The Court should now properly determine Mr. Sabal is a private figure. Regardless of its determination on this issue, however, Mr. Sabal has shown there is a genuine issue of material fact as to whether Defendant acted with actual malice and negligence.

Defendant argues only that Plaintiff is a limited purpose public figure. When considering whether an individual is a limited public figure, the Court considers a

"three-part test": "(1) the *controversy at issue* must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." Dkt. No. 35 at 17 (citing *Trotter,* 818 F.2d at 433–34 (emphasis added)).

While these are seemingly straight-forward factors, as noted by the Fifth Circuit, "defining a public figure has been likened to trying to nail a jellyfish to the wall." *Trotter,* 818 F.2d at 433. This is especially so in the modern era of social media where an individual may share his or her views with others much more readily and regularly than any previous time, making it more difficult to create neat divisions between the severe burden of actual malice and the traditional burden of negligence. This is a crucial determination in this case, where Defendant has presented minimal and entirely unpersuasive argument relating to negligence. *See* Dkt. No. 40 at 49 (dedicating only two short paragraphs to conclusory arguing that there is no evidence that Defendant knew or should have known that its statements were false). As outlined below, and throughout, this is an incredible argument.

In applying the three-factor test, this Court should also be mindful of additional guidelines. As this Court previously noted:

> It is not enough that a plaintiff is involved or associated with a matter of public or general interest, no matter how significant or sensational. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention' or is newsworthy.

Dkt. No. 18 at 17 (citing *Klentzman v. Brady*, 312 S.W.3d 886, 904 (Tex. App. 2009) (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167 (1979)) (internal citations and quotations omitted). Applying this test, Plaintiff is not a limited purpose public figure.

Despite this Court's recognition of the complexity and importance of the public figure determination—not only as it pertains to this case, but as it will affect countless private individuals who share controversial views or memes on social media—Defendant has not differentiated the factors or provided in-depth analysis. *See* Dkt. No. 40 at 42–45. Indeed, Defendant suggests "this case does not require a deep dive" into the issue of whether Plaintiff's social media usage makes him a limited purpose public figure, despite the bulk of its argument relating to posts on social media, most of which were reposts of others' posts. *Id.* at 44. To the contrary, the limited public figure analysis requires careful consideration, and Defendant's avoidance of the issue is telling.

### a. Mr. Sabal's prior affiliation with QAnon does not make him a limited public figure.

#### 1.   *The controversy at issue is not a matter of public concern.*

Simply posting online about topics of public concern does not and cannot convert someone to a limited purpose public figure. Defendant, just as it has done all along in defaming Mr. Sabal, seeks to distort the issues and conflate them with QAnon to evade responsibility for portraying Mr. Sabal as a dangerous, criminal extremist. *See* Dkt. No. 40 at 43 (claiming there is a public controversy over QAnon). QAnon, however, is not the "controversy at issue." *Trotter,* 818 F.2d at 433.

17

Indeed, "[t]o determine whether a public controversy existed under the first element—and, if so, what the contours of that controversy are—the court 'must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice.'" *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 WL 3618113, at *12 (N.D. Tex. Aug. 16, 2021) (citing *McLemore*, 978 S.W.2d at 572 (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980), *cert. denied*, 499 U.S. 898 (1980)). This district has already determined that communications "prior to the instant controversy cannot, by definition, amount to voluntary participation in the controversy" as those necessarily occurred *before* the controversy's existence. *Ackerman McQueen*, 2021 WL 3618113, at *13 (N.D. Tex. Aug. 16, 2021) (citing *McLemore*, 978 S.W.2d at 573 (asking "whether the plaintiff actually sought publicity *surrounding the controversy*") (emphasis added).

In *Bostic v. Daily Dot, LLC*, No. 1:22-CV-158-RP, 2023 WL 2317789, at *6 (W.D. Tex. Mar. 1, 2023), the Plaintiff was accused of being an organizer of the January 6 "insurrection." The Western District of Texas found that a plaintiff was a limited purpose public figure because he voluntarily engaged with the public about election irregularities and spoke publicly for the Stop the Steal organization. *Id.*

Here, in contrast, Defendant has not shown Mr. Sabal has sought publicity on any public controversy related to the defamation or thrust himself into the forefront of any debate about extremism, hate, or antisemitism. There is no dispute that Mr. Sabal, years ago, actively posted online about the QAnon phenomenon, and that he

18

used the online handle of "QAnon John." For this reason, Defendant wants to broadly define the public controversy in this case as being about QAnon. The three defamatory statements, however, as the Court properly analyzed in its Opinion on the motion to dismiss, are: (1) whether Plaintiff peddles antisemitic beliefs, (2) whether Plaintiff is a dangerous, extremist threat or even a criminal, and (3) whether the inclusion of Plaintiff in the Lone Star Report implies that he is associated with criminal activity. *See* Dkt. No. 18 at 8–9, 11, 13. The controversy at issue, therefore, is not QAnon, but Mr. Sabal himself, and his beliefs and posts that are at issue *in this controversy.*

Mr. Sabal, and whether he has posted controversial content, or is a dangerous extremist, are not matters of public concern. Defendant's first statement—that Mr. Sabal supposedly peddles vile, antisemitic beliefs—could not possibly be a public controversy unless Mr. Sabal were already a general public figure, which Defendant implicitly concedes (as it must) that he is not. Even if the controversy at issue were antisemitism, Mr. Sabal has never attempted to insert himself into or influence such a broad and ill-defined topic. While he has publicly posted his disdain and disapproval for antisemitism, this can be no more than a trivial or tangential involvement in such a complex controversy. Pl. App. 123, 165, 166, 167. Similarly, the Telegram posts that Mr. Sabal forwarded, which form the basis for Defendant's allegations about peddling antisemitic beliefs, are also trivial and tangential to the broad public controversy of antisemitism.

