# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOHN SABAL,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:23-CV-01002-O** |
| | § | |
| **ANTI-DEFAMATION LEAGUE,** | § | |
| | § | |
| *Defendant*. | § | |

## DEFENDANT ANTI-DEFAMATION LEAGUE'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102
817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

Nathan Siegel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:     (202) 973-4499
nathansiegel@dwt.com

Katherine M. Bolger (admitted *pro hac vice*)
Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
Fax:     (212) 489-8340
katebolger@dwt.com
jessefeitel@dwt.com

*Attorneys for Defendant*
*Anti-Defamation League*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

RESPONSE TO STATEMENT OF FACTS .......................................................... 3

ARGUMENT ......................................................................................................... 4

    I.    THE CHALLENGED STATEMENTS ARE NOT ACTIONABLE BECAUSE THEY ARE SUBSTANTIALLY TRUE, OR NON-ACTIONABLE OPINION, AND/OR NOT ACTIONABLE ON OTHER BASES ................................. 4

        A.    ADL Backgrounder ............................................................................ 4

            1.    The Backgrounder is Either Nonactionable Opinion or is not Materially False ................................................................... 4

        B.    The Backgrounder Statements Are Non-Actionable Opinion ........... 4

            1.    Alternatively, Plaintiff Fails to Establish a Genuine Issue that the Backgrounder Statements Are Materially False ................................... 5

            2.    Plaintiff's Claims Challenging the Glossary of Extremism Are Not Actionable ...................................................................... 8

                a.    The Glossary Entry Does Not Imply Plaintiff Is a Terrorist or Mass Murderer ........................................ 8

                b.    Plaintiff Personally Advocated Criminal Conduct, and this Court May Infer that He Committed Crimes on January 6th ............................................................. 9

                c.    Plaintiff's Claim Challenging the Glossary Is Time-Barred ...................................................................... 10

        C.    Texas Report .................................................................................... 11

    II.    THE APPLICABLE FAULT STANDARD IS ACTUAL MALICE ........................ 11

        A.    Plaintiff is a Limited Purpose Public Figure .................................. 11

            1.    There is a Public Controversy over QAnon ......................... 12

            2.    Plaintiff Has Had More than a Trivial or Tangential Role in the Controversy .................................................................. 14

            3.    The Allegedly Defamatory Statements Are Germane to the Controversy .................................................................... 15

        B.    Plaintiff Seeks Only Presumed Damages ....................................... 17

    III.    PLAINTIFF HAS NOT PROVIDED ANY POTENTIALLY CLEAR AND CONVINCING EVIDENCE THAT ADL ACTED WITH ACTUAL MALICE ...... 18

CONCLUSION .................................................................................................... 25

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................................19

*Arpaio v. Robillard*,
    459 F. Supp. 3d 62 (D.D.C. 2020) .......................................................................23

*Ayers v. Peterson*,
    130 F. App'x 666 (5th Cir. 2005) ...........................................................................6

*Baumgart v. Archer*,
    581 S.W.3d 819 (Tex. App. – Houston [1st Dist.] 2019, pet. denied) ...................18

*Blankenship v. NBCUniversal, LLC*,
    60 F.4th 744 (4th Cir.), *cert. denied*, 144 S. Ct. 5 (2023) ......................................23

*Bostic v. Daily Dot, LLC*,
    2023 WL 2317789 (W.D. Tex. Mar. 1, 2023) ...............................................16, 17

*Cheng v. Neumann*,
    51 F.4th 438 (1st Cir. 2022) ..............................................................................5, 18

*Dallas Morning News, Inc. v. Tatum*,
    554 S.W.3d 614 (Tex. 2018) ...................................................................................8

*Dershowitz v. Cable News Network, Inc.*,
    541 F. Supp. 3d 1354 (S.D. Fla. 2021) ..................................................................23

*Dershowitz v. Cable News Network, Inc.*,
    668 F. Supp. 3d 1278 (S.D. Fla. 2023) ..................................................................23

*Dolcefino v. Turner*,
    987 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1998) .....................................23

*Elliott v. Donegan*,
    469 F. Supp. 3d 40 (E.D.N.Y. 2020) .....................................................................13

*Foster v. Laredo Newspapers, Inc.*,
    541 S.W.2d 809 (Tex. 1976) ..................................................................................19

*Franchini v. Bangor Publ'g Co., Inc.*,
    19 F.4th 13 (1st Cir. 2024) .....................................................................................13

*Freedom Newspapers of Tex. v. Cantu*,
    168 S.W.3d 847 (Tex. 2005)....................................................................21

*Golden Bear Distrib. Systems of Tex., Inc. v. Chase Revel, Inc.*,
    708 F.2d 944 (5th Cir. 1983) ..................................................................13

*Harte-Hanks Comm'ns v. Connaughton*,
    491 U.S. 657 (1989)................................................................................21

*Harter v. RealPage, Inc.*,
    218 F. Supp. 3d 535 (E.D. Tex. 2016)....................................................19

*Huckabee v. Time Warner Entm't Co. L.P.*,
    19 S.W.3d 413 (Tex. 2000)......................................................................22

*Immanuel v. Cable News Network, Inc.*,
    618 F. Supp. 3d 557 (S.D. Tex. 2022), *appeal dismissed,* 2022 WL 18912180
    (5th Cir. Sept. 27, 2022)..........................................................................23

*Jones v. BuzzFeed, Inc.*,
    591 F. Supp. 3d 1127 (N.D. Ala. 2022) ..................................................23

*Klentzman v. Brady*,
    312 S.W.3d 886 (Tex. App. Houston [1st Dist.], no pet. 2009) ..............16

*Langiano v. City of Fort Worth, Tex.*,
    2022 WL 6813630 (N.D. Tex. Sept. 10, 2022)........................................10

*Lokhova v. Halper*,
    995 F.3d 134 (4th Cir. 2021) .............................................................10, 11

*Nat'l Rifle Ass'n of Am. v. Ackerman McQueen Inc.*,
    2021 WL 3618113 (N.D. Tex. Aug. 16, 2021).........................................15

*Planet Aid, Inc. v. Reveal*,
    44 F.4th 918 (9th Cir. 2022) ...................................................................13

*Prince v. Intercept*,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022)......................................................13

*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ....................................................................9

*Salyer v. S. Poverty L. Ctr., Inc.*,
    701 F. Supp. 2d 912 (W.D. Ky. 2009) .....................................................10

*Scott v. Cleveland City of Tex.*,
    2010 WL 11527432 (E.D. Tex. Aug. 6, 2010) ...........................................4

*Snead v. Redland Aggregates Ltd.*,
    998 F.2d 1325 (5th Cir. 1993) ................................................................18

*Snyder v. Phelps*,
    562 U.S. 443 (2011)................................................................................18

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)................................................................................20

*Trotter v. Jack Anderson Enterprises*,
    818 F.2d 431 (5th Cir. 1987) ...........................................................14, 15

*Turner v. KTRK Television, Inc.*,
    38 S.W. 3d 103 (Tex. 2000)................................................19, 23, 24