19

As to Defendant's inclusion of Mr. Sabal in the Glossary of Extremism and Hate in the Lone Star State Report, implying that he is a dangerous, criminal extremist, this once again cannot be a public controversy unless Mr. Sabal himself were a public figure. Defendant's argument, conflating Mr. Sabal with QAnon, is a fallacy. Defendants make conclusory allegations that QAnon—a phenomenon it admits is nebulous, without any central beliefs or leadership[2]—is a dangerous or violent group and that Mr. Sabal's history as a so-called QAnon influencer makes him fair game. By this logic, anyone with a large social media following who has posted about QAnon can be defamed with near impunity. Defendant has not shown sufficient evidence that Mr. Sabal or his views were matters of public controversy. Indeed, Defendant has not shown that this is an issue people were talking about or was regularly covered by news media. Nor has Defendant connected these issues to the public interest.

This is especially so considering the requirement that such evidence must come from *after* the controversy. *Ackerman McQueen,* 2021 WL 3618113, at *13 (excluding from consideration actions before the controversy). Regardless of timing,

---

[2] According to Defendant's expert report, "[t]he movement known as 'QAnon' is elastic and difficult to define. It is not a coherent belief system, allowing its adherents to pick and choose what aspects they want to be true, and discarding those they choose not to believe in. It does not present itself as a religion, a political movement, or a traditional cult that requires lockstep agreement with the leader . . . . At bottom, QAnon is an amalgam of conspiracy theories, paranoia, scams, and tropes." Pl. App. 104.

Defendant has presented no argument that Plaintiff sought publicity regarding himself or controversies of antisemitism. Defendant must show "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *TSM AM-FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 453 (Tex. App. 1998) (citing *Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 32 (D.C. Cir. 1990); *Waldbaum v. Fairchild Publications Inc.,* 627 F.2d 1287, 1296 (D.C. Cir. 1980)). Defendant fails to do so. The only public concern that can be gleaned from its briefing is a purported danger to the public from beliefs supposedly espoused by Plaintiff or other QAnon supporters. This, of course, is insufficient.

There is no support in the record for the claim that Mr. Sabal is dangerous or violent, and if that is not enough to avoid summary judgment on claims such as these, it would severely curtail individuals accused of anything that renders them a danger to the public right to redress. Defendant argues, at most, that others affiliated with QAnon may have committed violent acts. Whether this is true or not has nothing to do with Mr. Sabal, which is why Defendant insists upon conflating Mr. Sabal with the nebulous and ill-defined QAnon.

In addition, Defendant fails to present any evidence that anyone other than Mr. Sabal and the Defendant would be affected by the resolution of this case. *See TSM AM-FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 453 (Tex. App. 1998) (determining that the failure to establish as a matter of law that people other than the immediate participants in the controversy were likely to feel the impact of its resolution failed to meet the first prong of the test articulated in *Trotter*). Even

accepting Defendant's self-serving definition of the public controversy as being about QAnon, there is also no evidence to support the notion that QAnon more broadly is a dangerous or violent group. Defendant's only justification for including QAnon-affiliated persons in its lists of dangerous extremists is its own belief that the QAnon beliefs are inherently dangerous or violent. This is a matter of private concern to Defendant and is its own opinion, which they have not shown by evidence is shared broadly by the general public.

Finally, the Supreme Court has concluded that "a limited purpose public figure [must] maintain 'regular and continuing access to the media.'" *La Liberte v. Reid*, 966 F.3d 79, 91 (2d Cir. 2020) (citing *Hutchinson v. Proxmire,* 443 U.S. 111, 136 (1979). There have not been sufficient allegations here that Mr. Sabal had such regular and continued access. Simply having access to social media is not enough, and the fact that Mr. Sabal's defamation lawsuit against the ADL has attracted some isolated media coverage is also not enough.

### 2.    *Mr. Sabal's role in any public controversy is trivial and tangential.*

Turning to the second factor in the limited public figure analysis—whether a plaintiff's role in a public controversy is more than trivial or tangential—Texas courts recognize three additional factors to consider: "(1) whether the plaintiff actually sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff "voluntarily engag[ed] in activities that necessarily involve[d] the risk of increased exposure and injury to reputation." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 573 (Tex. 1998) (citations omitted).

22

Even if Mr. Sabal's alleged peddling of antisemitic beliefs or whether he is dangerous or an extremist were a matter of public concern, Mr. Sabal did not inject himself into the dispute other than by filing litigation to clear his name and subsequent media appearances resulting from interest in his lawsuit.