*Vore v. Colonial Manor Nursing Ctr.*,
    2004 WL 2348229 (N.D. Tex. Oct. 19, 2004) .....................................25

*Waldbaum v. Fairchild*,
    627 F.2d 1287 (D.C. Cir. 1980) ............................................................12

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019) .............................................4, 20, 21, 22

*WFAA-TV, Inc. v. McLemore*,
    978 S.W.2d 568 (Tex. 1998).............................................13, 14, 15

*Wiswell v. VerticalScope, Inc.*,
    2012 WL 13136295 (W.D. Tex. Aug. 1, 2012) .............................10, 11

**Other Authorities**

Fed. R. Civ. P. 56........................................................................................1

https://www.merriam-webster.com/dictionary/
    "glossary" definition ............................................................................9
    "peddle" definition...............................................................................4

Local Rule 56.5 ...........................................................................................1

U.S. Const.,
    amend. I...............................................................................................23
    amend. V ..............................................................................................10

Defendant Anti-Defamation League ("ADL") files this Reply Brief in support of its Motion for Summary Judgment in accordance with Fed. R. Civ. P. 56 and Local Rule 56.5.

## PRELIMINARY STATEMENT

When Plaintiff filed this lawsuit, his Complaint baldly claimed that ADL had "no basis to claim that Mr. Sabal has ever espoused [the blood libel] or any other antisemitic belief". Dkt. 1 ¶ 9. Plaintiff also alleged that it was "a lie and smear" for ADL to suggest that he believes there is "a global cabal of pedophiles (including Democrats) who are kidnapping children for their blood" *Id.* ¶ 13. He also alleged that "Defendant convinced PayPal to cancel its payment processing services with Mr. Sabal" and based a cause of action, injurious falsehood, on that claim. *Id.* ¶ 15.

In response to ADL's motion to dismiss, Plaintiff doubled-down. He claimed ADL "fabricated these lies" that were "based on nothing", all because of his "conservative beliefs." Dkt. 26 at 1, 2. He declared that he "never promoted" any belief about a global cabal of pedophiles. *Id.* at 9. He claimed that by including him in the Glossary of Extremism, ADL placed him on a "de facto terrorism watch list." *Id.* at 7. And most remarkably, he argued that he was not a limited-purpose public figure because "QAnon John" never had anything to do with QAnon. *See, e.g.*, *id.* at 14 ("While the subject of QAnon may be a public controversy—depending upon how you define it and in what context—Mr. Sabal and his events are not QAnon."); *Id.* at 16 ("For the reasons discussed, Mr. Sabal is not a limited-purpose public figure by virtue of his *non-existent* participation in QAnon.") (emphasis in the original).

Now that the facts have emerged, Plaintiff's summary judgment Opposition (Dkt. 59, "Opp.") sings a remarkably different tune. Mostly, Plaintiff's Opposition does not even attempt to respond to the undisputed facts about what he had alleged. He does not even mention, let alone address, his assertions regarding a global cabal of pedophiles. Nor does Plaintiff try to explain how

1

a supposed "de facto terrorism watch list" could include people like Kanye West, a Catholic prelate, prominent journalists, media personalities and academics.  He makes oblique references to PayPal, but does not even try to defend the injurious falsehood claim.

On the subject of antisemitism, Plaintiff essentially argues in the triple alternative.  He acknowledges that material he has distributed "could be seen as antisemitic", but plays coy as to whether he thinks any of it is antisemitic.  He suggests that he does not necessarily agree with the material he posts, but he never identifies any post with which he claims to disagree.  And he asserts that he removes material that is "objectionable", but points only to a single example where a journalist had already called him out.  None of those self-contradictory claims can mask the now indisputable fact that ADL's statements regarding antisemitism are either nonactionable opinions, or are not materially false.

With respect to whether he is a limited-purpose public figure, Plaintiff's position is now the opposite of what it was at the pleadings stage.  Given the undisputed facts about his public promotion of QAnon, he no longer contends that "Mr. Sabal and his events are not QAnon", nor does he maintain that his participation in QAnon was "non-existent".  Instead, even though all three ADL publications at issue are about QAnon, he now claims that the "subject of QAnon" has nothing to do with any public controversy relevant to this case.  But the reality is that Plaintiff correctly defined the limited public figure issue the first time – and now the facts make clear that he is one.

Finally, while the Complaint included boilerplate allegations of injury (Dkt. 1¶ 31), the record makes clear that Plaintiff may try to proceed only on a theory of presumed damages, which also requires proof of actual malice.  And Plaintiff has failed to meet his burden to create a genuine issue of fact on that element.  ADL respectfully requests that its motion for summary judgment be granted.

### RESPONSE TO STATEMENT OF FACTS

Throughout Plaintiff's Opposition there is a substantial disconnect between statements in his brief and what the "evidence" cited in support actually says.  Most of Plaintiff's factual arguments are addressed in the Argument section of this Reply, in connection with the legal issues they relate to.  Here, we present just a few examples of how the Opposition handles "evidence."

1.      "While Mr. Sabal has been known as QAnon John in the past, he began distancing himself from QAnon affiliation in 2021." Opp. 6, ¶ 10.  In his actual testimony, Plaintiff explained that he simply substituted the word "Q" for "QAnon", because that is what Q instructed followers to do.  Nothing else changed.  App. 0047:23-0050:20.[1]

2.      "Mr. Sabal merely used this name [QAnon John] because somebody gave it to him as a nickname and it stuck because it was catchy." Opp. 6, ¶ 10.  The Opposition cuts Plaintiff's actual testimony off, which says that he felt that "QAnon John" accurately captured his persona because "I was one of the progenitors I guess you could say of people who were sharing the Q drops, you know."  App. 0069:13-0070:3.

3.      "Mr. Sabal attempted to ensure that nothing on the TPV Telegram channel came across as hateful or antisemitic." Opp. 7, ¶ 13.  The cited testimony says nothing about ensuring anything.  To the contrary, the cited testimony concerns three examples of antisemitic content that have never been removed from the TPV Telegram channel.  One is a video shown at the Las Vegas conference that Plaintiff had previewed (App. 0115:19-23), another concerned a link to a Kanye West video that Plaintiff himself had posted (App. 0168:8-9) and a third concerned a video accusing the late Lord Jacob Rothschild of blood libel (App. 0132:17-20).

---

[1] "App" is a citation to Defendant's Appendix.  "Pl. App." is a citation to Plaintiff's Appendix.  Citations to deposition testimony are by Appendix page numbers and the transcript line on each Appendix page. Thus, "App. 0069:13-0070:3 means the cite begins at Defendant's Appendix page 0069 at the 13th line of the transcript on that page, and ends at line three of the transcript on Defendant's Appendix page 0070.

4.    "Eventually, TPV began operating a Telegram channel to share America First content." Opp. 7, ¶ 12.  The cited testimony says nothing about "America First" or the channel's content.  It is about who posts on that channel.  To the extent Plaintiff is trying to imply content on the channel does not concern QAnon, that is false.  *See* App. 0991; 1652; 1653; 1709-1715.