Mr. Sabal did not insert himself into or seek publicity on any controversies involving antisemitism or extremism. Only Defendant's self-serving and overly broad interpretation of a public controversy to include all things QAnon could possibly lead one to conclude that anything Mr. Sabal has said is more than trivially or tangentially related. And if that were the case, a person once affiliated with QAnon, no matter what happens subsequently, would be forever marked as a limited public figure. This is not the law. *See Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 WL 3618113, at *13 (N.D. Tex. Aug. 16, 2021) ("a person may be a public figure for some aspects of a multi-faceted public controversy, but a mere observer for other aspects. In the court's view, therefore, the scope of the controversy is limited to the actual dispute within which the defamation claim is situated.") In this case, the actual scope of the definition is narrow. As evidenced by Defendant's brief, the topics on which they have opted to defame Plaintiff—claiming that he peddles antisemitism and that he is a dangerous extremist—are not topics that Plaintiff has espoused or endorsed. At most, Defendant has shown that some of the things Plaintiff reposted or forwarded on Telegram could be seen as antisemitic.

This is insufficient to show that Mr. Sabal injected himself into any broad public controversy over antisemitism or QAnon, seeking to influence its outcome, much less the actual, narrow controversies at issue in this case.

### 3. ADL's defamation of Mr. Sabal—accusing him of peddling antisemitism and of being a dangerous, possibly criminal extremist—is not germane to Mr. Sabal's participation in any public controversy.

Finally, the question is whether the "alleged defamation is germane to the plaintiff's participation in the controversy." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 573 (Tex. 1998) (citing *Trotter,* 818 F.2d at 433; *Waldbaum,* 627 F.2d at 1298). As noted above, the defamation of Mr. Sabal is not germane to any participation by him in a public controversy because there was no public controversy about Mr. Sabal or his beliefs relating to antisemitism or violence. In *Butowsky v. Folkenflik*, No. 4:18-cv-442, 2019 WL 3712026, at *18 (N.D. Tex. Aug. 7, 2019), the court concluded a plaintiff was not a limited-purpose public figure, where the plaintiff had only limited communications related to the investigation of a murdered political party staffer. That court explained it was inapposite to the limited-purpose public figure analysis to find that the plaintiff was a public figure merely because he had made public appearances on national media outlets that were only tangential to the public controversy. *Id.* at 21–22.

Here, in contrast, Defendant is seeking to drag Plaintiff into a public controversy by impermissibly broadening the controversy to be about QAnon rather than the specific controversy relating to its defamatory statements and, even then, cannot show anything more than tangential public appearances by Plaintiff. Because

Defendant cannot show that all three elements are met, Plaintiff is not a limited purpose public figure and is entitled to the traditional negligence standard. Regardless of which standard applies, Plaintiff has shown that there is a genuine issue of material fact.

### b. Because Mr. Sabal is not a public figure, a negligence standard applies.

Defendant admits, "[u]nder Texas law, to establish negligence [Plaintiff] must prove that the [Defendant] "knew or should have known that the defamatory statement[s were] false." Dkt. No. 40 at 49 (citing *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976)). Indeed, "[a] private plaintiff . . . need only prove negligence . . . that is, the private plaintiff must show that the defendant knew or should have known that the defamatory statement was false." *Klentzman v. Brady*, 456 S.W.3d 239, 263 (Tex. App. 2014), *aff'd,* 515 S.W.3d 878 (Tex. 2017).

Defendant commits a total of two paragraphs to the issue of negligence and whether Defendant was negligent when making the statement. Its argument boils down to a flat claim that the record contains no evidence of negligence. *Id.* This is not so.

The negligence standard simply requires that Defendant knew *or should have known* that its statements were false and defamatory. Here, Defendant's statements amount to claiming that Plaintiff associates with criminals, is a dangerous extremist and potentially a criminal himself, and that he espouses or endorses antisemitic beliefs.

These statements are devoid of any direct support in the record, indeed, even in any public record. Defendant, through its agents, admits that it did a thorough search and reviewed information about Plaintiff before posting the statements. *See* Dkt. No. 40 at 25-27 (outlining the research and review process for reports such as those including Mr. Sabal) (citing Def. App. 1809, Reaves ¶¶ 4-6; Def. App. at 1784:3-1784A:7; Def. App. 1831 at Declaration of Katie McCarthy ("McCarthy Decl."), ¶ 4, 7, 10, 14, 18, 25). Following the initial publication, Defendant approved republishing the material in other reports and an update. *See* Dkt. No. 40 at 26 (citing Def. App. 1814, Reaves ¶ 18). Yet, this allegedly diligent search and review process failed to prevent the posting of false and highly defamatory statements. This is the very definition of negligence.

Prior to making its defamatory statements, Defendant knew or could have easily found out that Mr. Sabal had never been convicted of a crime. Pl. App. 49, 86–87 at 32:12–15, 126:4–127:5. Indeed, prior to making its defamatory statements, Defendant was asked about Mr. Sabal's TPV organization and Patriot Roundup event by Texas law enforcement, and ADL responded that it had no concerns. Pl. App. 59–60 at 49:12–50:25. That simple fact is enough to show the negligence of ADL by including Mr. Sabal on its *de facto* terrorist watchlist, which includes leaders of Hamas and mass shooters, or its Hate in the Lone Star State Report. It is simply inconceivable that Defendant could find it appropriate to include Mr. Sabal on such inglorious lists after stalking his every social media statement for months and finding

that it had no concerns about Mr. Sabal to law enforcement. *See* Pl. App. 58–58 at 42:4-6, 43:14-25, 44:1-2, 10-17.