## ARGUMENT

I.    **THE CHALLENGED STATEMENTS ARE NOT ACTIONABLE BECAUSE THEY ARE SUBSTANTIALLY TRUE, OR NON-ACTIONABLE OPINION, AND/OR NOT ACTIONABLE ON OTHER BASES**

A.    <u>**ADL Backgrounder**</u>

1.    **The Backgrounder is Either Nonactionable Opinion or is not Materially False**

As a preliminary matter, Plaintiff's claim that "Defendant bears the burden of proving that the statements are true" (Opp. 39) gets the law backward.  As ADL explained in its Motion (*id.* 32-33), in "a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity."  *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 743 (5th Cir. 2019) (citation omitted) *See, e.g.*, *Scott v. Cleveland City of Tex.*, 2010 WL 11527432, at *6 (E.D. Tex. Aug. 6, 2010) (granting summary judgment because the plaintiff "has not demonstrated that there is a genuine issue of material fact as to . . . whether the content of the articles is false").

The statements at issue are that Plaintiff "has been known to peddle antisemitic beliefs", and implied that one of those beliefs is "that Jews murder Christian children for ritualistic purposes."  The word "peddle" means to distribute or disseminate.  *See* https://www.merriam-webster.com/dictionary/peddle?src=search-dict-box.  Plaintiff arguments merely reinforce why summary judgment is required on these statements, for either of two reasons.

B.    <u>**The Backgrounder Statements Are Non-Actionable Opinion**</u>

First, Plaintiff concedes that he has forwarded information that "may be seen as antisemitic."

Opp. 40.  That includes the blood libel post/video, and indeed Plaintiff does not dispute that post describes a classic blood libel.  App. 0035:20-0036:3; 0129:14-0130:8.  In fact, in at least some instances his testimony acknowledges that material he forwarded *was* antisemitic (App. 0511-0512; 0165:22-167:11).  In any event, since there is no dispute that Plaintiff distributed material that may be seen as expressing antisemitic beliefs, then whether he disseminated (or "peddled") such beliefs is a matter of opinion. *See Cheng v. Neumann*, 51 F.4th 438, 447 (1st Cir. 2022) (where plaintiff had "published articles . . . which in the opinions of others could be called 'anti-vaccine' and/or favorable to QAnon", those characterizations were nonactionable opinion).

Notably, Plaintiff misrepresents this Court's April 30 Order (Dkt. 35) as if it definitively decided "the statement regarding antisemitic beliefs [is] not opinion."  Opp. 42.  That is not so.  Rather, the Order noted that statements concerning antisemitism can sometimes be opinions, but "assuming the veracity of the Complaint's allegations, the Court determines that Sabal sufficiently pleads that the Backgrounder's published statements are provably false and carry defamatory impact."  Dkt. 35 at 11.  But the veracity of the Complaint's allegations has now been disproven.  Had the Complaint accurately pled that Plaintiff has distributed material expressing beliefs that "could be seen as antisemitic", this Court would have been presented with a different question.  Since that point is now conceded by Plaintiff summary judgment is warranted.

### 1.    Alternatively, Plaintiff Fails to Establish a Genuine Issue that the Backgrounder Statements Are Materially False

If not opinion, then summary judgment is warranted because Plaintiff fails to create a triable issue on the element of material falsity.  He asserts that while his posts could be seem as antisemitic, "this does not mean that he resonates or agrees with Defendant's interpretation of things he has forwarded either" (Opp. 39).  In other words, at least rhetorically Plaintiff appears to dispute that the contents of those posts are antisemitic.

This argument is at least consistent with Plaintiff testimony.  There, he repeatedly defended the truth of posts claiming that Jews are slaughtering gentile children to use their blood and flesh; that *The Protocols of the Elders of Zion* reflects an actual plan for world domination; that most Jews (Ashkenazi Jews) are fake Jews who are part of a child-sacrificing, Khazarian cabal headed by the Rothschilds; that many Jews are part of a "Synagogue of Satan", and other canards.  Indeed, the Opposition doubles down by pointing to Plaintiff testimony that he posted the blood libel video to expose "wickedness" (Opp. 41) and posted everything else to expose "bad acts" (Opp. 8, ¶ 16).  That confirms Plaintiff actually believes Jews are engaging in the wicked, bad acts described.

Put another way, Plaintiff appears to suggest that this Court should preside over a jury trial to decide whether blood libels and *The Protocols of the Elders of Zion* are antisemitic.  Opp. at 39.  But while Plaintiff largely stands by his posts, he does not (and cannot) offer any *evidence* that their contents are true, nor any evidence that the views they express are *not* antisemitic.  By contrast, ADL offered a wealth of testimony, prior publications, and even case law to establish those posts express classic antisemitic beliefs – a point that, in any event, should be subject to judicial notice.  *See, e.g.*, App. 0566-0570; 1833 at ¶ 10; *Ayers v. Peterson*, 130 F. App'x 666, 671-72 (5th Cir. 2005).  In fact, the only contribution Plaintiff makes to the record on this point is to include the report of ADL's expert, which sets out in more scholarly detail why materials Plaintiff distributed express antisemitic beliefs.  *See* Dkt. 60 ("Pl. App.") at 106-108, 115-122.  He offers no expert to dispute that.

Thus, there is no genuine dispute of fact that the beliefs Plaintiff has distributed are antisemitic, including the belief that Jews kill gentile children to use their blood.  Plaintiff offers a potpourri of additional, often self-contradictory arguments, but all are beside the point.  First, he claims that he does not necessarily agree with all material that he reposts.  Opp. 39.  The cited

testimony says nothing of the kind.  *See* Opp.  37 (citing App. 0022:22; 0079:23;00 94:19).  To the contrary, Plaintiff testified he only forwards material that he believes "resonates" with his "values and stance on things."  App. 0019:22-0020:7.  But even if that were not so, it would make no difference.  Plaintiff testified that he does agree with most of the posts at issue here, and the Opposition does not point to anything he posted with which he disagrees.  Indeed, the notion that Plaintiff would have forwarded memes about Jews killing gentile children to use their blood and flesh because he disagreed with them, without noting his disagreement, borders on the absurd.

Next, Plaintiff claims that he removed objectionable content when he learned about it.  Opp. 39, 40.  Here too, this argument is self-defeating.  The evidence Plaintiff cites shows that he only removed a single post, so this argument implies he found nothing objectional about all the other antisemitic ones.  The undisputed record also supports that conclusion.  Several of Plaintiff's posts were criticized as antisemitic.  App. 0316; 1022-26.  But far from removing them, he defended the posts and doubled down by repeating yet another antisemitic canard, that he knows the difference between "[Jewish] infiltrators and the REAL thing".  *Id.* 0316.

Moreover, the single instance to which the Opposition points is when Plaintiff removed a post promoting the film *Europa, The Last Battle*.  He claims the post was sent to him and he didn't watch the film, and he removed it after a reporter inquired about it.  Opp. 39 (citing App. 0144:19-24).  But when Plaintiff did watch some of the film's antisemitic content at his deposition, he agreed with it and acknowledged it was similar to material he has posted.  App. 0149:4-0151:19.