In addition, the manner in which the reports by Defendant were written was negligent. As the Court noted at the motion to dismiss stage, Defendant wrote these reports and created the defamatory implications. *See* Dkt. No. 35 at 9 (finding that a reasonable reader would infer that Defendant was connecting Plaintiff to defamatory statements about antisemitism); *id.* at 12 (discussing the defamatory implications of including Plaintiff on a list with those in the Glossary of Extremism); *id.* at 13 (discussing the context surrounding the Lone Star Report). It was negligent to draft the reports in this manner, and it was negligent that the review process did not reveal these plainly defamatory implications and allegations. Such institutional failure in the review and editing process can amount to negligence.

### c. Even if this Court finds that Plaintiff is a limited purpose public figure or that presumed damages require proof of actual malice, Defendant made the statement with actual malice.

First, as to presumed damages, despite Defendant's contention that *Snead v. Redland Aggregates Ltd.* stands for the proposition that presumed damages are unavailable without proving actual malice, that case stands for no such broad proposition. First, "[u]nder Texas law, presumed damages are available in cases of libel *per se.*" *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1331 (5th Cir. 1993) (citing *Leyendecker & Assocs. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984)). Second, under federal law, contrary to Defendant's contention, there is no general ban on presumed damages absent actual malice. *See id.* at 1332–34 (discussing Supreme

Court precedent holding that only in cases of public concern is there such a ban). Defendant has, as described in detail above, not shown that this matter is on an issue of public concern, particularly connected to this argument regarding actual malice, and therefore, its contention fails as a matter of law.

There is a genuine issue of fact as to whether Defendant made its statements about Mr. Sabal with actual malice. Actual malice "means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744 (5th Cir. 2019). A defendant acts with reckless disregard for the truth if it "in fact entertained serious doubts as to the truth of [its] publication" or acted "'with a high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

In *St. Amant v. Thompson*, the Supreme Court laid out three general categories of the kinds of proof that would likely support a finding of actual malice: "evidence establishing that the story was (1) 'fabricated'; (2) 'so inherently improbable that only a reckless man would have put [it] in circulation'; or (3) 'based wholly on an unverified anonymous telephone call' or some other source that the defendant had 'obvious reason[] to doubt.'" *Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987) (citing *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). "[A] plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence. *Tavoulareas v. Piro*, 817 F.2d 762, 789

28

(D.C. Cir. 1987) (citing *Herbert v. Lando,* 441 U.S. 153, 160 (1979); *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir.1966), *cert. denied,* 385 U.S. 1011 (1967)).

Here, Defendant knew or recklessly disregarded the truth or falsity of its statements about Plaintiff when it intentionally included Plaintiff in its Glossary and Report, implying that he was a dangerous and criminal extremist threat. Indeed, Defendant's agents extensively researched Mr. Sabal. Dkt. No. 40 at 8, 53, 55; *see* Pl. App. 54 at 40:4 (monitoring Mr. Sabal "two, three times a week"); Pl. App. 57 at 43:14–21 (using a 7-Eleven receipt to determine where Mr. Sabal lives). In fact, as far as ADL is concerned, it is the arbiter of who practices "extremism," not an unbiased third party. *See* Pl. App. 46 at 22:1–2. ("ADL determines that based on off our own research and analysis."). ADL did not rely upon neutral, unbiased, or third parties for its determination about Mr. Sabal. Instead, it made its own determination, which was incorrect and defamatory.

Defendant included Mr. Sabal in these reports based only on its research. But this research was fueled by its own predetermined narrative, and Defendant had obvious reason to doubt the veracity of such research, particularly that based on public information from sources that may be unreliable. Including Mr. Sabal, who has never been convicted of a crime, on an extremism watchlist with terrorists and mass shooters, implying that he is himself an extremist threat, is so inherently improbable that only a reckless person would have put that into circulation based on what ADL knew at the time. Finally, Defendant purposefully avoided any

information that would have shown that its statements were false, showing its ill-will and actual malice in publication.

While Mr. Sabal has admitted some of the material he forwarded *may be seen as* controversial, Defendant has presented no proper support for its allegations he is an anti-Semite, he personally expressed or endorsed antisemitic views, or that he is a dangerous extremist or potentially a criminal. Dkt. No. 40 at 11–12, 16, 18–20. The reckless inclusion of Mr. Sabal on Defendant's extremist watchlist, combined with the ideological ill will toward Mr. Sabal and his beliefs, evinces a genuine issue of material fact as to actual malice to be determined by a jury.

While the Supreme Court has determined that a finding of ill will does not automatically meet the test of actual malice, it is supportive of such a finding. *See Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997) ("Proof that a defendant spoke out of dislike, or with ill will towards another, also does not automatically meet the test of actual malice, even if his statements are shown to be false.") (citing *Garrison v. Louisiana,* 379 U.S. 64, 73 (1964)). Further, federal courts recognize the cumulation theory to prove actual malice using ill will. *Fairfax v. CBS Broadcasting Inc.*, 534 F. Supp. 3d 581, 595 (E.D. Va. 2020); *see Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) (en banc); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact."); *see also*

*Tavoulareas,* 817 F.2d at 789 (D.C. Cir. 1987) ("[A] plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence.").