Finally, Plaintiff repeatedly points to the views of his church, as well as a few posts after this lawsuit was filed criticizing pro-Palestinian demonstrators.  Opp. 40.  But once again, this is beside the point.  What is at issue are the views Plaintiff peddled, not what his church preaches.  And even if that were not so, Plaintiff wholly ignores Pastor Golliday's unrebutted testimony that

7

Plaintiff's postings are antisemitic and inconsistent with the values of the Church.  App. 0538:9-0543:1; 0544:9-0549:21.[2]   The notion that a person's membership in a church negates the expression of their own views, including views contrary to those of the church, has no foundation in law or logic.

In short, if this Court considers the statements at issue in the Backgrounder to be statements of fact, Plaintiff cannot meet his burden to demonstrate those statements are materially false.  In fact, the record establishes that they are substantially true.

> **2.    Plaintiff's Claims Challenging the Glossary of Extremism Are Not Actionable**
>
> **a.    The Glossary Entry Does Not Imply Plaintiff Is a Terrorist or Mass Murderer**

The applicable legal standard for assessing the threshold element of defamatory meaning for a claim for defamation by implication is well-settled.  Plaintiff must make an "especially rigorous showing" of the publication's defamatory meaning" to survive summary judgment.  *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 633-34 (Tex. 2018).  Specifically, this requires Plaintiff to "prove that [his] alleged implication is the *principal* inference a reasonable reader or viewer will draw'" from his Glossary entry (*id.* at 629) (citation omitted) as well as "point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'"  *Id.* at 635 (citations omitted).

ADL's opening brief provided all the nearly 300 entries for individuals in the Glossary, as

---

[2] Plaintiff's disagreements with his church go far beyond what was reviewed by Pastor Golliday.  As one example of the church being pro-Israel, Plaintiff says that its lead pastor is a friend of Prime Minister Netanyahu. App. 0013:22-0014:1.  But Plaintiff is no friend of Netanyahu.  He has posted content suggesting that Netanyahu and his government were involved in the 9/11 attacks and that "Dancing Israelis" involved were caught celebrating. App. 0514-0515; 0517-0518.  He also thinks the Mossad secretly holds controlling positions of influence in U.S. politics and media ( App. 1833 at ¶12).  Other content he forwarded questions Israel's very legitimacy by claiming it was founded by fake "Khazarians", not real Jews.  App. 1078.

well as all entries relating to QAnon. That evidence demonstrates that, like Plaintiff's entry, most say nothing about criminal activity – let alone terrorism and mass murder – nor do they suggest ADL endorses anything beyond what each entry says. Dkt. 40 at 34-36. To the contrary, the Glossary contains numerous entries for journalists, academics, media personalities, religious prelates, and others such that it would be unreasonable to conclude that everyone included is a terrorist, or that ADL intends to imply they are. Indeed, viewed as a whole the Glossary is exactly what it purports to be – a "collection . . . of specialized terms with their meaning". *See* https://www.merriam-webster.com/dictionary/glossary (defining "glossary"). By their very nature, reference works like glossaries, dictionaries and encyclopedias do not imply that each entry is equivalent to all others.

Plaintiff's Opposition offers no response to the evidence about the Glossary's content. Instead, Plaintiff just repeatedly cites to this Court's decision, effectively treating it as if it were the law of the case. *See* Opp. 28, 32, 34, 42-43. But that is not so; this Court held merely that the Complaint "pleads sufficient facts at this stage" to conclude that Plaintiff's alleged defamatory implication "is plausible". Dkt. 32 at 12-13. But rather than evidence, Plaintiff simply offers repeated rhetorical references to "terrorists" or "mass murderers" (Opp. 1, 12, 26, 29, 33, 34, 40, 43). *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("[n]eedless to say, unsubstantiated assertions are not competent summary judgment evidence") (citation omitted). Thus, with the benefit of the full summary judgment record, the alleged implication fails to meet the rigorous standard Texas law requires.

### b.    Plaintiff Personally Advocated Criminal Conduct, and this Court May Infer that He Committed Crimes on January 6th.

Even if the Glossary could somehow be construed to imply and endorse an implication that Plaintiff engages in and/or advocates criminal conduct, summary judgment would be warranted. In

its Motion, ADL put forward evidence that Plaintiff has advocated such obviously criminal conduct as military mutiny and desertion, even using his *ex post* definition of those terms. *See* Dkt. 40 at 17, 37-38. Plaintiff also posted a photo of himself traveling to Washington, D.C. on January 3, 2021 to "#StopTheSteal" (App. 1317), but invoked the Fifth Amendment to all questions about January 6th, including whether he engaged in any violent or criminal activity on that day. Plaintiff offers no response, and thus this Court may draw an adverse inference that he did. *Langiano v. City of Fort Worth, Tex.*, 2022 WL 6813630, at *11 (N.D. Tex. Sept. 10, 2022) (O'Connor, J.). Summary judgment should be granted to ADL on the claim challenging the Glossary, because any implication that Plaintiff advocated and/or engaged in criminal conduct would be substantially true.

### c.    Plaintiff's Claim Challenging the Glossary Is Time-Barred

Plaintiff argues that the Glossary entry is not time-barred because the 2023 Texas Report linked to that entry. Opp. 44. He cites *Wiswell v. VerticalScope, Inc.*, 2012 WL 13136295 (W.D. Tex. Aug. 1, 2012) for the proposition that a hyperlink to a different publication can in some cases be a republication of the linked-to material. This argument fails for either of two reasons.

First, *Wiswell* is very much an outlier on whether a hyperlink can be a republication. The overwhelming view is that it cannot, especially where, as here, the linked-to publication is part of the same organization's website. *See, e.g.*, *Lokhova v. Halper*, 995 F.3d 134, 142-144 (4th Cir. 2021) (discussing cases). As *Lokhova* points out, hyperlinks are the digital equivalent of footnotes, which have never been considered republications. *Id.* at 143. Rather, republications are what the word's plain meaning suggests – actual new publications, not mere references to prior works. *See, e.g.*, *Salyer v. S. Poverty L. Ctr., Inc.*, 701 F. Supp. 2d 912, 917 (W.D. Ky. 2009) ("the hyperlink is simply a new means for accessing the referenced article. Making access to the referenced article easier does not appear to warrant a different conclusion from the analysis of a basic reference."). The mere fact that references on the internet may be more accessible does not support any principled

10

departure from the way the law has always treated source material.  *Lokhova*, 955 F.3d at 143.

But even if this Court were to follow *Wiswell*, it would make no difference.  Indeed, the Court need not even reach the republication question.  Plaintiff offers no response to the point that if the link in the Texas Report could be a republication, all that it would "republish" is the single Sabal Glossary entry web page - https://extremismterms.adl.org/glossary/john-sabal.  It does not link to, let alone republish, the entire Glossary.  And we know of no court that has ever suggested that a hyperlink could also republish material only accessible through downstream linking – if so, almost any single link would republish vast amounts of material.  But Plaintiff does not allege that his Glossary entry standing alone is defamatory.  Thus, even if republished, that Glossary entry fails to support a claim because standing alone it is not reasonably capable of a defamatory meaning.