Here, Defendant made incredible and malicious allegations with the capacity to cause irreparable and severe damage to reputations.[3] Only a reckless person would have published these statements online for anyone to see without being sure these statements and implications about Mr. Sabal are actually true. In essence, this case and this issue boil down to the fact that Mr. Sabal holds ideas that are different from the ones Defendant prefers, and, therefore, Defendant asserts it can label Mr. Sabal a dangerous extremist and anti-Semite. Defendant even admits that it seeks to deplatform individuals like Mr. Sabal who are affiliated with QAnon because it considers them radical. *See* Pl. App. 63 at 59:10–13.

Defendant's ill will towards Plaintiff is further evinced by its attempts to frame the instant dispute through its own preferred lens. Essentially, Mr. Sabal is an "extremist" because Defendant and its "researchers" say so. Defendant props itself up as an authority on what is antisemitic, padding its assertions by noting that a given subject "has its own entry in the Glossary of Extremism." Dkt. No. 40 at 11–13, 18, 20 ("This 'Fake Jews' trope even has its own entry in the Glossary of Extremism.") In doing so, Defendant forgets one of the primary reasons it is in this litigation is because

---

[3] Defendant incredibly claims that inclusion on the COE's Glossary of Extremism and Hate is not damaging to a person's reputation. Pl. App. 80 at 94:3-12. A jury should be given the opportunity to judge the veracity of such an incredible and factually unsupported allegation.

31

it recklessly defamed Plaintiff Sabal in the very "Glossary" it props up as an authority on other issues. Such an argument is incredible and self-serving.

Moreover, ADL concedes in its motion that, when publishing its "backgrounder," "McCarthy and others at COE also *believe* that some of the beliefs common to many QAnon followers *resemble* antisemitic tropes." ECF No. 40 at 33 (emphasis added). This does not grant ADL the right to then implicate Mr. Sabal with "some extremely antisemitic imagery" and as a peddler of "antisemitism". As to extremism, in its Motion, Defendant utilizes its own definition of the word "extremism" rather than using trusted, credible dictionaries. Dkt. No. 40 at 30 ("COE's definition of "extremism" is in the Glossary of Extremism). Ironically, it describes "extremism," in part, as "political belief systems that exist substantially outside of belief systems more broadly accepted in society (*i.e.*, "mainstream" beliefs)," blind to the fact that ADL itself arguably possesses such belief systems to the extent its categorizations disagree with the belief systems broadly accepted by society. *Id.* In fact, ADL devotes an entire page to expressing its view of what is and who are "extremists" and "hateful." *Id.* ("ADL thus follows and writes about movements and individuals who advocate beliefs that ADL considers to be extremist and/or hateful."). But what Defendant chooses to believe as "true" may be far different from what the jury determines the facts to be. *See Atlas Roofing Company, Inc. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 458 (1977) ("it is apparent from the history of jury trial in civil matters that factfinding . . . is the essential function of the jury in civil cases"). Defendant seeks to take the jury's role as factfinder,

asserting that its "Glossary" definitions are facts in this litigation. Only the jury gets to decide what is "antisemitic" or "extremist" or "hateful." *Id.*

Defendant's self-serving arguments extend to its claims of investigation. Defendant claims it investigated, and has no reason to doubt its investigation results, either at the time it published these statements nor now. Dkt. No. 40 at 53. Now that ADL finds itself defending a serious defamation charge, it conveniently asserts that its "researchers," like Katie McCarthy and Marilyn Mayo, didn't "believe" or "didn't intend" to smear Mr. Sabal with the false labels they branded him with. *Id.* at 7, 34, 36–37 ("ADL did not intend to imply, and does not believe it did imply, that Sabal was a terrorist, mass murderer, or a criminal."). Suddenly, Sabal's inclusion in the "Hate in the Lone Star State" report was not intended to imply that Sabal was a criminal. Rather, ADL now claims, in conclusory fashion, it only included him "because it believes the extremist ideas he promotes can induce violence by others." *Id.* at 37. Again, Defendant seeks to supplant the Court and Jury's roles in interpreting the reasonable meaning of its publications.

In *St. Amant*, the Supreme Court expressly cautioned that a "defendant in a defamation action brought by a public official cannot, however, automatically ensure a favorable verdict by testifying that he published with a belief that the statements were true." *Id.* Indeed, the *St. Amant* Court warned that professions of good faith will not always carry the day where there is other evidence of actual malice. *See id.* Therefore, "[t]he finder of fact must determine whether the publication was indeed made in good faith." *Id.*

Because Defendant's investigation was carried out solely by its own personnel, who have the same inherent bias as the organization as a whole, and worked from definitions that are not publicly supported, they had obvious reason to doubt the integrity of the investigation and the veracity of its statements about Plaintiff.

In addition, Defendant's inclusion of Plaintiff in each publication creates defamatory implications when viewed in context. *See* Dkt. No. 35 at 8–11 (Backgrounder), 11–13 (Glossary of Extremism), and 13 (Lone Star Report). These reports, based on the context of the reports themselves, show different definitions of extremism, hate, and antisemitism that a reasonable juror could find that Plaintiff possesses these similar qualities.