### C.      Texas Report

The Opposition barely mentions the Texas Report, and where it does it largely just reiterates the allegations of the Complaint.  Opp. 12-13, 19.  ADL thus refers the Court to the applicable arguments in its opening brief.  Moreover, even if the Texas Report could be construed both to imply and endorse an implication about "criminal activity", such implication would be substantially true for the reasons discussed above with respect to the Glossary.

## II.      THE APPLICABLE FAULT STANDARD IS ACTUAL MALICE

Actual malice is the applicable fault standard for either or both of two reasons.  Plaintiff is a limited public figure, and he is proceeding on a claim of presumed damages.

### A.      Plaintiff is a Limited Purpose Public Figure

In the Opening, ADL explained that Plaintiff is a limited-purpose public figure because the Publications at issue were related to a public controversy over QAnon, in which he has had a more than trivial role.  ADL attached over 60 news articles, television programs, podcasts and other media from around the world discussing both the controversy over QAnon and Plaintiff's role in

it.[3]  ADL also attached excerpts from Plaintiff's deposition (and that of his partner) in which they explain the broad reach and impact of their political activity, both online and off.

In response, Plaintiff wholly ignores that record.  Instead, he rhetorically tries to posture this case as if it were about whether anyone who has a large social media following is a public figure. Opp. at 20.  However, all that is presented here is the narrow question of whether, when the applicable law is applied to this specific record, Plaintiff is a limited-purpose public figure.

### 1.  There is a Public Controversy over QAnon

In his opposition to ADL's motion to dismiss, Plaintiff correctly acknowledged that there is a public controversy over QAnon and that is the relevant controversy here, but denied he had any involvement with QAnon.  The summary judgment record reinforces the first point.  It shows multiple examples of robust public debate over QAnon, including supporters like Plaintiff who promote its common core beliefs and extol the patriotism of its followers; detractors who label it an extremist conspiracy theory; and politicians (including President Trump) who have weighed in along multiple points within that spectrum.  *See, e.g.*, App. 0240 at 21:16;  App. 0066:9-0068:15; Pl. App. 105 (noting that by 2019 QAnon was the subject of FBI warnings and Congressional testimony).  *See also Waldbaum v. Fairchild*, 627 F.2d 1287, 1297 (D.C. Cir. 1980) (a public controversy exists where "persons actually were discussing some specific question" and "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment").

In response, Plaintiff does a complete about-face from his prior position.  He now argues "[t]he controversy at issue … is not QAnon, but Mr. Sabal himself, and his beliefs and posts that are at issue in this controversy."  Opp. 19.  The law, however, is precisely the opposite.

---

[3] ADL's expert's report cites more books and articles about the controversy over QAnon.  Pl. App. 104.

For example, in *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998), a broadcast discussed the ATF raid of the Branch Davidian complex in Waco and hypothesized that the local media had some role in the raid's failure. The plaintiff was a journalist who alleged the broadcast defamed him by questioning his ethics. *Id.* at 570. The Court expressly rejected the assertion that the public controversy should be defined "as limited to 'McLemore's personal ethical standards as a journalist,'" i.e. the alleged defamatory implication. It held instead that "the public controversy at issue is the broader question of why the ATF agents failed to accomplish their mission." *Id.* at 572. *See also Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 928 n.4 (9th Cir. 2022) ("The preexisting public controversy need not be narrowly defined or limited to the exact factual contours of the alleged defamation."); *Prince v. Intercept*, 634 F. Supp. 3d 114, 136 (S.D.N.Y. 2022) ("However, the scope of a public controversy is not limited to the debate in the alleged defamatory document."); *Elliott v. Donegan*, 469 F. Supp. 3d 40, 50 (E.D.N.Y. 2020) (" A controversy is broader than only the statement or discussion contained in the allegedly defamatory document.").

In fact, no other rule makes sense because both the public controversy and the plaintiff's involvement in it must have started *before* the publication of the allegedly defamatory statements. *Golden Bear Distrib. Systems of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 952 (5th Cir. 1983) ("To achieve this status, the plaintiff must be involved in a public controversy before the defamatory statement is published."). *See also Franchini v. Bangor Publ'g Co., Inc.*, 19 F.4th 13, 32 (1st Cir. 2024) (The "only temporal requirement of this inquiry is that the public controversy predate the allegedly defamatory statement at issue."). In short, Plaintiff is simply wrong that the allegedly defamatory statements define the controversy.

Rather, the relevant controversy is the same one Plaintiff acknowledged at the pleadings stage, the robust controversy over QAnon. ADL's Publications all focus on QAnon, the issues

involved with it, and its impact on our country. Plaintiff is discussed entirely in that context, including his role as a "QAnon influencer", the organizer of "multiple QAnon-themed conferences", and as an example of how antisemitism has permeated the movement. Plaintiff's remaining arguments on the first prong of the public-figure test are thus irrelevant because they all proceed from the false premise that the specific statements at issue about Plaintiff define the public controversy. *See, e.g.*, Opp. 19, 20 (arguing ADL's statements about Plaintiff could not be a public controversy unless he was a general public figure); *Id.* at 21 (arguing ADL has not shown that Plaintiff's views were matters of public controversy); *Id.* at 22 (arguing "there is no support in the record for the claim that Mr. Sabal is dangerous or violent").

## 2. Plaintiff Has Had More than a Trivial or Tangential Role in the Controversy

For the second element of the *Trotter* test, Plaintiff's argument is the same circular one he makes with respect to the first element. He argues that he has not had a more than trivial role in any controversies over the topics of the allegedly defamatory statements, i.e., antisemitism and extremism. Opp. 23. Since those statements do not define the controversy, that argument fails.

Plaintiff also cites to *McLemore*'s three factors that Texas state courts consider when analyzing the second *Trotter* factor, but he never actually addresses those factors. Opp. 22. The Fifth Circuit has never adopted this analysis, and *Trotter* holds that media access is not a significant consideration. *Trotter v. Jack Anderson Enterprises*, 818 F.2d 431, 435-36 (5th Cir. 1987). In any event, the record shows that all three factors are satisfied.

First, Plaintiff sought publicity for his QAnon beliefs in an effort to influence public opinion – both in the mainstream media to bring a "positive outlook" to QAnon, (App. 0044:21-0045:22), and in numerous conservative media outlets. App. 0270; App. 0025:12-0026:21, 0029:10-0030:6). He organized conferences replete with QAnon iconography and influencers to

demonstrate that "The Plan is still moving forward" (App. 0270 at 20:33; 52:09; 1028), and extolled the international news coverage those conferences attracted. App. 0028:17-0029:5 ("We're like the only ones like written about in Forbes and AP and Reuters"). He reached hundreds of thousands more persons directly, through social media and by livestreaming his conferences. Far from being "tangential" to the public controversy over QAnon (Opp. 24), Plaintiff's public activity went to the heart of it.

Second, Plaintiff has access to the media. He has appeared numerous times in the media, had reporters who regularly followed his activities, and indeed has given multiple interviews specifically about his grievances against ADL starting months before this lawsuit was filed. *See, e.g.*, App. 0208-0237; 0240; 0244. Finally, Plaintiff has acknowledged that he "voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation." *McLemore*, 978 S.W.2d at 573 (cleaned up). *See, e.g.*, App. 0025:20-22 ("We often get targeted and hit pieces written by leftist journalists.").