Only a reckless individual or organization would have put these statements into circulation, accusing an individual of such horrendous conduct based on its own internal definition and investigation. Indeed, Defendant's argument that they did not intend to provide the contextual meaning to Plaintiff is incredible, but it, regardless, is an issue of credibility for a jury. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002) (courts "focus[] the analysis on a statement's verifiability and the entire context in which it was made."; *see* Dkt. No. 35 at 9, 12 ("To accept Defendant's argument that a reasonable viewer would not attribute the blood libel conspiracy to Sabal would require the Court to ignore illustrative context in the Backgrounder . . . In the full context of the Glossary, it was plausibly defamatory to call Sabal an extremist by including him alongside obviously dangerous terrorists and mass murderers").

34

In ADL's view, conspiracy theories are a particularly dangerous form of extremist ideology. Def. App. 1811–12, Reaves ¶ 10, while "conspiracy theories . . *usually inspires* believers to take action against them." *Id.* Moreover, antisemitism is a "*prime example*," embracing conspiracies about or stereotypes of Jews to blame them for society's ills. Def. App. 1812, Reaves ¶ 11. Therefore, Defendant argues that its statements about Plaintiff are acceptable. Despite Defendant's protests, this is an admission that Defendant intended to accuse Plaintiff of being a dangerous extremist just like others in these reports. This is, therefore, an issue for the jury to resolve.

In essence, Defendant failed to investigate at all by relying on its own internal beliefs and definitions. At the least, it failed to investigate its claims fully and adequately. Although courts have found that failure to investigate alone will not support a finding of actual malice, the purposeful avoidance of the truth is in a different category. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989); *see also St. Amant*, 390 U.S., at 731, 733.

In *Connaughton*, the D.C. Circuit found that a newspaper's deliberate decision to avoid information that might have proven the story false was relevant to the issue of actual malice. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509–10 (D.C. Cir. 1996) (citing *Connaughton*, 491 U.S. at 692). The defendant newspaper relied upon a single source to accuse a candidate for public office of using "dirty tricks" to influence a grand jury investigation so as to cast doubt upon his opponent. Further, the newspaper failed to review audiotapes and speak with other witnesses that would have shown that their article was false. *Connaughton*, 491 U.S. at 682–83. The

Supreme Court found this purposeful avoidance of the truth supported a finding of actual malice because it was "likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *McFarlane*, 91 F.3d at 1509–10 (D.C. Cir. 1996) (discussing the Connaughton decision).

Here, it is apparent from the record that Defendants made no effort to acquire full knowledge or seek out sources that might have opposed its viewpoint despite the knowledge being readily available. Defendant decided on its narrative about Plaintiff, and it never looked back, despite the fact Plaintiff merely shared or forwarded the opinions of others on his Telegram channel. One example by McCarthy is particularly instructive. When confronted with the fact that Mr. Sabal posted clarifying posts following his "military mutiny" post on Telegram, McCarthy simply refused to accept Mr. Sabal's actions, choosing instead to rely on her own preferred conception of Mr. Sabal's view. "He tried to clarify that what he was calling for was not violent. But I would disagree with that, because again, as I mentioned, I've never heard or seen throughout history a case in which . . ." *See* Pl. App. 51–52 at 34:25–35. That was after McCarthy proclaimed that Mr. Sabal's post "was in essence a coup." Pl. App. 51 at 34:20. Thus, in determining Mr. Sabal's inclusion in the "extremist" category, McCarthy willfully ignored Mr. Sabal and decided to hear what she wanted to hear. This, from one of the lead researchers for Defendant, is indicative of its entire process, resulting in avoidance of the truth to attempt to avoid liability.

36

Defendant concedes that, at best, Mr. Sabal forwarded or shared material on the Patriot Voice Telegram account that may fit the defamatory statements they made, but this does not provide a sufficient basis to assume that Mr. Sabal believes such statements, no matter how hard it attempts to convince the Court that he does. *See e.g.,* Pl. App. 11 at 35:2; Def. App. 22 at 36:22, 79 at 130:23, 94 at 148:19. In fact, Mr. Sabal repeatedly stated that he does not believe that forwarding content always indicates his belief or support for it. Pl. App. 14 at 154:5-6; Def. App. 97 at 156:22-23, 104 at 170:19-22. As evinced in Mr. Sabal's deposition, his opinions about the antisemitic value of any of the things he shared were repeatedly qualified with phrases like "could be seen as," "*I could see how* somebody would see it as antisemitic," "I could see how this post *could be construed* as antisemitic" Dkt. No. 40 at 10–11, 19–20 (emphasis added). And while Defendant labels the latter qualifier as a "concession," Mr. Sabal's actual language indicates that while he doesn't agree with Defendant's contention, he recognizes that others may. *Id.* This is not a concession. Ultimately, the best that ADL can muster is accusing Mr. Sabal of "promoting" others' worldviews–but certainly not that Mr. Sabal definitively agrees with those views. Dkt. No. 40 at 19.

Further, there was no confusion about what Mr. Sabal posted himself or shared for his followers. ADL's "researchers," by their own admission, published content that goes through "multiple levels of review before publication," including by "Vice President of the COE" Oren Segal, or by Aryeh Tuchman, "Director at the COE," and finally by "a group of ADL executives." Dkt. No. 40 at 31. After that, the editorial

team produces a draft report, which is reviewed by Mr. Segal, and by the "Clearance group." ADL knew exactly what Mr. Sabal posted or forwarded when it published its defamatory content, and its multiple-tier review process failed to detect the defamatory meanings of its accusations or the flaws in its research.