### 3.    The Allegedly Defamatory Statements Are Germane to the Controversy

As for the third prong of the *Trotter* test, once again Plaintiff argues that the alleged defamatory statements are not germane to a public controversy because there was no public controversy about those statements. Opp. 24. As discussed above, this circular argument fails as a matter of law. All of ADL's statements about Plaintiff specifically relate to his activities as a "QAnon influencer".

Finally, the case law upon which the Opposition relies further shows that Plaintiff is a limited-purpose public figure. Plaintiff cites *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen Inc.*, 2021 WL 3618113 (N.D. Tex. Aug. 16, 2021), largely for the proposition that communications made by a plaintiff before the relevant controversy started are irrelevant. Opp. 18, 20, 23. Here, the first communications by Plaintiff in the record begin with the 2020 election, which is several

years after QAnon emerged in the public eye. *See, e.g.*, App. 0240; Pl. App. 104-05 (the QAnon "movement began in late October 2017" and citing FBI warnings about QAnon in May 2019).

Plaintiff also cites *Klentzman v. Brady,* 312 S.W.3d 886 (Tex. App. Houston [1st Dist.],  no pet. 2009) for the proposition that merely being involved in or associated with a matter of public interest does not automatically make a person a public figure.  Opp. 16-17.  That is so, but the facts of *Klentzman* make clear why this is not such a case.  In *Klentzman*, the plaintiff was the son of a chief deputy sheriff, and the media reported on allegations that the sheriff had taken improper actions to benefit his son. 312 S.W.3d at 892-93.  While the deputy sheriff had often been covered in the local media, no public controversy involved the son until the media started to report about his father's misconduct.  Nor had the son had taken steps to "influence the resolution of the issues involved" in the controversy.  *Id.* at 906-07.  Here, Plaintiff is analogous to the chief deputy sheriff, not the son.

By contrast, *Bostic v. Daily Dot, LLC*, 2023 WL 2317789 (W.D. Tex. Mar. 1, 2023), also discussed by Plaintiff (Opp. 18-19), presents a case very much like this one.  In *Bostic*, the plaintiff argued that a magazine defamed him by referring to him as a "Jan 6. Stop the Steal Organizer". The court found it unnecessary to precisely define the controversy, concluding that "it is self-explanatory that the validity of a national election is a matter of great public concern."  *Id.* at *5. Since the allegedly defamatory statements concerned the plaintiff's activities on Jan. 6, they were germane.  *Id.*  Finally, the Court concluded that Bostic played more than a trivial role in that controversy because:

> He has voluntarily and deliberately injected himself into the public spotlight regarding the election with the goal of influencing public discourse. Moreover, his role far exceeds that of a private individual. Bostic was not discussing election integrity with only friends and family. He was actively promoting documentaries at a major conservative news conference and posting about his activities to what he himself describes as a "relatively large number" of Twitter followers. … Bostic has

16

> repeatedly thrust himself into public debate in order to influence how people view
> the legitimacy of national elections. Under First Amendment and Texas law, these
> activities render him a limited-purpose public figure.

*Id.* at *6. Plaintiff's activities not only resemble those of Bostic, they reflect far more involvement in a controversy than Bostic was. Bostic attended CPAC to promote a documentary; Plaintiff created his own CPAC that promoted QAnon iconography and ideas. Bostic had about 55,000 Twitter followers; Plaintiff had hundreds of thousands and was a "progenitor" of QAnon. Bostic live-streamed himself at the Capitol; Plaintiff live-streamed numerous politicians and celebrities speaking from a conference podium. In short, Plaintiff is a limited public figure.

### B.   Plaintiff Seeks Only Presumed Damages

Regardless of whether Plaintiff is a limited public figure, the actual malice standard applies to his claims for the independent reason that he seeks and may only seek presumed damages.

Plaintiff briefly tries to argue that he has some actual damages, but the evidence he cites refutes that. Opp. 13. He cites his girlfriend's testimony to argue that "shortly after Defendant started defaming Mr. Sabal, [he] had his services canceled with payment processing companies such as PayPal and Total Systems". *Id.* ¶ 37. This claim, however, is unsupported by anything other than his girlfriend's speculation. Pl. App. 0022:1-20 ("I do *wonder* if one of those firms that ADL is partnering with is TSYS.") (emphasis added).

By contrast, the director of ADL's Center on Extremism testified that ADL had no communication about Plaintiff with PayPal, TYSY, or any other payment processing company. Dkt. 54, O. Segal Tr. 83:22-85:6. This claim is also specious on its face because Plaintiff's girlfriend testified that PayPal canceled Plaintiff in October 2021. Pl. App. 0022:1-20; *see also* App. 1164. ADL's first publication was in March 2022, so it could not possibly have influenced anything PayPal did six months earlier. Finally, the Opposition's only other claim of damage is Plaintiff counsel's rhetorical statement that "the reputational harm to Mr. Sabal has been immense",

unsupported by any cite to any evidence of any actual reputational harm.  Opp. 13, ¶ 37.  Moreover, as set forth in ADL's opening brief, Plaintiff testified he is relying solely on a claim of presumed damages.  Dkt. 40 at 45-46.

Nonetheless, Plaintiff argues that he need not prove actual malice because even if he is seeking presumed damages, this case does not involve speech on any matter of public concern.  *See Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1332-33 (5th Cir. 1993) (private figures must prove actual malice where the case involves speech on an issue of public concern).  The United States Supreme Court has explained that "[s]peech deals with matters of public concern when it can be 'fairly considered as relating to any matter of political, social or other concern to the community.'"  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted).  In *Snyder*, the Court held that picketing outside a private funeral of a gay soldier holding signs such as "God Hates Fags" was speech about a matter of public concern.  *Id.* at 454-56.

The ADL Publications were all speech about matters of public concern.  Regardless of one's point of view, QAnon, political extremism and antisemitism within a movement like QAnon are all matters of public concern.  *See, e.g.*, *Cheng*, 51 F.4th 438.  Moreover, even looking solely at the allegedly defamatory implication that Plaintiff is a dangerous criminal, that too would be a matter of public concern.  *See, e.g.*, *Baumgart v. Archer*, 581 S.W.3d 819, 826 (Tex. App. – Houston [1st Dist.] 2019, pet. denied) ("courts routinely hold that 'matters related to the reporting of crimes and related proceedings are matters of public concern.'") (citation and omitted).  Thus, Plaintiff must prove actual malice to recover presumed damages.