Finally, McCarthy personally knew that Mr. Sabal had never committed a crime. McCarthy Depo 32:18. When confronted with that fact, she could only fall back on the familiar excuse that the "Glossary" includes people who "promoted extremist views." Pl. App. 49–50 at 32:24–33:1-2. Accordingly, ADL purposefully avoided the fact that Mr. Sabal did not personally state antisemitic beliefs or promote violent or criminal acts, and had not engaged in such acts himself, yet ADL published its false statements anyway. Through its own research, they should have known that what they were writing was slanted so deeply that any reasonable reader could not have known that Mr. Sabal did not actually state the beliefs that ADL positioned as "antisemitic" and "extremist". Dkt. No. 40 at 8, 53, 55. Therefore, Defendant acted with actual malice and negligence.

## II.     Defendant has failed to establish the affirmative defense of truth.

"In defamation suits brought by private individuals, truth is an affirmative defense." *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 383 (5th Cir. 2019) (citing *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995)); *see also Klocke v. Watson*, No. 22-10348, 2023 WL 2823060, at *5 (5th Cir. Apr. 7, 2023) ("Truth of the statement in the publication is an affirmative defense in defamation suits.") (citing TEX. CIV. PRAC. & REM. CODE § 73.005(a); *Warren v. Fed. Nat'l*

38

*Mortg. Ass'n*, 932 F.3d 378, 383 (5th Cir. 2019) ("In defamation suits brought by private individuals, truth is an affirmative defense.")). An affirmative defense places the burden on the party raising the defense to prove the defense. Therefore, on this motion, Defendant bears the burden of proving that the statements are true, and if they should be dismissed at this time. While falsity is an element of a defamation claim, Plaintiff only needs to show that there is a genuine issue of material fact as to the falsity of the statements. Defendant has not carried its burden because there is a genuine issue of material fact to be decided by a jury.

As an initial matter, Mr. Sabal noted that he forwards things from other people that he feels "resonates" with his "values and stance on things". Def. App. 20. This is not an admission that every post he has ever shared from someone else is something that he agrees with, and as he has testified—to which many can relate—once he learned that he had shared objectionable content, he removed it. *See* Def. App. 144 at 229:19–24. Indeed, Mr. Sabal testified that not all of the things he reposts are things that he necessarily agrees with. Def. App. 115 at 190:19–23; 132 at 213:17–20; 168 at 278:8–9.

It also does not mean that he resonates or agrees with Defendant's interpretation of things he has forwarded either. Defendant, however, tries to take the determination of what Mr. Sabal shared and his intent away from the proper factfinder, the jury, by asserting that it can interpret what Plaintiff's values and stances are from the forwarded material. This is simply not so, especially as it is the quintessential province of the jury.

While Defendant is correct that the required showing is only that the sting or gist of the defamation must be at least substantially true, it has not shown that anything true carries nearly the same sting as its statements, which infer that Mr. Sabal is an anti-Semite and a dangerous extremist or possibly a criminal. *See* Dkt. No. 40 at 32 (citing *Dolcefino v. Turner*, 987 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103 (Tex. 2000)). Utilizing the test whether the truth would be less damaging to Mr. Sabal than the defamatory statement, it is plain that it would be. *Id.* ("The test is whether a statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have (citing *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990)).

Here, Defendant has, at best, shown Mr. Sabal forwarded posts authored by others that may be seen as antisemitic. This is insufficient to cause the same sting to Mr. Sabal as statements that he peddles antisemitic beliefs or implying that he is a dangerous extremist, belonging on lists and reports that include terrorists and murderers. Indeed, the record shows Mr. Sabal has publicly denounced others for spreading antisemitism and stated that he would not tolerate antisemitism on his Telegram channel. Pl. App. 96 at 28:13–18. Additionally, he has removed posts when it was brought to his attention that they could be viewed as antisemitic. Def. App. 144 at 229:19-24. Further, he attends a pro-Israel church and contributes to pro-Israel causes. There is, therefore, a drastic difference in the sting from the truth— that Mr. Sabal forwarded some material that may be seen as antisemitic—and

Defendant's claims and implications that Mr. Sabal peddles in or espouses vile, antisemitic beliefs.

As to Defendant's statements that Mr. Sabal is a dangerous extremist, and as to his inclusion in the Glossary and the Report, this obviously exposes Mr. Sabal to considerably more sting than the truth, which is simply that he followed the QAnon movement and subscribes to some QAnon-related beliefs, which, as Defendant admitted, is not inherently extremist. Pl. App. 80–81 at 94:21–95:2. Instead, Defendant has openly alleged Mr. Sabal is dangerous and possibly violent, which he is not. If he were, then Defendant itself would not have communicated to the Irving Police Department in private that Mr. Sabal was not a threat. *See* Pl. App. 59–60 at 49:12–50:25. The transcripts also make clear that for purposes of the Backgrounder, Mr. Sabal did not "espouse" blood libel. Instead, he shared one singular post to expose "wickedness" in general, not about any singular religion. Dkt. No. 40 at 4 (citing Def. App. 0124:16-0125:19; 0126:16-19). The Backgrounder pairs Mr. Sabal with QAnon poster GhostEzra, someone that Mr. Sabal has explicitly denounced for his antisemitic posts. Pl. App. 53 at 37:14–16. Therefore, there is at least a genuine issue of material fact as to the truth or falsity of the statements.