## III.    PLAINTIFF HAS NOT PROVIDED ANY POTENTIALLY CLEAR AND CONVINCING EVIDENCE THAT ADL ACTED WITH ACTUAL MALICE

What "actual malice" means in this case is simple.  Plaintiff would need to meet his heavy burden to provide "concrete" evidence that could lead a reasonable jury to find, clearly and

convincingly, that (1) when publishing the Backgrounder ADL entertained serious doubts that he ever peddled antisemitic beliefs, or the blood libel trope in particular, and/or (2) when publishing the Glossary and the Texas Report ADL actually intended to imply that he was a terrorist, murderer, and/or dangerous violent criminal. *Turner v. KTRK Television, Inc.*, 38 S.W. 3d 103, 120 (Tex. 2000). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Summary judgment is warranted because Plaintiff offers no such evidence – indeed, barely any evidence at all.[4]

Instead of evidence, the Opposition largely just lobs rhetorical insults at ADL and its employees. In the process, Plaintiff ends up *conceding* the absence of malice. He argues that "what Defendant chooses to believe as true may be far different from what the jury determines the facts to be". Opp. 32. But the essence of the doctrine is that if ADL believed its statements to be true, the case is over. *See Harter v. RealPage, Inc.*, 218 F. Supp 3d 535, 540 (E.D. Tex. 2016) (a plaintiff must prove the publisher 'entertained serious doubts as to the truth of his publication.'") (citation omitted). Whether a jury might disagree with ADL is irrelevant.

In an effort to respond succinctly, this Reply addresses what appears to ADL to be the principal categories of arguments the Opposition attempts to make in this regard.

ADL's Research. Plaintiff concedes that ADL "extensively researched" him. Opp. 29. But he then criticizes ADL for relying on its own research, claiming that it should have relied on "neutral, unbiased or third parties for its determination about Mr. Sabal", and should have also ignored its extensive research about all antisemitic tropes. *Id.*; Opp. 32. This is a curious argument,

---

[4] Plaintiff's defamation claim must be dismissed even if the actual malice standard did not apply. Under Texas law, to establish negligence Plaintiff must still prove that the ADL "knew or should have known that the defamatory statement[s were] false." *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976). ADL's publications were based on extensive factual research, and the organization employed a robust editorial process requiring multiple levels of review for any published article, including each of the challenged publications. In his Opposition, Plaintiff has not come forward with any record evidence to even suggest that ADL knew or should have known that any of its statements about him were false.

19

since defamation plaintiffs typically criticize defendants where they do *not* do their own research, or ignore their research. In any event, Plaintiff does not provide a shred of evidence as to what "third parties" he contends ADL should have consulted. In fact, ADL did find other media reports that drew similar conclusions about Plaintiff and antisemitism and extremism. *See, e.g.*, App. 1022-1025. Nor does Plaintiff point to any evidence that any of ADL's research or publications about antisemitic tropes are wrong. Even more remarkably, the Opposition asserts that ADL has provided no "proper support" for its allegations concerning Plaintiff and antisemitism. Opp. 30. While it is not ADL's obligation under the actual malice standard to provide "proper support", it would be difficult to imagine more clear and obvious evidence of antisemitic beliefs than this record contains. In short, no evidence supports any of Plaintiff's conclusory allegations about ADL's research. And even if there were, it is well-established that any failure to investigate does not establish actual malice. *See, e.g.*, *Walker*, 938 F.3d at 744.

Next, Plaintiff offers conclusory, verbatim recitations of language from *St. Amant v. Thompson*, 390 U.S. 727 (1968) of generic examples where actual malice may be found. Thus, he claims that ADL had "obvious reason to doubt the veracity of such research, particularly based on public information from sources that may be unreliable." Opp. 29. But Plaintiff does not point to any evidence of any supposedly "unreliable" sources. Moreover, this argument is particularly baffling because ADL's primary source was Plaintiff himself – his social media posts, media interviews, and statements at his conferences. His own posts and words could hardly have given ADL "obvious reasons" to doubt their content.

Similarly, Plaintiff contends that ADL "[p]urposefully avoided information that would have shown its statements were false," citing *Harte-Hanks Comm'ns v. Connaughton*, 491 U.S. 657 (1989). Opp. 29-30, 35. But here too, he points to no evidence of any information ADL supposedly

avoided. He also maintains that ADL "made no effort to seek out sources that might have opposed its viewpoint despite the knowledge being readily available". But again, he provides no evidence of any such "sources" or "knowledge" that was supposedly "available."

In fact, these types of conclusory allegations are insufficient to survive a motion to dismiss on the element of actual malice, let alone create a material issue of fact for summary judgment. *See, e.g.*, *Walker*, 938 F.3d at 744-45. And *Harte-Hanks* further demonstrates why no issue of fact is presented here. There, the Court concluded that there was a question of fact as to whether journalists had acted with actual malice because they chose to publish one source's view of the plaintiff, while declining to interview five other identified sources or listen to a tape recording that contradicted that view. 491 U.S. at 692. Here, Plaintiff provides no evidence of any such source that ADL ignored. Moreover, since the primary "source" for ADL's publications was his own words, the notion that ADL purposefully avoided anything defies logic.

Finally, the only actual evidence Plaintiff points to underscores why there is no clear and convincing evidence of actual malice. When he called for a "military mutiny" to remove President Biden, after receiving a storm of criticism he tried to qualify that by claiming he was not calling for "violence". Plaintiff argues that it was actual malice for ADL researcher Katie McCarthy to disbelieve him. Opp. 36. The premise of that argument seems to be that a defendant must accept the plaintiff's version of the "truth," and if it does not then there is a jury issue on actual malice. If that were so there would be a fact issue in virtually every defamation case, because by definition a defendant always disputes a plaintiff's version of events. But the law is to the contrary. *See Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) ("The mere fact that a defamation defendant knows that the public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations.");

*Walker*, 938 F.3d at 744-45 (claim that plaintiff "repeatedly and timely asked the" defendants "making defamatory statements to cease and desist from making such false statements [but they] failed to retract, correct, or clarify the statements" is insufficient to even plead actual malice).

Here, Ms. McCarthy explained exactly why she was skeptical about Plaintiff's after-the-fact efforts to qualify his statements. App. 1790:25-1791:5 ("He tried to clarify that what he was calling for was not violent. But I would disagree with that, because again, as I mentioned, I've never heard or seen throughout history a case in which members of the military would go in and forcibly remove a government leader and do so in a peaceful, nonviolent manner."). Not only is there no evidence that Ms. McCarthy doubted that conclusion, her view was widely shared, including even by Plaintiff's QAnon allies. *See* App. 982; 1215-1216; 1472-1474.

Alleged Ill Will. Plaintiff concedes that ill will does not equate with actual malice but argues that it could be one item of circumstantial evidence that, along with others, could contribute to a finding of malice. Opp. 30. The case Plaintiff cites on its face does not say that, and indeed Texas courts have generally rejected efforts to infer actual malice from ill will. *See Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 424-25 (Tex. 2000) (journalist's memo calling the plaintiff a "corrupt judge" "might suggest personal ill will towards [the judge] [but] nothing in either of these documents suggests that [the journalists] had any doubts about the truth of the broadcast.").

In any event, the only evidence Plaintiff points to suggests the opposite of ill will. Plaintiff points to testimony that ADL has sometimes supported deplatforming some persons affiliated with QAnon. Opp. 31. But the undisputed facts are that ADL has never tried to deplatform Plaintiff, either on social media or with any payment processors. Pl. App. 63:10-13; App. at 1860-61. If anything, that evidence suggests a lack of ill will towards Plaintiff personally, and it fails to adduce any evidence of actual malice.