## III.   ADL's statements are not simply opinion and are actionable.

To be defamatory, statements must assert an objectively verifiable assertion of fact rather than an opinion. *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 529 (W.D. Tex. 2021). As such, a statement is either fact or opinion based on its verifiability and the entire context of the statement. *Id.* Whether a statement is false

and defamatory "depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). The same is true when determining whether a publication is actionable. *Id.* While determining whether statements are capable of being actionable is an initial question for the court, if the statements are "of ambiguous or doubtful import, the jury must determine its meaning." *Turner*, 38 S.W.3d at 114. The determination turns on whether the statement can be objectively verified. *Morris v. Blanchette*, 181 S.W.3d 422, 424 (Tex. App. 2005).

Looking at each statement in turn, as discussed above, each is still provably false after discovery has concluded and, therefore, not opinion. In sum, Defendant presented only minimal argument on this issue, none of which addresses or overcomes the force of this Court's opinion on its motion to dismiss, where the Court ably explained that in the proper context each statement is properly verifiable and not opinion.

As to the Backgrounder, this Court found the context created by Defendant's choice of structure and language rendered the statement regarding antisemitic beliefs not opinion. *See* Dkt. No. 35 at 9–10. This still holds true, and Defendant presents no persuasive arguments to the contrary.

As to the Glossary of Extremism, this Court found, "combined with the mission statement, the Glossary's context appears [to] convey factual assertions about

42

persons with Glossary entries rather than mere opinion." *See id.* at 11. Discovery has borne this conclusion out.

While Defendant has attempted to profess good faith and that it did not intend to paint all the individuals and entities included in the list with the same brush, this is betrayed by its own statements about Mr. Sabal and conspiracy theories. In ADL's view, conspiracy theories are a particularly dangerous form of extremist ideology. Def. App. 1811-12, Reaves ¶ 10, while "conspiracy theories . . . *usually inspires* believers to take action against them." *Id.* Moreover, antisemitism is a "*prime example*," embracing conspiracies about or stereotypes of Jews to blame them for society's ills. Def. App. 1812, Reaves ¶ 11. Therefore, far from being ashamed about accusing Mr. Sabal of being an extremist, dangerous, or an anti-Semite, Defendant actually believes that he, and others that promote certain beliefs—that they label conspiracy theories—are dangerous and belong on these lists with terrorists and mass shooters. The same goes for the Lone Star Report. Contrary to supporting its arguments as to opinion, this conclusively demonstrates that they intended the interpretation the Court ably found previously.

## IV.    Plaintiff's claims are not time-barred.

Defendant's sole argument that Mr. Sabal's claims regarding the Glossary are time-barred is a 2012 Third Circuit case. This is unpersuasive. While Defendant first published Mr. Sabal in the Glossary in January 2022, it republished the hyperlink to Mr. Sabal's Glossary entry in the Report within the statute of limitations.

As a court from within this Circuit and a Texas court found in 2012, whether the inclusion of a hyperlink to a statement otherwise outside of the statute of limitations constitutes a republication comes down to whether the new matter reaches a new audience. *Wiswell v. Verticalscope, Inc.*, 2011 WL 13324271, at *3 (W.D. Tex. Oct. 3, 2011). In *Wiswell*, the defendant made a similar argument as Defendant does here, that posting a hyperlink in a later publication cannot constitute a republication. *Id.* The court rejected that argument, likening it to when a hardback book is republished in a paperback form; this constitutes a republication because the paperback is cheaper, and, therefore, reaches a different market and audience. *Id.* Ultimately, when the case proceeded to summary judgment, the court found it was a question of fact for the jury as to whether the new publication containing the hyperlink reached a new audience, thereby becoming a republication. *Wiswell v. Verticalscope, Inc.*, 2012 WL 13136295, at *4 (W.D. Tex. Aug. 1, 2012).

Similarly, here, this is a question best left for the jury. The purpose of the Report was to reach a Texas-based audience, and as Defendant testified, such Reports are often given to law enforcement agencies. *See* Pl. App. 44 at 18:18-20; Pl. App. 59–60 at 49:2-50:25; Pl. App. 75–76 at 86:23-87:5. Thus, this would constitute a new audience from the Glossary, which is to expose "threats" to the general public at large. McCarthy 17:12-18:1. At the very least, it is a jury question as to whether the specific audience of the Report would constitute a new audience.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests the Court deny Defendant's motion for summary judgment.

Dated: July 31, 2024                    Respectfully submitted,

                                        */s/ Jason C. Greaves*
                                        Jason C. Greaves, TBN 24124953
                                        Jared J. Roberts (*pro hac vice*)
                                        BINNALL LAW GROUP
                                        717 King Street, Suite 200
                                        Alexandria, Virginia 22314
                                        (703) 888-1943
                                        Fax: (703) 888-1930
                                        jason@binnall.com
                                        jared@binnall.com

                                        Paul M. Davis
                                        PAUL M. DAVIS & ASSOCIATES PC
                                        9355 John W Elliott Dr
                                        Suite 25454
                                        Frisco, TX 75033
                                        (945) 348-7884
                                        paul@fireduptxlawyer.com

                                        *Attorneys for John Sabal*

## CERTIFICATE OF SERVICE

I certify that on July 31, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Jason C. Greaves*
Jason C. Greaves, TBN 24124953

46