Ideological Bias.  Plaintiff also asserts that ADL and all its employees have an "inherent bias".  Opp. 34.  Here too, Plaintiff points to no evidence, nor does he even explain what "bias" he is referring to.  In any event, it is well-settled that "Political motivation does not equate with knowing or reckless falsity"; *Dolcefino v. Turner*, 987 S.W.2d 100, 119 (Tex. App.—Houston [14th Dist.] 1998).[5]  Nor do allegations of a "preconceived narrative" suffice.  *Blankenship v. NBCUniversal, LLC,* 60 F.4th 744, 760 (4th Cir.), *cert. denied*, 144 S. Ct. 5 (2023) ("'Many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity.'") (citation omitted).

Judge Raag Singhal of the Southern District of Florida struck allegations of political bias when evaluating a motion to dismiss and aptly explained why they are so plainly inconsistent with the doctrine as long as it remains settled law.  *Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1370 (S.D. Fla. 2021) (a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions.").  Following discovery, on summary judgment Judge Singhal strongly criticized *Sullivan*, but granted summary judgment on the element of actual malice.  668 F. Supp. 3d 1278, 1290 (S.D. Fla. 2023).

ADL's Intent Regarding the Glossary and the Texas Report.  In its Opening Brief, ADL showed that with respect to claims for defamation by implication, the actual malice standard adds an additional inquiry.  *Turner*, 38 S.W.3d at 120 ("In this type of case, a public figure must present

---

[5] *See also Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 566-67 (S.D. Tex. 2022) ("Political bias does not equate to evidence of actual malice in statements made about a limited purpose public figure"), *appeal dismissed,* 2022 WL 18912180 (5th Cir. Sept. 27, 2022); *Dolcefino*, 987 S.W.2d at 119 ("a newspaper's motive in publishing a story cannot provide a sufficient basis for finding actual malice."); *Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020) ("Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment."); *Jones v. BuzzFeed, Inc.*, 591 F. Supp. 3d 1127, 1132 (N.D. Ala. 2022) (if bias was "the legal test for deciding defamation cases, the President could not appoint, and the Senate could not confirm, enough judges to the federal judiciary to handle all the litigation that would be filed in federal courts in this one area of the law alone.").

clear and convincing evidence that the defendant knew or strongly suspected that the publication as a whole could present a false and defamatory impression of events.").

In response, Plaintiff largely attempts to ignore this requirement. He argues that ADL knew he had no criminal record, and therefore it was inherently improbable to include him on a "list" that implies he is a criminal. Opp. 29, 30. But this puts the cart before the horse. For purposes of actual malice, the question is whether there is clear or convincing evidence that ADL knew (or strongly suspected) those Publications conveyed those alleged implications.

Here too Plaintiff offers rhetoric, not evidence. He mocks ADL's evidence as "convenient" and "self-serving", but offers nothing about why it is wrong. He points to *St. Amant*'s statement that "professions of good faith will not always carry the day", but ignores the second clause of that sentence – "where there is other evidence of actual malice." Opp. 33. Similarly, as *Turner* makes plain, a plaintiff cannot simply claim this element of actual malice raises a "credibility" issue. Opp. 34. Rather, the burden is on the plaintiff to point to clear and convincing evidence that the defendant's expression of its state of mind is false. *Turner*, 38 S.W.3d at 120.

The Opposition provides no such evidence. It points out that before Plaintiff's Dallas conference, the Irvine Police Department reached out to ADL to ask if it thought there were any law enforcement concerns raised by the upcoming conference. ADL responded that it did not have any concerns. App. 1797:11- 1798:12. That exchange merely confirms ADL's point that it never thought Plaintiff was a dangerous criminal, and never intended to imply to anyone that he was.

Finally, the Opposition strings together sentence fragments in the Declaration of Jessica Reaves to claim that Ms. Reaves "admitted" that ADL intended to accuse Plaintiff of being a dangerous criminal. Opp. 35. But the Declaration states the opposite. Ms. Reaves explained that ADL placed prominent, non-violent progenitors of conspiracy theories like Plaintiff in the Glossary

because the organization believes that conspiracy theories like QAnon can "inspire believers to take action against" others. App. 1811-1812 at ¶¶ 12-13, 16. Plaintiff is, of course, free to disagree with and condemn ADL's views that when non-violent persons like himself promote conspiracy theories like QAnon, they can inspire others to engage in violence. But that is a far cry from coming forward with clear and convincing evidence that Ms. Reaves disbelieves her sworn testimony. On that score, Plaintiff fails to identify a shred of evidence that ADL knew, intended, or strongly suspected it was implying that he is a dangerous criminal.[6]

In short, summary judgment is warranted on the element of actual malice.[7]

## CONCLUSION

For these reasons and for those described in its Motion, ADL respectfully requests that its Motion for Summary Judgment be granted.

Dated: August 14, 2024

/s/ Nathan Siegel
Nathan Siegel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street
Suite 500 East
Washington, DC 20005
Phone: (202) 973-4237
Fax:    (202) 973-4499
nathansiegel@dwt.com

---

[6] Rhetorically, Plaintiff also asserts that "it remains a question" as to why Plaintiff was included in the Glossary, when others such as General Flynn, Sidney Powell and Lin Wood were not. Opp. 11 ¶ 29. But there is no such question, because the evidence on that point is unrebutted. Ms. Reaves chose to include Plaintiff, as well as another QAnon influencer, because she viewed them as important leaders in the QAnon movement. App. 1812-13 at ¶ 14. Other names floated, like General Flynn, were popular within the movement but were not leaders, and were largely known for activities beyond QAnon. *Id.* at 1778; 1781 at ¶ 12. And most relevant here, this evidence, like everything else in the record, contains nothing suggesting that ADL included Plaintiff in any publication because it intended to imply he was a violent criminal.

[7] The Opposition does not address the tagalong claim for injurious falsehood, and it must therefore be dismissed. *See, e.g.*, *Vore v. Colonial Manor Nursing Ctr.*, 2004 WL 2348229, at *2 n.3 (N.D. Tex. Oct. 19, 2004) (granting summary judgment for defendant on claims where "Plaintiff tacitly concedes the[ Defendant's] arguments by failing to address them in his response").

Katherine M. Bolger (admitted *pro hac vice*)
Jesse Feitel (admitted *pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
Fax:    (212) 489-8340
katebolger@dwt.com
jessefeitel@dwt.com

Robert P. Latham State Bar No. 11975500
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
blatham@jw.com

Trevor Paul State Bar No. 24133388
**JACKSON WALKER LLP**
777 Main St., Suite 2100,
Fort Worth, Texas 76102
817.334.7200– Telephone
(214) 953-5822 – Facsimile
tpaul@jw.com

*Attorneys for Defendant Anti-Defamation League*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document has been served on all counsel of record, via the Court's CM/ECF system, in accordance with the Federal Rules of Civil Procedure, on this 14th day of August, 2024.

/s/ Nathan Siegel
Nathan Siegel